UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

KAREN HANDLIN, BRIAN HANDLIN, and MAXINE     )
FORTUNE,                                      )
                                             )
                                             )
              Plaintiffs,                     )
                                             )
         vs.                                  ) Case No.
                                             )
MURPHY PIERSON, MICHELLE MERCERI,            ) C08-1861-JCC
KATHERINE MERCERI, ALTERNATIVE INVESTORS,    )
INC. (a partnership), FOCUS MORTGAGE,        )
LLC, AZ-WA INVESTORS (a partnership),        )
RAINIER TITLE, LLC, GMAC MORTGAGE            )
CORPORATION, MARK MERCERI, JAMES             )
AYLESWORTH, SEAN "CASEY" JONES, and          )
MORTGAGECLOSE.COM, INC.,                     )
                                             )
                                             )
              Defendants.                     )
                                             )
SHAWN CASEY JONES,                            )
                                             )
              Third-Party Plaintiff,          )
                                             )
         vs.                                  )
                                             )
LENNIE MUELLER and AVISTA ESCROW             )
SERVICES, LLC,                                )
                                             )
              Third-Party Defendant.          )

---

DEPOSITION OF MAXINE FORTUNE
December 15, 2009
Seattle, Washington

Reported by:
Mary W. Miller, RPR, CRR, CCP
CCR No. 2653

## Page 2

```
1
2              APPEARANCES
3
4    For the Plaintiffs Karen and Brian Handlin:
5        ERIC DUNN
         Northwest Justice Project
         401 Second Avenue S.
6        Suite 407
         Seattle, Washington 98104
7        206-464-1519
         ericd@nwjustice.org
8
9    For the Defendants Jones and Aylesworth:
10       KARI BROTHERTON
         Ryan Swanson & Cleveland
11       1201 Third Avenue
         Suite 3400
12       Seattle, Washington 98101
         206-654-2278
13       brotherton@ryanlaw.com
14
15   For the Defendants Michelle Merceri and Focus Mortgage:
16       RUSSELL M. AOKI
         Aoki, Sakamoto, Grant
17       701 Pike Street
         Suite 1525
18       Seattle, Washington 98101
         206-624-1900
19       russ@aoki-sakamoto.com
20   For the Defendant GMAC:
21       DAVID A. WEIBEL
         Bishop, White & Marshall
22       720 Olive Way
         Suite 1301
23       Seattle, Washington 98101
         206-622-5306
24       dweibel@bwmlegal.com
25
```

## Page 3

```
1    For the Plaintiff Maxine Fortune:
2        HARISH BHARTI
         Law Offices of Harish Bharti & Associates
3        1718 NW 56th Street
         Seattle, Washington 98117
4        206-706-6400
         bharti@lawyer.com
5
6
     Also Present:
7
         KAREN HANDLIN
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1              EXAMINATION INDEX
2
3    EXAMINATION BY:              PAGE NO.
4
     MS. BROTHERTON                  5
5    MR. AOKI                       92
     MR. DUNN                       99
6    MS. BROTHERTON                103
     MR. AOKI                      106
7
              EXHIBIT INDEX
8
9    EXHIBIT NO.  DESCRIPTION            PAGE NO.
10   10  5-30-73 Prudential Borrower's Statement    54
11   11  5-30-73 Deed of Trust                 54
12   12  Second Amended Complaint              74
13   13  Verified Complaint                    76
14   14  First Amended Complaint               76
15   15  Plaintiff Fortune Interrogatories and Requests  79
         for Production
16
17
         WITNESS INSTRUCTED NOT TO ANSWER
18
         (None)
19
         INFORMATION REQUESTED
20
         (None)
21
22
23
24
25
```

## Page 5

```
1        BE IT REMEMBERED that on Tuesday, December 15,
2    2009, at 1201 Third Avenue, Seattle, Washington, at 1:30
3    p.m., before Mary W. Miller, Notary Public in and for the
4    State of Washington, appeared MAXINE FORTUNE, the witness
5    herein;
6        WHEREUPON, the following proceedings were had,
7    to wit:
8
9            <<<<<<  >>>>>>
10
11   MAXINE FORTUNE,      having been first duly sworn
12                   by the Notary, deposed and
13                   testified as follows:
14
15           EXAMINATION
16   BY MS. BROTHERTON:
17       Q.  Good afternoon, Ms. Fortune.  Again I'm Kari
18   Brotherton.  I represent Sean Casey Jones and James
19   Aylesworth, two defendants in this case.  At this time I'm
20   going to let everybody introduce themselves.
21       MR. AOKI:  I'm Russ Aoki.  I represent Michelle
22   Merceri and Focus Mortgage.
23       MR. WEIBEL:  My name is Dave Weibel and I
24   represent GMAC.
25       MR. DUNN:  Eric Dunn representing Karen and
```

Maxine Fortune 12/15/09

Page 6

1  Brian Handlin.
2       MR. BHARTI:  Harish Bharti representing
3  Ms. Fortune.
4  BY MS. BROTHERTON:
5       Q. I understand you did already watch the deposition of
6  Ms. Handlin, your daughter this morning.
7       A. Yes.
8       Q. And we will probably be going over some of the same
9  topics, documents throughout this deposition.  And so even
10 though we've already gone over that, I need to hear your
11 testimony as to those same things.  So even if you think
12 we've heard it before, we need to hear it from you today.
13      A. Okay.
14      Q. Have you been deposed before?
15      A. No.
16      Q. As I explained this morning, we have a court
17 reporter here recording our deposition, so we need to make
18 sure we're not talking over each other.  As I ask a question
19 you let me finish and then you go ahead and answer.  If
20 there's something you don't understand, just ask me.  I'll
21 either rephrase the question or we'll have the court
22 reporter read it back to us.
23      A. Okay.
24      Q. And if you need a break, just let us know.  I just
25 ask that it's not in the middle of a question and answer,

Page 7

1  and instead we wait until we finish the answer and then we
2  can take a break.  Is that okay?
3       A. Uh-huh.  Yes.
4       Q. Could you please state your name for the record?
5       A. Maxine J. Fortune.
6       Q. And what is your current address?
7       A. 7311 Coal Creek Parkway Southeast, apartment D102,
8  Newcastle, Washington 98059.
9       Q. And are you currently employed?
10      A. No, I'm retired.
11      Q. Retired, okay.  When did you retire?
12      A. I retired in 2007.
13      Q. And where did you retire from?
14      A. Barnes & Noble bookstore in Bellevue, downtown
15 Bellevue.
16      Q. How long had you been with them?
17      A. About 12 years.  No, 15 years.
18      Q. What did you do with them?
19      A. I was a bookseller and then I became a lead.  And I
20 was leading the children's department and I was the lead in
21 the, I guess the business department is what you'd call it.
22      Q. Okay.  Thank you.  The property that you live in you
23 noted it was an apartment.  So is it an apartment that you
24 own or you rent?
25      A. We rent.  My son and I.

Page 8

1       Q. So you live with your son?
2       A. Yes.
3       Q. And what is his name?
4       A. Michael E. Fortune.
5       Q. And how long have you been in the apartment?
6       A. A little over a year.  A year and two months about.
7       Q. And does Michael live there with you the whole time
8  as well?
9       A. Yes.
10      Q. And are you both responsible for the rent there?
11      A. Yes, the rent and the other bills.
12      Q. Okay.  Have you owned real estate before?
13      A. Well, the house.
14      Q. Property.
15      A. Actually two houses, if you want to count my husband
16 and I together.
17      Q. Okay.  And what is the first of those two houses?
18      A. It was a house in Newport Hills.  11654 Southeast
19 58th Street.  It was a little three bedroom rambler.
20      Q. And when did you own that house?
21      A. Now there you've got a question.  I don't remember
22 exactly, but Karen was a toddler.  No, Karen was in school.
23 She was in first grade.  Michael was a toddler when we moved
24 to the other house.
25      Q. Okay.  And then is the other house the second home?

Page 9

1       A. Yes, and that's the one that Karen is living in now.
2       Q. Okay.  And what is that address?
3       A. 5623 - 129th Avenue Southeast, Bellevue, Washington
4  98006.
5       Q. And the first home in Newport Hills, did you
6  purchase that home?
7       A. Yes.
8       Q. And then did you sell it when you purchased the next
9  home?
10      A. Yes.
11      Q. And then you did purchase the home that's at issue
12 in this transaction?
13      A. Yes.
14      Q. And who was the other owner?  Was it your husband
15 that owned the other -- owned the house with you?
16      A. Yes.
17      Q. Were there any other family members involved in the
18 initial purchase?
19      A. Of the house I'm living, they're living in now?
20      Q. Yes.
21      A. No.  It was just my husband and I because Karen was,
22 you know, in first grade and Michael was two months old,
23 three months old, something like that.
24      Q. Do you recall if you financed the purchase of this
25 house when you initially bought it?

Maxine Fortune 12/15/09

Page 10

1    A. Yes.
2    Q. And when did you purchase this house?
3    A. I don't know. I can't remember.
4    Q. Was it over ten years ago?
5    A. Oh, yes. It's been -- my son is 31 years old and he
6  was not even a year old when we purchased it, moved in. So
7  it's been 30 years at least.
8    Q. Okay, thank you. During this time I understand your
9  husband passed away?
10   A. Yes.
11   Q. Did you transfer ownership to anyone else?
12   A. Yes. Well, Karen helped me with that and it was put
13  in both of our names.
14   Q. Okay. How was it put in both of your names? Did
15  she purchase a portion of it?
16   A. No.
17   Q. Did you gift a portion of it to her?
18   A. No, I don't think so. Just put her name on with
19  mine.
20   Q. Okay. And why was that?
21   A. Because after my husband died, a year after he died,
22  I had a heart problem and had to go in and have angioplasty.
23  And at that time it was suggested by my physicians, my heart
24  doctors that I add Karen to the house because it would be
25  less of a problem if I passed on and she had to go through

Page 11

1  all the paperwork.
2    Q. Less of a problem. The problem being the paperwork?
3    A. Uh-huh, and the transferring of the house and, you
4  know, it would be easier.
5    Q. Okay. And I'm sorry, when did your husband pass
6  away?
7    A. He passed away in 1992.
8    Q. Okay. So it was about a year later that you
9  developed heart issues you said, so 1993?
10   A. Yeah.
11   Q. Okay.
12   A. I probably had them before. I just didn't know it.
13  But the stress of his dying I think kind of.
14   Q. At the time in 1993 then did the house have a
15  mortgage on it?
16   A. Yes.
17   Q. Do you recall about the balance of that mortgage?
18   A. No, I don't.
19   Q. Do you recall what bank it was with?
20   A. No, I don't. I want to say it was Seattle First
21  National but it wasn't. It was another bank.
22   Q. Was it the original mortgage from when it was
23  purchased or had it been refinanced since that time?
24   A. No. It was the original mortgage.
25   Q. And then did you refinance this original mortgage

Page 12

1  then at some point after 1993?
2    A. Yes.
3    Q. Do you recall who you refinanced it with?
4    A. No, I don't. No, I don't. I've lost a lot
5  but -- no, I don't.
6    Q. When you first refinanced the original mortgage, was
7  it at that time that you put your daughter on title to the
8  house?
9    A. I don't remember. It was about that time.
10   Q. Do you recall if you refinanced on your own at all?
11   A. No. Well, I don't know. I think I didn't. I think
12  I waited until Karen was on it but I'm not sure, or it
13  happened at that refinance.
14   Q. Do you recall the purpose of refinancing the
15  original mortgage?
16   A. There were things that had to be done in the house
17  and changes to be made. I made them after my husband died,
18  and the money that he had left was gone and I had to
19  remortgage or I couldn't do it.
20   Q. Are these changes like improvements or repairs?
21   A. Yeah. A change of carpeting, you know, that kind of
22  thing.
23   Q. Okay. Did you have any other debts that were
24  refinanced at the same time?
25   A. I don't think so. I can't remember.

Page 13

1    Q. So just in estimating on timeline. Do you think
2  that you did the first refinance within five years?
3    A. Yes.
4    Q. Do you recall how much longer it was after that
5  before you refinanced again?
6    A. No.
7    Q. Do you recall what bank you did the next refinance
8  through?
9    A. No.
10   Q. Do you recall the purpose of the next refinance?
11   A. No.
12   Q. Did you carry credit card debt during this time
13  between the first and the second refinances?
14   A. I had a credit card and it wasn't -- I had a little
15  on it but not much.
16   Q. And was that part of the refinance where that credit
17  card was paid off?
18   A. Yes.
19   Q. Do you recall any other debts that you had, loans
20  with banks, any other debts that would be incorporated in
21  the refinance?
22   A. No, I don't.
23   Q. On your original mortgage did you ever have
24  difficulty making that mortgage payment?
25   A. No.

Maxine Fortune 12/15/09

Page 14

1   Q.  Had you ever made a mortgage payment late that you
2  recall?
3      A.  Not on the first mortgage.
4      Q.  When you refinanced the first time, do you recall
5  having difficulty making that payment?
6      A.  No, I don't.  I don't recall that.
7      Q.  Were you solely responsible after your husband's
8  passing for making the mortgage payment on the original
9  mortgage?
10     A.  No.  I had the help of my daughter and my son and my
11  daughter's best friend, Diane.
12     Q.  Did they pay rent to you?
13     A.  Um, I guess you could call it that.  It was just
14  everybody, you know, put money in so we would have enough to
15  pay the rent.  Not the rent but pay the amount of money we
16  needed to pay the mortgage.
17     Q.  And was that true after your husband's passing?  Was
18  it your daughter, your son and her best friend?
19     A.  Yes.  Before my husband passed, was just my husband
20  and I my daughter and -- or my son for a while and then
21  my daughter and her roommate moved back in after he died.
22     Q.  And when the first refinance was done within about
23  five years, was anybody else participating in that refinance
24  or were just you obtaining the refinance?
25     A.  I don't remember.  You're going to get that a lot,

Page 15

1  I'm sorry.
2      Q.  That's okay.  Can you estimate how many times you've
3  refinanced prior to the transaction at issue, between your
4  original mortgage and the transaction?
5      A.  No, not for sure.  I can give you an estimate maybe.
6      Q.  Okay.
7      A.  About four times.  Maybe more.  I don't know.
8      Q.  Can you tell me in those four times -- we've talked
9  about the first two generally.  Would the next two have been
10  in the ten years prior to this transaction at issue?
11     A.  Yes.
12     Q.  Did you participate in those refinances on your own
13  or did somebody else participate with you?
14     A.  My daughter Karen participated, at least she
15  advised.  She was the brains.
16     Q.  And so what does that mean that she would advise?
17     A.  I wasn't really good with finances and I really
18  didn't -- I didn't know how to go about doing things and
19  Karen was quick to figure it out.  And she worked as my, my
20  leader, you know.  She was giving me information and helping
21  me to understand what I was supposed to do.
22     Q.  And is that true for all of the refinances then
23  while she was living with you?
24     A.  Yes.  Karen was the lead in most of it.
25     Q.  And in lead does that mean would she be the one that

Page 16

1  contacted the representatives, the mortgage brokers or
2  banks?
3      A.  Yes, that, but more -- she was the brains.  I am
4  more flighty and she was more, you know, to the point, and
5  this is what we need to do and this is what we need to do.
6  She kept me on track.
7      Q.  And did you trust your daughter's advice?
8      A.  Implicitly.
9      Q.  Did you ask to refinance or was that your daughter's
10  idea?
11     A.  I don't remember.  It would -- no, I just don't
12  remember.
13     Q.  Do you recall yourself seeking a refinance through a
14  mortgage broker or a bank on your own?
15     A.  Um, no.
16     Q.  When you would sign documents in these refinances,
17  was your daughter with you?
18     A.  Yes.
19     Q.  Would you have an opportunity to ask the
20  representative questions?
21     A.  You know, I don't remember.  I would think so but I
22  just don't remember.
23     Q.  Do you remember if in signing documents for the
24  refinances there was a representative, a mortgage broker or
25  a bank representative or escrow officer attending those

Page 17

1  signings?
2      A.  Not -- I don't think all the time but I can't give
3  you specifics.
4      Q.  Okay.
5      A.  But in my mind I'm saying no, they weren't there all
6  the time.
7      Q.  Were there times when it was just you and your
8  daughter signing the documents together?
9      A.  Yes.
10     Q.  Do you recall if in any of these refinances that you
11  did if there were cash proceeds coming from any of the
12  refinances to you or your daughter?
13     A.  I don't think so.
14     Q.  Do you recall whether credit cards were -- your
15  credit cards were paid off in any of these refinances?
16     A.  I don't know.  I really don't.  I can't pull it up.
17     Q.  Do you recall ever obtaining another loan that
18  wasn't secured by your house?
19     A.  No.  Well, I borrowed money from a friend once, you
20  know, just a couple of days and paid it back.  But that
21  isn't what you mean, is it?
22     Q.  No, no, but thank you.  Did you ever go through the
23  process of requesting a loan and get turned down?
24     A.  Yes.
25     Q.  When was that?

Maxine Fortune 12/15/09

Page 18

1    A. I know we did but I don't know when.  I just can't
2  remember.
3    Q. And when you say we, is that you and your daughter
4  again?
5    A. Yes.
6    Q. And do you recall if it was more than once?
7    A. No, I can't remember that either.  I'm sorry.
8    Q. The most recent loan that was on your home that's at
9  issue here, do you recall the circumstances around obtaining
10  that loan?
11    A. No.
12    Q. Do you recall if it was you and your daughter
13  obtaining that loan?
14    A. I think it was.
15    Q. Do you recall if anybody else participated in
16  obtaining that loan?
17    A. No.
18    Q. And do you recall if your credit cards were paid off
19  in that transaction?
20    A. I don't know.
21    Q. Do you recall about what the monthly payment was of
22  that mortgage?
23    A. No.
24    Q. How was that mortgage payment made?
25    A. The last one?

Page 19

1    Q. Yes.
2    A. It was made in -- we paid on the first of the month
3  at U.S. Bank in Factoria, Washington.
4    Q. I'm sorry, just to make sure we're not getting
5  confused.  The loan prior to the one, prior to this
6  transaction.
7    A. Oh, okay.
8    Q. I'm sorry.
9    A. I'm cloudy there.  I don't remember.
10    Q. You had mentioned before that your daughter, son and
11  her best friend had helped make the mortgage payments.  Is
12  that true for the last mortgage on the house when you owned
13  the house?
14    A. I think maybe I missaid that because they helped
15  with the house payments, all of them.  That would be the
16  mortgage payment, the lights, the heat, the water, phone,
17  you know, just all the utilities and everything.  I mean we
18  all chipped in and paid.
19    Q. Okay.  And by chipping in was there an account that
20  you used for those purposes?
21    A. No.  I don't think so.
22    Q. Did you make the mortgage payment from your checking
23  account?
24    A. No, I don't think so.
25    Q. Did your daughter make the mortgage payment?

Page 20

1    A. I don't know.
2    Q. Did you review bank statements that would show that
3  the mortgage payment was made?
4    A. I think so, for a while.
5    Q. Do you recall what bank statements those were, whose
6  name they were in?
7    A. No.
8    Q. Did you review invoices or other documents that were
9  received from the mortgage company?
10    A. No.
11    Q. Who would have -- did you receive those?
12    A. I don't know.  To my knowledge, no, but I may have
13  forgotten it.
14    Q. Did you discuss with your daughter whether she was
15  receiving those invoices?
16    A. I don't remember.  But I'm assuming if she was, she
17  would have shown them to me.
18    Q. Do you recall ever having a concern on whether your
19  mortgage payment was actually being made?
20    A. Not before my heart attack.
21    Q. Prior to your heart attack, you don't recall being
22  concerned whether a mortgage payment was being made?
23    A. Yeah, they were made.
24    Q. In the last loan that was on your house before this
25  transaction were the mortgage payments always made?

Page 21

1    A. I don't know.
2    Q. Did you believe that the mortgage payments were
3  always made?
4    A. I don't remember.
5    Q. Do you recall if the bank, the mortgage company was
6  saying that mortgage payments were not being made?
7    A. No, I don't remember at all.
8    Q. Do you have your own checking account?
9    A. Yes.
10    Q. When you were working with Barnes & Noble, did you
11  have your own checking account?
12    A. Yes.
13    Q. Did anyone else have check signing authority over
14  your account?
15    A. I don't know.  I don't remember.  I just don't know.
16    Q. Did you reconcile your bank account, your checking
17  account?
18    A. On a monthly basis?
19    Q. Yes.
20    A. I think I did but I don't remember doing it.
21    Q. Do you recall ever having a concern that someone
22  else was using your checking account?
23    A. You mean taking money out of my account?
24    Q. Yes.
25    A. I don't think so.  Again, I don't remember but I

Maxine Fortune 12/15/09

Page 22

1    don't think so.
2         Q.  Prior to this last loan, so with your original
3    mortgage and the first approximate three refinances, did you
4    ever have trouble with those banks where you were not able
5    to make a payment?
6         A.  I don't think so.
7         Q.  Were you ever notified by any of those banks that
8    there were past due amounts?
9         A.  Not that I remember.
10        Q.  And with these same banks did you ever receive
11   notice of any foreclosure action?
12        A.  No, I don't think so.
13        Q.  And again with the original mortgage of the first
14   three refinances, did you ever have a concern you were going
15   to lose your home?
16        A.  I don't know.  I don't remember.
17        Q.  With the last loan prior to this transaction, do you
18   recall being concerned that you were going to lose your
19   home?
20        A.  Yes.
21        Q.  And this was on the last mortgage prior to this
22   transaction, okay.  Why were you concerned that you were
23   going to lose your home?
24        A.  I really don't know why I was concerned but I was.
25   I think it was really because I was worried we wouldn't have

Page 23

1    the money to pay the rent or, you know, we wouldn't have
2    enough money to pay monthly.
3         Q.  To pay the monthly mortgage?
4         A.  Uh-huh.  Yes.
5         Q.  Do you recall a time where you stopped making the
6    mortgage payment?
7         A.  Um, yes.  It was after my heart attack, the second
8    one.  And after I got out of the nursing home where I went
9    after surgery and we were told we could pay less than the
10   full amount until, you know, everything was kind of
11   straightened out and then that's when things started getting
12   a little bit strange and we were advised not to pay, I
13   think.
14        Q.  I just want to clarify again because I don't want us
15   getting confused.  The last mortgage that you had on your
16   home when you owned your home was prior to this transaction.
17   So was it in 2006 and before, early 2007?
18        A.  Yeah, and that was when Pope Mortgage was involved
19   and everything looked great, everything looked perfect and
20   then suddenly it wasn't there.  It dissolved, and it was
21   really strange.
22        Q.  And I'm sorry, because I heard you say second heart
23   attack.
24        A.  Yes.
25        Q.  Was your first heart attack during this time?

Page 24

1         A.  My first heart attack was in '93, 1993.  My second
2    was in June of 2007.
3              MR. BHARTI:  '7?
4         A.  '8.  This is '9 now, so it was '8.
5         Q.  During 2008.
6         A.  Yeah, and I don't remember a lot since then.  I mean
7    I'm getting my memory back, but it's slow.
8         Q.  So you do recall working with Pope Mortgage?
9         A.  Yes.
10        Q.  And why -- did you contact Pope Mortgage initially?
11        A.  I don't remember.  I just don't remember.
12        Q.  Do you recall how you learned about Pope Mortgage?
13        A.  Well, I know at some point we got, we got mail or
14   got cards from Rudy Zenega but I really don't remember how
15   it got started.  I don't think anyone suggested them or
16   referred us to them, but I don't remember who talked to him
17   first.  I know I did some talking during the day and he
18   always told me everything was fine, was fine.  It was
19   just -- just a couple more days.
20        Q.  Do you recall why you were refinancing at that time?
21        A.  No.
22        Q.  Were you making your mortgage payments at that time?
23        A.  We were until -- we were until we got in touch with
24   Rudy and he was telling us that we didn't have to, to use
25   the money that we would use for our mortgage payments to pay

Page 25

1    bills and then they would cover the rest of it, you know,
2    because we were going to get a new mortgage.
3         Q.  What other bills were being paid at that time?
4         A.  Well, lights, water, heat.  I don't know.  I just
5    don't remember.  I know about those.  I mean I'm assuming.
6         Q.  And like the mortgage, my question was whether you
7    actually wrote the check for the mortgage.  Did you write
8    the check for these various utilities and expenses?
9         A.  My son took care of some, I took care of some and
10   Karen and her husband took care of some.
11        Q.  And at any point in time was it your daughter, son,
12   Diane and your son-in-law and you in this house?
13        A.  Just for a very short time.  Diane moved out, I
14   don't know exactly when, but it was very shortly -- she'd
15   been planning to anyway.
16        Q.  And did you, this may sound funny, but did you ask
17   for everyone to move in with you?
18        A.  I don't remember if I actually asked them to move in
19   but I encouraged them, you know, if they wanted to.  I think
20   after my husband died Karen and Diane thought it would be
21   better for me to have someone else there because I had had
22   the heart problem, you know, that next year.  So I think it
23   was, it was a choice that was made by the two girls and Mike
24   was already in.
25        Q.  Mike is your son?

Page 26

1    A. Yes.
2    Q. And when your daughter got married --
3    A. Uh-huh.
4    Q. -- did you want her husband to also move in to the
5  house?
6    A. Yes.
7    Q. Did you ever have discussions about your daughter
8  and son-in-law purchasing the house from you?
9    A. I don't know.  I don't think so.  Maybe we did but I
10 just don't -- I don't remember.
11   Q. I'm sorry, remind me again, you retired in 2006; is
12 that correct?
13   A. '6 or -- yeah, it must have been.  It was just
14 before Christmas I retired out.  That November, I guess.
15   Q. And you have other income sources since retiring?
16   A. Yes.
17   Q. So you since retiring have still contributed to
18 making the mortgage payment?
19   A. Yes.  Well, on the apartment now.  After I retired I
20 continued, you know, at the house until I had my heart
21 attack and then after that all my money was going to pay
22 for, you know, care, what wasn't covered by insurance and
23 Medicare.  And then I had to move out because I needed a
24 flatter -- I couldn't -- our house is -- the house is on a
25 hill and there are steps up and then more steps up and they

Page 27

1  didn't want me climbing steps.  And so my son and I went out
2  and found an apartment that is level and we don't have steps
3  to climb.
4    Q. Did you still have your own checking account now?
5    A. Yes.
6    Q. Do you write the checks for your rent now?
7    A. Yes.
8    Q. Do you reconcile your bank account monthly now?
9    A. Yes.  Or my son does.
10   Q. Does your son have check signing authority over your
11 account now?
12   A. I don't know.  I would assume he does but I don't
13 know.
14   Q. Does he write checks from your account?
15   A. No.
16   Q. Do you guys have a joint account that you use?
17   A. No.
18   Q. Did you look into filing bankruptcy at any time?
19   A. Not personally.  At least I don't think so.
20   Q. Have you ever been notified that your home was going
21 into foreclosure?
22   A. I don't remember that I got anything on it, but I do
23 sort of have a memory that it was.  And it was either file
24 bankruptcy or sell the house or try to find someone to help
25 us.

Page 28

1    Q. But you did not look into bankruptcy?
2    A. No, not personally.  I don't think so.
3    Q. Did you consider selling the house?
4    A. I don't know.  I knew that it might come to that but
5  I didn't look into it.  You know, I didn't try to find out
6  what I had to do to do it.
7    Q. Did you discuss it with your daughter?
8    A. I think, I think we talked about it.
9    Q. And what did you guys determine together to do with
10 the house?
11   A. I think, I think what we decided was we were going
12 to look for alternatives so we wouldn't have to sell the
13 house and that we wouldn't have to go into foreclosure and
14 lose it, and that's about all I can remember.
15   Q. Do you know how many mortgage payments weren't made?
16   A. From the time I had my heart attack in June?
17   Q. No.  When you had the mortgage on your home before
18 this transaction, do you know how many mortgage payments
19 were missed?
20   A. No, I don't.
21   Q. During the time that mortgage payments were not
22 being made, were you contributing to a fund to make the
23 mortgage payment?
24   A. I don't know.
25   Q. Were you transferring any of your personal funds to

Page 29

1  your daughter to make the mortgage payment for you?
2    A. No.  I don't know.
3    Q. Did you have legal counsel at any time prior to the
4  transaction at issue here for any of your debt issues,
5  mortgage issues?
6    A. No.  Not that I know of.
7    Q. Going back to your discussions with Pope Mortgage.
8  You said you didn't recall whether you initially contacted
9  them.  Do you recall -- can you tell me about your
10 discussions that you do remember having with Rudy or anyone
11 else about the refinance?
12   A. Well, I remember him calling me during the day and
13 saying he thought that he had everything set up, and I asked
14 him how much it would cost, you know, how much we would be
15 paying in mortgage.  I can't remember if he gave me a figure
16 or not, but he said it's all set up and within the next
17 three weeks or something like that it would be all done.
18   Q. And then did you speak with him again during the
19 next three weeks?
20   A. I spoke to his boss once about a week, week and a
21 half later I think, and then I tried to call him a week
22 after that and I didn't get ahold of him I think until
23 almost two weeks after that.
24   Q. And what was that discussion?
25   A. I asked him how the, you know, how the arrangements

Maxine Fortune 12/15/09

## Page 30

1  were going and he said that, he said that something -- the
2  bank was going to take the mortgage backed out but that he
3  had another prospect and it would only be a couple more
4  weeks and everything would be finished.
5      Q.  And did you continue to keep contact with him then?
6      A.  I tried.  It finally got to the point where he
7  wouldn't answer the phone.  Someone answered and he wasn't
8  there or he was out or he was busy with a customer.  He just
9  wasn't there.
10     Q.  And was that over the two week period that he had
11 mentioned it would take?
12     A.  No.  It was after that.  It was after I called and
13 he said that the bank backed out but they had everything set
14 up again.  Now, this is kind of rough.  I want you to know
15 what I'm saying is what I remember sort of, but, you know,
16 there might have been other stuff in there that I'm not
17 remembering.  But basically it was sort of he was making
18 excuses and spreading it out further and further.
19     Q.  Do you know about how long that process took before
20 you found out that it wasn't going to happen?
21     A.  Probably three to four months.  Maybe longer.
22     Q.  Did you find out that that mortgage was not going to
23 go through or that refinance was not going to go through or
24 did your daughter find that out?
25     A.  I don't remember.  I really don't.

## Page 31

1      Q.  What happened after finding out that that was not
2  going -- that refinance was not going to happen?
3      A.  When I found out that the refinance wasn't going to
4  happen the way he said, he stopped taking his calls and his
5  boss wouldn't answer.  And I would get someone on the phone
6  that would give me a runaround.  At first I thought well,
7  he's busy with another client but it kept going.  And so it
8  was about May, April or May when I finally realized it was
9  all a big scam.
10     Q.  And what happened after that then?
11     A.  Then we had to start looking for someone else to
12 finance the mortgage for us.
13     Q.  Do you know if at that point you started to make
14 your mortgage payment again?
15     A.  No, I don't know.
16     Q.  Do you recall discussing that with anybody, whether
17 you were going to be making the mortgage payment or not?
18     A.  No.  I don't remember.
19     Q.  Did you initiate any of the contacts with either
20 mortgage brokers or other representatives to find a
21 resolution?
22     A.  I don't remember.
23     Q.  Do you remember any of the contacts that you did
24 make?
25     A.  Well, I talked to Michelle but Karen made the

## Page 32

1  original contact.  No, I don't remember any others.
2      Q.  Did you ever have any direct communication with the
3  bank that the mortgage was not being paid on?
4      A.  U.S. Bank?
5      Q.  No.  The mortgage on your home before this
6  transaction, did you have any direct communication with that
7  bank or mortgage company?
8      A.  No.
9      Q.  When did you first learn of Alternative Investors?
10     A.  A card came in the mail and Karen read it and
11 decided to check on it and talked to Michelle, and then I
12 called her and talked to her.  I don't even remember what
13 the conversation was about, but it had something to do with
14 signing papers at the mall.  And that's about all I
15 remember.
16     Q.  Did you have more than one discussion with Michelle?
17     A.  Before we signed papers, I don't remember.  But if
18 you want me to make a guess, I'd probably say yes, because I
19 was home during the day and Karen was at work.
20     Q.  Did you meet with Michelle?
21     A.  At Barnes & Noble when we signed papers with her.
22     Q.  Did you meet with her at any time prior to that?
23     A.  Not that I remember.
24     Q.  Did you have discussions with Michelle to ask her
25 about the transaction and how the transaction would work or

## Page 33

1  different ideas that she could help you with?
2      A.  I don't remember.
3      Q.  Do you remember if you learned about how the
4  transaction was going to work from Michelle or from your
5  daughter?
6      A.  I don't remember.
7      Q.  Did you have discussions with anybody else besides
8  Michelle Merceri regarding the transaction?
9      A.  Other than my family?
10     Q.  Other than your family.
11     A.  I don't remember.  I don't think so.
12     Q.  As a family did you discuss what your options were?
13     A.  I don't remember it, I really don't but I think we
14 probably did.
15     Q.  Do you remember if you specifically had the
16 discussion about Alternative Investors with your family?
17     A.  No.
18     Q.  Do you recall after first getting the postcard and
19 your daughter making contact how much longer it was before
20 you talked to Michelle?
21     A.  I really don't know.  Within a -- I don't know.  I
22 better not say because I don't want to say something that
23 was wrong.  It wasn't too long.  I would say a week at the
24 longest.
25     Q.  Then take me through the transaction and the

Maxine Fortune 12/15/09

Page 34

1  documents.  It sounds like you guys had some phone calls.
2  Did you have a meeting with Michelle right away or did you
3  have a meeting with somebody else?
4      A.  With the contracts and stuff?
5      Q.  Yes.
6      A.  I hadn't -- I don't remember if we met Michelle or
7  even seen her, talked to her, yes, seen her before we signed
8  the papers down at Southcenter at the mall.  And the first
9  time I think I saw her was at Barnes & Noble, at the coffee
10 shop next door.
11     Q.  And what happened at Southcenter?
12     A.  We went in and we sat down at a table with chairs
13 around it.  And the gal brought in the papers and she said
14 all she was doing was bringing the papers and seeing that
15 they were signed and that was it.  And she handed them out
16 and they went from, I don't know, Karen to Brian to me and
17 then back to her.
18     Q.  Did you review the documents as you signed them?
19     A.  A little bit, but she didn't give us a lot of time.
20 I don't remember that I did at all but I think -- you know,
21 I can't say that because I don't know.  I'm sure that there
22 was a little reviewing of them but a lot of them it was just
23 sign, sign, sign, sign.
24     Q.  Did you think that your daughter was reviewing the
25 documents for you?

Page 35

1      A.  I don't know.  I hope so.
2      Q.  You think your son-in-law was reviewing the
3  documents for you?
4      A.  I don't know.
5      Q.  Did you ask the escrow officer -- I assume that this
6  is a meeting with the escrow officer?
7      A.  Yes.
8      Q.  Did you ask the escrow officer any questions?
9      A.  I don't remember that I did.
10     Q.  Do you recall having any questions as you signed the
11 documents?
12     A.  No, I don't remember.
13     Q.  Did you walk away from this meeting with copies of
14 any of the documents that you had signed?
15     A.  I don't remember but I don't think so.  I don't
16 think so because we weren't supposed to get them right away
17 I think.
18     Q.  What happened next in the process?  You've mentioned
19 another meeting at a coffee shop.
20     A.  Yes.  That was a Starbucks in Bellevue next to the
21 bookstore.
22     Q.  Were there any discussions in between the
23 Southcenter meeting and the Starbucks meeting?
24     A.  I don't know.
25     Q.  And then what happened at the Starbucks meeting?

Page 36

1      A.  Michelle came in and gave us some documents to sign
2  and I really don't remember anything else.  But in the back
3  of my mind I get the feeling that she took those documents
4  back and didn't give them to us and she said she'd get them
5  all together and give it to us later, but I may be wrong.  I
6  don't know.
7      Q.  Did you go over any questions at this meeting at
8  Starbucks?
9      A.  I don't know.
10     Q.  Do you recall if you had any questions at the
11 meeting?
12     A.  No.  Not really, no.
13     Q.  I'm sorry, no, you don't recall or no, you didn't
14 have --
15     A.  I don't recall, okay.
16     Q.  Did you review the documents as you signed them?
17     A.  No.  I don't think so, not completely.  I skimmed
18 them.
19     Q.  After that meeting were there additional documents
20 to be signed?
21     A.  I don't know.  I honestly don't know.
22     Q.  Did you meet with anyone in this transaction again
23 prior to the transaction closing?
24     A.  I don't think so.
25     Q.  Did you fax any documents back and forth?

Page 37

1      A.  There was one document we took to Kinkos and faxed
2  to Michelle but I can't remember what it was.  I remember
3  going there and doing it but I don't remember what it was.
4      Q.  Did you retain a copy of those documents?
5      A.  I think so.
6      Q.  Have you produced a copy of those documents in this
7  lawsuit?
8      A.  I have no idea.  I don't know.
9      Q.  Have you produced any documents in this lawsuit?
10     A.  No, not personally.  I don't think so.
11     Q.  Did you speak with anybody else at Alternative
12 Investors?
13     A.  I spoke with Kathy Merceri once to leave a message
14 for Michelle.
15     Q.  And what was that regarding?
16     A.  I wanted to talk to Michelle about something.  I
17 don't know what it was.  I don't remember.  And Kathy said
18 she wasn't in the office but she'd give her the message and
19 she'd call me back.
20     Q.  Did you speak with anybody else or Kathy again?
21     A.  No.
22     Q.  Did you write letters back and forth to anybody at
23 Alternative Investors?
24     A.  No.
25     Q.  Did you receive anything from Alternative Investors

Maxine Fortune 12/15/09

Page 38

1  in the mail after the transaction closed?
2      A. I don't remember. I want to say yes, but I just
3  don't remember.
4      Q. What was your understanding of the transaction with
5  Alternative Investors?
6      A. I thought what they were doing was they were taking
7  title of the house and we were paying them a monthly amount
8  that would help lower the interest. And that they were
9  holding the house until the 14 months, or whatever it was,
10  was up and then we would decide whether we wanted to
11  refinance and buy the house or we would sell it. I don't
12  remember Michelle saying anything about helping us, but I do
13  remember talking to her a couple of times and she reassured
14  me that everything would be fine. There wouldn't be any
15  problems, but that's all I remember.
16      Q. I'm sorry, I asked you before whether one of the
17  resolutions was to sell the home and you had said you guys
18  decide not to sell the home.
19      A. That was -- yeah, that was the fall, a year ago this
20  fall. We just didn't want to sell the home if we didn't
21  have to.
22      Q. Was it a family discussion whether to sell the home
23  or not?
24      A. I think so. I don't remember the discussion but I
25  think so.

Page 39

1      Q. Do you recall around the time of this transaction
2  what the value of the home was?
3      A. No.
4      Q. You've owned this home a long time. Do you recall
5  at any point in time what the value of the home was? Like
6  when your husband passed away, do you recall about what the
7  house was worth?
8      A. No, I don't.
9      Q. At any of these refinances over time do you recall?
10      A. No.
11      Q. Do you believe the value was appreciating or
12  increasing?
13      A. Yes. I can't say for sure yes, but I believe it
14  was. I didn't have a frightened feeling that, you know, it
15  was going way down and, you know, we would be paying large
16  amounts on the house. It wasn't worth it. I don't remember
17  that at all.
18      Q. As part of this transaction knowing that after 14
19  months or a number of months you were going to be revisiting
20  whether to sell the house or not, did you intend to sell the
21  house at that time?
22      A. I don't remember. I think that probably would have
23  been a family decision, all of us together.
24      Q. At any time in these refinances did you transfer the
25  entire ownership of the home to your daughter?

Page 40

1      A. Well, yeah, I did I guess, from what was said here
2  today. I don't really remember that. But that isn't a
3  problem because she became the lead on the loan and I was
4  secondary. Is that what you mean by transferring?
5      Q. Yes. Whether you transferred the entire ownership
6  to your daughter.
7      A. I don't remember.
8      Q. Did you do any research on the background of
9  Alternative Investors or Michelle Merceri?
10      A. No.
11      Q. Did you understand that your daughter was doing that
12  research?
13      A. Yes.
14      Q. Did you rely on her to do that research, to get
15  comfortable with them so that you were comfortable with
16  them?
17      A. Yes.
18      Q. Did you want that research done?
19      A. I think so.
20      Q. Did you ever meet Murphy Pierson?
21      A. The first time I saw Murphy Pierson was at the mall
22  after we signed. I couldn't have told you what he looked
23  like in any way, shape or form. The next time I saw him was
24  when he came to the house and wanted us to pay him rent for
25  the house because he owned it. And I just was walking up

Page 41

1  the driveway as they were handing the check and then they
2  decided they would call Michelle and see. I didn't think we
3  should do it. I didn't even get a really good look at him
4  then.
5      The next time I saw him was at the, at a hearing
6  that we had and I really didn't recognize him even then. If
7  he walked into this room and sat down, depending on what he
8  said and, you know, how he was dressed, I probably wouldn't
9  recognize him even now.
10      Q. What did you understand his role to be in the
11  transaction?
12      A. Michelle said that she and a group of people were
13  investors, you know, they help people that were in a
14  situation like ours. Murphy Pierson was brought in,
15  according to Michelle, by one of the other investors in
16  there. That's as much as I really knew about him. And then
17  later I found out from Michelle that he owned four or five
18  homes, rental homes but I really didn't know that much about
19  him. Just that he became very, very nasty and I didn't like
20  him at all. That I remember.
21      Q. Do you recall Michelle Merceri signing any of the
22  contracts when you met with her?
23      A. No, I don't.
24      Q. Do you recall her signing any of the contracts that
25  you signed over fax or with the escrow officer?

Maxine Fortune 12/15/09

Page 42

1    A. No, I don't.
2    Q. Outside of this transaction, how this ended up, did
3  you guys discuss other options with Alternative Investors?
4    A. Other options?
5    Q. Other ways to structure this transaction.
6    A. I don't think so. I don't know.
7    Q. Did you think that your prior mortgage was going to
8  be paid off in full?
9    A. You know, I can't answer that. I don't know. I am
10  going to think I probably did but I wasn't understanding
11  exactly what was happening. But I can't give you a yes or
12  no. Just a no.
13    Q. Did you believe that this transaction was going to
14  stop the foreclosure on your home?
15    A. Yes. Slow it down at least.
16    Q. Did you have any discussions regarding the value of
17  your home with Michelle Merceri?
18    A. I don't know. I don't remember.
19    Q. Did you discuss a dollar amount for this
20  transaction?
21    A. Not that I can remember.
22    Q. And I'm sorry, I believe you already answered this,
23  but did you sign any of these documents without Karen,
24  without your daughter?
25    A. No.

Page 43

1    Q. Did you ever have any contact with Focus Mortgage?
2    A. The name sounds familiar but I don't know. I don't
3  know.
4    Q. What did you understand Michelle Merceri's job to
5  be?
6    A. I thought that she and a group of investors were
7  helping people like us get our finances straightened out and
8  keep our homes. I believed that she was going to do her
9  best to see that we didn't lose the house and that when the
10  time came around to do something, that she would help us
11  find a loan or help us sell the house.
12    Q. Did you know if she had any real estate experience
13  in getting loans or in selling homes?
14    A. You know, I think she did say something about that,
15  that she had real estate experience, but I can't say it for
16  sure. It's just sort of a little niggle there. So I'm
17  going to have to say I don't know.
18    Q. Did you request an appraisal of the home to be done?
19    A. No. I didn't personally, no.
20    Q. Did you ever have a discussion with an appraiser who
21  was appraising your home?
22    A. There was an appraiser who came in for, I'm going to
23  say Pope Mortgage. It's a man from here or from Bellevue
24  and he did -- the last appraisal that I knew -- there may
25  have been appraisers running around the outside of the

Page 44

1  house, but he came in and he looked from top to bottom and
2  outside. And I don't remember his name but I think it had
3  to do with Pope Mortgage.
4    Q. Do you remember what the value was on the home?
5    A. No, I don't.
6    Q. Outside of the meeting that you had at Southcenter
7  with the escrow officer, did you have any other contact with
8  the escrow officer?
9    A. No, I don't think so.
10    Q. Do you recall if any documents were sent back and
11  forth with the escrow officer through the fax or mail?
12    A. No, I don't think so.
13    Q. Do you remember asking if Alternative Investors was
14  charging a fee for setting up this transaction?
15    A. No.
16    Q. Did Michelle talk to you about whether there was a
17  fee charged?
18    A. I don't remember.
19    Q. Did you have any discussions with your daughter
20  about whether there was a fee charge for the transaction?
21    A. I don't remember.
22    Q. When you had questions about this transaction, did
23  you call Michelle Merceri or did you talk to your daughter?
24    A. Well, I'm sure I talked to my daughter first. But
25  if neither of us could come up with, you know, an answer, I

Page 45

1  called Michelle Merceri. I called her quite a bit.
2  Probably drove her insane. But she always seemed, you know,
3  willing to answer or she said I'll get back to you.
4    Q. And did she get back to you?
5    A. Most of the time no.
6    Q. Do you recall what any of those questions were that
7  you had that were not answered?
8    A. No. Not off the top of my head, no.
9    Q. For this transaction did you have discussions with
10  any bank that was involved?
11    A. No.
12    Q. Did you have discussions with any mortgage broker?
13    A. No.
14    Q. Did you have legal counsel during the time of this
15  transaction?
16    A. No.
17    Q. What was your understanding of the rental
18  arrangement then? You mentioned before you understood that
19  there were payments that were going to be made monthly, I
20  think you said to reduce the interest. Could you tell me a
21  little bit more about your understanding of your monthly
22  payments?
23    A. That, that's about all I remember. That it was for
24  that.
25    Q. And how long did you think you would be making those

Page 46

1  monthly payments?
2      A.  I think we were given -- well, I heard what Karen
3  said earlier.  It was 12 or 14 months and I believe we were
4  on a 14 month schedule.  That's what's here in my head.  It
5  may not be right.
6      Q.  Did you have a due date every month for that
7  payment?
8      A.  Was the beginning of the month.
9      Q.  And did you make the payment?
10     A.  My daughter and I made the payment.
11     Q.  And how was that payment made?
12     A.  Cash.  And we took it to U.S. Bank and we filled out
13  a form, put it in the account and then we -- they took the
14  money, counted it and put it where they needed to put it.
15  And then they, they made their -- they put the receipt in,
16  made a copy of it and gave that to us and they stapled it on
17  the back of a little -- well, smaller than that, but, you
18  know, just a bunch of papers that were there.
19         MR. BHARTI:  Let the record reflect you are
20  describing the size about four inches by six inches.
21         THE WITNESS:  Yeah.  Yes.
22     Q.  Who was contributing to making that payment?
23     A.  My daughter, my son-in-law and I.
24     Q.  And was there a set amount that each one of you paid
25  every month towards the payment?

Page 47

1      A.  I don't remember.  I really don't.
2      Q.  But you recall every month you made that payment; is
3  that correct?
4      A.  Yes, until I had my heart attack.
5      Q.  And up until you had your heart attack, did you make
6  that payment timely every month?
7      A.  Yes.
8      Q.  Just in light of time, do you want to take a break
9  at all or are you doing fine?
10     A.  I'm doing fine.
11         MR. BHARTI:  How much more do you have?
12         MS. BROTHERTON:  Quite a bit more.
13         MR. BHARTI:  Let's take a break.
14         (Recess taken 2:47 p.m. to 2:55 p.m.)
15  BY MS. BROTHERTON:
16     Q.  We were going over a little bit just discussing our
17  understanding of the transaction a little bit.  Were you
18  aware that cash proceeds were going to be coming out of this
19  transaction with Alternative Investors?
20     A.  No.  I don't think so.  I don't know.  No.
21     Q.  And did you think this transaction was repaying your
22  mortgage on the house?  Did you understand -- I'm sorry, did
23  you understand that this transaction was repaying your
24  mortgage on your house?
25     A.  I don't know.  No.  I don't remember.

Page 48

1      Q.  Do you remember if it was covering any other debts
2  of yours or your families?
3      A.  No.
4      Q.  Did you ever speak to James Aylesworth?
5      A.  No.
6      Q.  Did he ever represent any facts to you?
7      A.  No.  Not that I know of, no.
8      Q.  Did he write to you?
9      A.  No.
10     Q.  Did you speak with him?
11     A.  No.
12     Q.  Was he held out as someone that was available to
13  assist you with the loan?
14     A.  No.
15     Q.  Did he provide any advice to you?
16     A.  No.
17     Q.  Did you ever speak with Sean Casey Jones?
18     A.  No.
19     Q.  Did he ever make any representations to you?
20     A.  No.
21     Q.  Did he write to you?
22     A.  No.
23     Q.  Did you ever talk with him over the phone?
24     A.  No.
25     Q.  Was he ever held out as somebody available to assist

Page 49

1  you with obtaining a loan?
2      A.  No.
3      Q.  Did he provide any advice to you?
4      A.  No.
5      Q.  We talked about the summer of your heart attack.
6      A.  Uh-huh.
7      Q.  Prior to your heart attack, did Murphy Pierson come
8  to your home?
9      A.  Yes.  He came in -- the first time that I saw him,
10  that was the time that he came and said the home was his and
11  he wanted us to pay this huge amount of rent.
12     Q.  And was it your understanding that you had paid the
13  monthly payments on time up until that time?
14     A.  Yes.
15     Q.  What is your understanding that happened once you
16  had your heart attack over those next couple months with
17  payments?
18     A.  Well, the payment --
19         MR. BHARTI:  You understand the question?  Can
20  you say again.  Are you talking about during the heart
21  attack.
22     Q.  Once you had your heart attack, what was your
23  understanding what happened with the monthly payment during
24  that time?
25         MR. BHARTI:  During how much time?

Maxine Fortune 12/15/09

Page 50

1      MS. BROTHERTON:  The two months after your heart
2  attack.
3      MR. BHARTI:  After heart attack.
4      A.  I don't know.  I don't know I even thought about it.
5      Q.  Do you recall if you had any discussions with your
6  daughter about the monthly payment being made while you were
7  recovering from your heart attack?
8      A.  If we talked during my recovery?
9      Q.  Yes.
10     A.  No, I don't remember.  I don't think we did.  I
11  don't know.
12     Q.  Did you have any contact with Michelle Merceri
13  during that time?
14     A.  No.
15     Q.  After you were recovered, did you move back to your
16  same home?
17     A.  I moved back after I came out of the nursing home.
18     Q.  Do you recall if while you were back at home if you
19  had any discussions regarding the monthly payments that were
20  due?
21     A.  No, I don't remember.
22     Q.  Did you have any contact with Michelle Merceri once
23  you moved back home?
24     A.  No, I don't think so.
25     Q.  Actually have you talked with Michelle Merceri ever

Page 51

1  again?
2      A.  I don't think so.
3      Q.  Did you discuss with your daughter whether the
4  monthly payment was being made once you moved back home?
5      A.  I don't know.  At first I doubt it because I was
6  kind of in a fog.
7      Q.  How long were you back at home before you moved into
8  an apartment?
9      A.  A couple of months.  Maybe two and a half months.
10     Q.  So just so I have my timeline right.  In June 2008
11  is when you had your heart attack?
12     A.  Yes.
13     Q.  How long were you in a nursing home?
14     A.  I don't remember, but it was a week or so.  I don't
15  know.
16     Q.  Okay.  Do you recall at what point you moved into
17  your apartment?
18     A.  September.  A year ago this last September.
19     Q.  And tell me again why did you move into an
20  apartment?
21     A.  I had problems with stairs and stair climbing.  I
22  got short of breath.  If I needed to go anywhere, I had to
23  walk down a hill and then I'd have to walk back up.  And all
24  the steps -- if I wanted to leave the main part of the
25  house, I had to go down a flight of stairs to out the door

Page 52

1  or another flight of stairs down to the lower.  It was split
2  level.  And my cardiologist said it wasn't really that good
3  for me to do that.  And so my son said let's see if we can
4  find someplace where you can live that's flat, you know,
5  level.  And we found that and we moved.
6      Q.  When you moved out in September 2008, did you
7  continue to contribute to your daughter and son-in-law to
8  help make that monthly payment on your home?
9      A.  I don't know.  I'm turning by that time we had
10  found out the problems we were having and we weren't paying
11  any more in.
12     Q.  Okay.  You stopped --
13     A.  But I don't know.  I'm going to have to say I don't
14  know.
15     Q.  What was your understanding of what the problem was?
16     A.  At that time I don't know that I had much
17  understanding of the problem.  I knew I had to brush my
18  teeth and comb my hair and get myself dressed and that was
19  almost it.  I knew there were problems.  And I knew that
20  what we'd been told was going to happen wasn't going to
21  happen and that was it.
22     Q.  Did you have any discussions about how to resolve
23  that problem with your daughter?  Did you have any
24  discussions with your daughter about how to resolve that
25  problem?

Page 53

1      A.  I don't, I don't know if I did or not.  I don't
2  remember.
3      Q.  Do you recall if you made any effort to contact
4  Michelle Merceri at that time to resolve the problem?
5      A.  No, I don't.  I sort of have a remembrance of
6  calling.  I talked to Michelle and I talked to Kathy and
7  they were closing up the business, but I don't remember if
8  that was before the heart attack or after.
9      Q.  And you believe you spoke to Kathy Merceri?
10     A.  Yes.
11     Q.  And she told you they were closing up?
12     A.  They were moving their business.
13     Q.  Do you recall what she said about where they were
14  moving to?
15     A.  She didn't.
16     Q.  Did you have any discussions with your daughter
17  about resolving the problem before going to file the
18  lawsuit?
19     A.  We talked, but I don't remember that we came up with
20  any resolution but that.  We didn't see any other way to go
21  besides that.
22     Q.  Did you have counsel at the time that that decision
23  was made?
24     A.  No.
25     Q.  If we could go over some documents now.

Page 54

1    A. Sure.
2    Q. I'm going to start with a couple documents that we
3  haven't seen yet.
4       (Exhibit No. 10 and 11 marked
5       for identification.)
6    Q. On Exhibit 10, the first one I handed to you, it has
7  Prudential Mutual Savings Bank at the top?
8    A. Uh-huh.
9    Q. Do you recall what this is?
10   A. This is -- I don't recall it. I mean I'm looking at
11  it now and I'm thinking it is a loan from this bank to pay
12  for the house.
13   Q. It's dated May 30th, 1973. Does that sound like
14  when you purchased the home?
15   A. It was about that, yeah. That's about right because
16  Karen was at the end of the first grade.
17   Q. And the first line kind of in the ledger area says
18  amount of loan and off to the right it says $29,200.
19   A. Uh-huh.
20   Q. Is that the original mortgage on the home when you
21  first bought the home?
22   A. I don't know. Probably it was but I don't remember.
23   Q. Do you recall if this was the loan that you were
24  still paying on when your husband passed away in 1992?
25   A. Yes, it was.

Page 55

1    Q. Thank you. Exhibit 11 that I handed you is titled
2  deed of trust at the top.
3    A. Okay.
4    Q. It is also dated May 30th, 1973.
5    A. Uh-huh.
6    Q. Do you recognize this document?
7    A. No, I don't.
8    Q. Do you understand what this document is?
9    A. What is it? You tell me.
10   Q. It's a deed of trust. It's saying that the deed of
11  trust is made on May 30th, 1973 between Lawrence E. Fortune
12  and Maxine J. Fortune, his wife, as grantor whose address is
13  5623 - 129th Southeast, Bellevue, Washington 98006.
14   A. Uh-huh.
15   Q. And Lawrence was your husband; is that correct?
16   A. Yes.
17   Q. So this is showing that the home was titled in both
18  of your names in 1973?
19       MR. BHARTI: Was that a question?
20   A. Yes.
21   Q. I just wanted to confirm that. Thank you. Now, if
22  we could go to Exhibit 1 that we looked at this morning.
23  And this is going to be right in front of you in this pile
24  here.
25   A. Okay.

Page 56

1    Q. Do you recognize Exhibit 1?
2    A. No.
3    Q. It's titled a quit claim deed and the grantor is
4  "Maxine J. Fortune, for and in consideration of love and
5  affection-gift, conveys and quit claims to Maxine J. Fortune
6  and Karen A. Fortune both single the following described
7  real estate." And I believe that's the legal description of
8  your property in Bellevue.
9       MR. BHARTI: What is the question?
10      MS. BROTHERTON: I'm giving her time to review
11  those.
12   Q. Do you recall signing this quit claim deed?
13   A. No, I don't but this is my signature.
14   Q. That is your signature?
15   A. Yes.
16   Q. Do you have any memory of transferring the property
17  into your daughter's name?
18   A. No. But, you know, it's down here in black and
19  white.
20   Q. Take a look at Exhibit 2. This is also a quit claim
21  deed dated November 27th, 2000. Do you recognize this deed?
22   A. No, I don't.
23   Q. Is that your signature?
24   A. Yes, it is. And I'm sure it's my daughter's, too.
25   Q. Okay. Do you recall -- this says the

Page 57

1  grantor/borrower Maxine J. Fortune and Karen A. Fortune,
2  grantee/assignee/beneficiary is Karen A. Fortune. Do you
3  recall transferring the title of the property into Karen's
4  name solely?
5    A. No, I don't, but the signature's on here.
6    Q. Do you remember any discussions regarding you
7  gifting the property to your daughter?
8    A. No, no.
9    Q. If we can go to Exhibit 3, please.
10   A. Okay.
11   Q. We're looking at another quit claim deed dated
12  October 28th, 2004. Do you recognize this deed?
13   A. No.
14   Q. Do you recall a transaction where the title of the
15  property was placed back in your name with your daughter's?
16   A. No, I don't. But like I say, my memory's holey.
17   Q. Have you had any discussion with your daughter
18  regarding the transfer of the property between the two of
19  you over time?
20   A. I'm sure we have but I can't remember it. But I'm
21  comfortable with it, so. I don't know if that makes a
22  difference.
23   Q. Exhibit 4. This is a letter dated July 17th, 2007.
24  And on page 2 it says that the author is your daughter. Do
25  you recall this letter?

Page 58

1      A. No.
2      Q. Do you know if you saw this letter before your
3  daughter sent it to the bank?
4      A. I'm sure I did.  I don't remember it, but I'm sure
5  she showed it to me.
6      Q. Do you remember having, that your bank -- you were
7  having issues making the mortgage payment with this bank and
8  were trying to find a resolution with this bank?
9      A. No, I don't remember.
10     Q. Do you remember your daughter telling you that you
11  were having issues?
12     A. No.  Doesn't mean she didn't.
13     Q. Exhibit 5.  This is a Notice of Trustee's Sale.
14  Have you seen this document before?
15     A. No, not that I remember.
16     Q. If you turn to page 2, under part 3 it says payment
17  information.  Just above that it says, "The default for
18  which this foreclosure is made is/are as follows:  Failure
19  to pay when due the following amounts which are now in
20  arrears."  It says from January first, 2007 through July
21  19th, 2007.  Number of payments is seven and the amount is
22  $2081.46.  Were you aware that you were seven months behind
23  in your mortgage payment?
24     A. No.  And I probably knew that.  If you asked me that
25  before my heart attack, I probably would have been able to

Page 59

1  say.  I hate saying no because it sounds like I'm stupid.
2      Q. No.
3      A. But I really don't remember any of this.
4      Q. Did you have a discussion -- do you remember having
5  discussions with your family regarding this Notice of
6  Trustee's Sale?
7      A. No.
8      Q. If you would look at Exhibit 6.  Again, this is a
9  compilation of pages 1 through 28 from documents that were
10  produced by your daughter's attorney.  This is the first 28
11  pages of what they produced.  Do you recall seeing -- first
12  of all, do you know what this first page is?
13     A. No.
14     Q. Have you seen this statement before?
15     A. I don't know if I have or not, but it came from
16  Eric, her lawyer.
17     Q. From your daughter's attorney, Mr. Dunn, yes.
18     A. Then probably I have a copy because his office
19  copied most everything to me.
20     Q. Okay.
21     A. But it doesn't look familiar to me.
22     Q. Okay.  So at the time of the transaction you don't
23  remember this document?
24     A. I don't think so.
25     Q. If we turn to page 3, this is a statutory warranty

Page 60

1  deed.
2      A. Uh-huh.
3      Q. Do you remember this document?
4      A. No, I don't but I signed it.
5      Q. Is that your signature?
6      A. Yes.
7      Q. Do you remember signing this document with your
8  daughter and son-in-law?
9      A. No.  But there were a lot of documents signed.
10     Q. Do you remember signing documents in the presence of
11  Lennie Mueller who signed the bottom of this document?
12     A. Yes.
13     Q. But you do not remember this document in particular?
14     A. No.  I probably don't remember any of the documents
15  in particular but I remember signing.
16     Q. Okay.  Do you know what this deed does?  Do you
17  understand what this is?
18         MR. BHARTI:  Which page number are you referring
19  to?
20         MS. BROTHERTON:  Page 3.  We're still on page 3.
21     A. No.  What does it?
22     Q. It states that, "The grantor, Karen A. Handlin and
23  Brian A. Handlin, husband and wife, who acquired title as
24  Karen A. Fortune and Maxine J. Fortune, a married woman, for
25  and in consideration of $10 and other good and valuable

Page 61

1  consideration in hand paid, conveys and warrants to Murphy
2  Pierson a single man the following described real estate."
3  And I believe that's the legal description of your Bellevue
4  home.
5      A. That looks like it, yeah.  No, I don't remember.
6      Q. Page 4 is the exhibit that would be attached.  Page
7  5 is a real estate excise tax affidavit.  Do you remember
8  this form?
9      A. No.
10     Q. Let's go to the next page, page 6.  The title is
11  Residential Real Estate Purchase and Sale Agreement,
12  Specific Terms.  Do you remember this document?
13     A. No.
14     Q. Is that your signature on this document?
15     A. Yes, it is.
16     Q. If you could look at the multiple initials that are
17  on this page.  Are all of those your initials?
18     A. Yes.
19     Q. Do you remember why this document was being
20  initialed multiple times?
21     A. No.  I'm assuming has something to do with
22  Alternative Investors and their taking over.
23     Q. Do you remember if this was one of the documents
24  that was faxed?
25     A. No, I don't.

Maxine Fortune 12/15/09

Page 62

1      Q.  If a document was faxed back to Michelle Merceri,
2   would you have faxed it at Kinkos or would your daughter
3   have done that?
4      A.  Um, well, I know I did one.  My son and I went and
5   did one.
6      Q.  Do you recall which one that was?
7      A.  No.
8      Q.  Did you retain copies of what you faxed?
9      A.  I think so, yeah, because when they make a fax it
10  makes another copy and I kept the original copy and sent the
11  fax copy.
12     Q.  Okay.  Have you produced those documents in this
13  case?
14     A.  No.
15          MR. BHARTI:  Do you know what produce means?
16     A.  Showed them to you or someone.
17          MR. BHARTI:  No.  Let's clarify.  Please ask her
18  again so that she's answering.
19     A.  Sorry, about that.
20     Q.  Have you provided these documents to any of the
21  parties in this lawsuit?
22     A.  No.
23     Q.  What is your understanding of this document?
24     A.  Well, it looks like it's an agreement to sell the
25  house but I don't remember that.  I don't think that was

Page 63

1   what we -- that wasn't what we were doing.  I mean I didn't
2   think we were.
3      Q.  Do you remember what you were doing?  What your
4   intention was in this transaction?
5      A.  Well, the intention was that we were going to I
6   guess turn over title to the house.  But we got no money on
7   this, nothing was paid to us.  So I'm not sure, I'm really
8   not.
9      Q.  Do you remember asking Michelle Merceri about a
10  document that looks like you're selling your house?
11     A.  No.  No, I don't.
12     Q.  But this is your signature and your initials?
13     A.  Yes.
14     Q.  If we could turn these next few pages, we're going
15  to confirm these are your signatures.  So page 7, is that
16  your signature?
17     A.  Yes, it is.  And same with 8 and 9.  That doesn't
18  look like my signature on 10 but it might be.  It's awful
19  tiny.
20     Q.  Okay.  Do you have reason to think that it's not
21  your signature?
22     A.  I just don't know.  It doesn't look like my
23  signature.  These are small little spaces and if I remember
24  correctly, we had a whole bunch of papers that we had to
25  sign.

Page 64

1      Q.  And page 11, is that your signature?
2      A.  Oh, I guess so.  It sort of looks like it.
3          MR. BHARTI:  That's 12.
4          MS. BROTHERTON:  Page 11.
5      Q.  Do you remember reviewing the documents that we just
6   confirmed your signature on?
7      A.  No.
8      Q.  Do you remember discussing the terms -- on page 11,
9   sorry, it says it is agreed between the seller and buyer as
10  follows and it has some terms listed.  Do you remember
11  discussing these terms?
12     A.  No.
13     Q.  If you read that second -- either of those
14  paragraphs, does that help you recollect the discussions of
15  the terms?
16     A.  No.
17     Q.  In signing this document, would you have read it
18  before you signed it?
19     A.  I don't know.  I hope that I would but I don't
20  remember it at all.
21     Q.  If you look at page 12, is that your signature at
22  the bottom of the page?
23     A.  Yes, it is.
24     Q.  Do you recall seeing this settlement statement?
25     A.  Well, I don't remember this at all but that is my

Page 65

1   signature.  But if my memory isn't failing me, it seems like
2   we went through these awfully fast.
3      Q.  And who did you go through these with?
4      A.  I think it was down at Southcenter.
5      Q.  Okay.  And that would be with the escrow officer?
6      A.  Uh-huh.
7      Q.  Okay.  If you turn to page 13, is that your
8   signature at the bottom there?
9      A.  Yes, it is.
10     Q.  And if you look a couple lines above that, it's line
11  1304.  It says, "Proceeds disbursements to Alternative
12  Investors, $142,675.68."  Do you remember --
13     A.  No.
14     Q.  -- signing this page?
15     A.  No, I don't but that's my signature.
16     Q.  Do you remember discussing the proceeds disbursement
17  with Michelle Merceri?
18     A.  No.
19     Q.  Do you remember discussing the proceeds
20  disbursements with your daughter?
21     A.  No.
22     Q.  If you go to page 14 titled HUD 1, page 3.  Is that
23  your signature towards the bottom?
24     A.  Yes.
25     Q.  Do you recall if you signed this document with

Maxine Fortune 12/15/09

Page 66

1  Murphy Pierson?
2      A. Um, I don't remember signing anything with him.  In
3  fact if it was done at Southcenter, he came in as we left.
4      Q. So would that mean that this page would not have had
5  his signature on it yet when you signed it?
6      A. I think so.
7      Q. Do you recall if Lennie Mueller signed this document
8  in your presence?
9      A. I don't remember.
10     Q. If you go to page 15, this is titled Closing
11  Agreement and Escrow Instructions for Purchase and Sale
12  Transaction.  Do you recall reviewing this document?
13     A. I don't remember it at all.
14     Q. Do you remember if you guys discussed the terms of
15  this document?
16     A. I don't remember.
17     Q. Are these initials your initials at the bottom of
18  the page?
19     A. They might be but it's not usually the way I
20  initial.  I don't know.
21     Q. On page 16 are those your initials?
22     A. Now, this is more, at the bottom is more my
23  initials.
24     Q. Okay.  And page 17, are those your initials?
25     A. Yes.  But I don't remember any of this.

Page 67

1      Q. Page 18, are those your initials?
2      A. Yes.
3      Q. And is that your signature?
4      A. Yes.
5      Q. And about a third down this page it says that the
6  limited practice officer for this transaction is Beverly
7  Wolfrum.  Do you remember if you met Beverly Wolfrum?
8      A. No.  This was probably done at Southcenter.  If it
9  was, she wasn't there.
10     Q. Do you remember reading this document?
11     A. No.
12     Q. If we go to page 19, this is a supplement to closing
13  agreement and escrow instructions.  I don't see your
14  initials on this page.
15     A. No.
16     Q. Page 20, are those your initials?
17     A. Yes.
18     Q. Is that also your signature?
19     A. Yes.
20     Q. Do you remember reviewing this document that says,
21  "Proceeds check, transfer all net proceeds to Alternative
22  Investors"?
23     A. No, I don't remember that.
24     Q. Do you remember discussing this with Michelle
25  Merceri?

Page 68

1      A. No.
2      Q. Do you remember discussing this with your daughter?
3      A. No.
4      Q. Page 21, are those your initials?
5      A. Yes.
6      Q. Page 22, are those your initials?
7      A. Well, it's my signature.  So yeah, it could
8  be -- it's kind of icky but it probably is my signature.
9      Q. Page 23 is your daughter's page.  Page 24, is that
10  your signature?
11     A. Yes, it is.
12     Q. Okay.  This document's titled Certification for No
13  Information Reporting on the Sale or Exchange of a Principal
14  Residence.  Do you remember reviewing this document?
15     A. No, I don't.
16     Q. Do you remember answering the seller assurances
17  under part 2 where there's yes and no boxes?
18     A. No, I don't.
19     Q. Page 25, is that your signature?
20     A. That's my signature.
21     Q. Do you recall this document?
22     A. No.
23     Q. That's the last one in that exhibit.
24     You don't need these last ones.
25     Q. If we can go to Exhibit 7, this is titled the

Page 69

1  Residential Option to Purchase Agreement.
2      A. That's my signature.
3      Q. Do you remember this document?
4      A. No, I don't.
5      Q. Have you reviewed this document since signing it?
6      A. No.
7      Q. Do you remember if this document was signed at a
8  meeting or via fax or mail?
9      A. I really don't remember.
10     Q. Do you remember discussing that you had an option to
11  repurchase your home with your daughter?
12     A. I think that we thought we did.  I think that's what
13  we planned to do.
14     Q. Can you tell me what your understanding of that was?
15     A. Well, we were going to be paying a certain amount to
16  Alternative Investors and get ourselves straightened out
17  financially, and then we were going to repurchase the house
18  or sell it, if it was so expensive we couldn't refinance it.
19  That's really, pretty much all I remember.
20     Q. Do you remember after your heart attack and after
21  you recovered if you had discussions about where you were at
22  in this agreement; if you were going to repurchase the home
23  or if you were going to sell the home?
24     A. Um, no, I don't really remember.  I mean after
25  Murphy Pierson got in there and said it was his house, we

Maxine Fortune 12/15/09

Page 70

1   talked then.
2       Q.  Okay.  And was that prior to your heart attack?
3       A.  It was after the heart attack but it was after the
4   first of the year.
5       Q.  What did you guys discuss?
6       A.  We decided we were going to go and see if we could
7   find help.
8       Q.  Okay.
9       A.  I think.
10      Q.  And was it help to repurchase the home or was it
11  help to file the lawsuit?
12      A.  I think it was help to file the lawsuit.
13      Q.  Do you recall if you did any research or discuss
14  with any parties about repurchasing the home?
15      A.  No, I can't remember.
16      Q.  If we go to Exhibit 8.
17      A.  Okay.
18      Q.  This is titled an Addendum/Amendment to Purchase and
19  Sale Agreement dated August 4th, 2007 up top.  Do you
20  remember this document?
21      A.  Um, sort of.  I remember we had three options of
22  payment or how to start payment and we chose the bottom one.
23  I don't remember that much more about it.  Oh, this is my
24  writing on the back here.
25      Q.  On page 2 of Exhibit 8?

Page 71

1       A.  Uh-huh.  "We've chosen December to start payments.
2   Thanks for all your support and help."
3       Q.  And you were reading what you wrote in the comment
4   section?
5       A.  Yes.
6       Q.  And you continued, "Please keep in touch as will
7   we," and you signed your name?
8       A.  Yes.
9       Q.  Do you remember -- this is a fax cover sheet it
10  looks like?
11      A.  Yes.
12      Q.  Do you remember sending this to Michelle Merceri?
13      A.  Yes, that's one of the faxes.  I remember this one
14  because it had the options on it.
15      Q.  What was your understanding of these options?
16      A.  Well, we were given three options of when to start
17  payment and that's about it.  I don't really remember a lot
18  more about it.
19      Q.  It states on the first page of Exhibit 8, "It is
20  agreed between the seller and buyer as follows."  And
21  there's a second paragraph there that states that, it's
22  discussing the terms and there's some crossing out and
23  numbers written in.  But it's saying part way through there,
24  "Estimate amount on August 4th, 2007 from figures from Karen
25  Fortune would be 22,000," although that's crossed out and

Page 72

1   36,000 is in place.  "This would count towards the next 18
2   months estimated mortgage payment would be 3700," 3,000 is
3   crossed out and 3700 is written in, "which means the amount
4   of," again crossed out, 36,000, "would be prorated over the
5   term of the contract."  Do you remember what any of that
6   means?
7       A.  No.
8       Q.  Did you understand that your payment was going to be
9   1800 a month then based on the choice, the option that you
10  chose?
11      A.  Yes, I think I remember that.
12      Q.  Okay.  And that there was something -- there was
13  some amount that you guys had paid to reduce that amount
14  from 3700 a month to 1800 a month based on your option you
15  chose?
16      A.  I don't know.
17      Q.  Do you remember who provided this document to you?
18      A.  No.  I'm assuming it was Michelle but I don't know.
19      Q.  Would you have retained a copy of this document?
20      A.  I think it should be in the document somewhere at
21  the house.
22      Q.  Okay.  Now, I just want to clarify going forward
23  her.  We understand obviously that you have obtained counsel
24  recently?
25      A.  Yes.

Page 73

1       Q.  And prior to that you represented yourself; is that
2   correct?
3       A.  I guess so, yes.
4       Q.  So I just want to make clear, I don't want to know
5   anything about your discussions with your counsel now.  I'm
6   asking you about prior to the time of obtaining your
7   counsel.  I want to know about that time period.  Nothing
8   that you've discussed with your counsel.
9       A.  Okay.
10      Q.  Why have you chosen to represent yourself up until
11  getting counsel?
12      A.  I wasn't -- I didn't feel I was really involved.  I
13  got information from Eric but, you know, I don't know.  I
14  just felt like -- I didn't really know what was going on.  I
15  didn't remember a lot.  I didn't feel like I would be a
16  credible witness for or against.  And, you know, it's been
17  months for me to get back up to the point where I even
18  remember some things.  So I don't know.  I just figured
19  that, you know, nobody was probably going to care one way or
20  the other what I said, so.  And I couldn't afford a lawyer.
21      Q.  But you understand you're a plaintiff in this
22  lawsuit; is that correct?
23      A.  Well, I do now, yeah.
24      Q.  Did you understand when the complaint was filed that
25  you were a plaintiff in this lawsuit?

Page 74

1    A. I don't know if I did.  When was it filed?
2    Q. I'm actually not sure.  I'm not sure.
3    A. I don't know.
4    Q. Possibly a year ago.  Do you recall when the initial
5    complaint was drafted?
6    A. No.
7    Q. Did you have input on the initial complaint or help
8    draft the initial complaint?
9    A. I don't know.  I don't remember.
10   Q. Did you think that Northwest Justice Project was
11   representing you?
12   A. No.  I knew that they couldn't because I have too
13   much income.
14   Q. Okay.  So did you understand that you were without
15   legal representation?
16   A. Yes, I did.  When I heard about this I was scared to
17   death because I knew I'd be surrounded by lawyers and then
18   it would just be little old me, but then I got saved.
19   MR. BHARTI:  You have nothing to worry about
20   now.
21   (Exhibit No. 12 marked
22   for identification.)
23   A. Am I okay with answering the way I am?
24   Q. Your attorney.  Do you know what this is?
25   A. It's a complaint filed by Karen and Brian and I

Page 75

1    against the people in Alternative Investors.
2    Q. Had you seen this document before now?
3    A. You know, I think I have.  I get most -- I get
4    copies of most everything and I read the ones I understand
5    and look at the others.  And sometimes I have my son read
6    them and explain them.
7    Q. Okay.  In this lawsuit an initial complaint was
8    filed and there's been a first amended complaint and there
9    was a second amended complaint.  Do you recall all three
10   complaints?
11   A. No, I don't, but I'm sure I have them.
12   Q. Did you give input into drafting these complaints,
13   any one of them?
14   A. No.
15   Q. Were you ever asked to review these complaints prior
16   to them being filed?
17   A. No, I don't think so.
18   Q. Would that be true for the initial complaint as
19   well?
20   MR. BHARTI:  I think it would be appropriate if
21   you let her see the document so she can remember because
22   referring to documents with that kind of situation.
23   MS. BROTHERTON:  Would you like me to get the
24   initial complaint?
25   MR. BHARTI:  As least if you could even show her

Page 76

1    the cover page, that will be helpful to her.
2    MS. BROTHERTON:  Okay.  Do you mind if we take a
3    break?  Is that okay?
4    (Recess taken 3:42 p.m. to 3:49 p.m.)
5    (Exhibit No. 13 and 14 marked
6    for identification.)
7    BY MS. BROTHERTON:
8    Q. So if we start with Exhibit 13.
9    A. Yes.  You know --
10   MR. BHARTI:  Hold on.  Review the complaint
11   before you answer.  I want you to see the document, complete
12   document before you answer any questions.  So take your
13   time.  There is no tendency to answer right away until you
14   have reviewed it.
15   A. Okay.
16   MR. BHARTI:  Have you?
17   Q. Do you recall this document?
18   A. I don't recall it but I do remember signing
19   something, and this is probably it because it had this
20   number across the top of it.
21   Q. Okay.  Who asked you to sign the document?
22   A. I don't remember.  I'm going to say Eric Dunn but I
23   don't remember him asking.  My signature is definitely on
24   here.  Karen's signature is definitely on here and that
25   comes from the Justice league, so I'm assuming it's Eric.

Page 77

1    Q. Did you have a meeting with Mr. Dunn to review this
2    document?
3    A. I don't remember.
4    Q. Were you provided any drafts prior to this document
5    being signed?
6    A. I don't think -- I don't know.
7    Q. Did you provide any -- I'm sorry?
8    MR. BHARTI:  Can you tell her what draft means
9    so that she knows what --
10   Q. Draft means prior to the final version.  Were you
11   asked for your input into this document or were you asked to
12   review any drafts prior to them finalizing this document?
13   A. No.  I don't think so.
14   Q. Had you read this document before in its entirety?
15   A. No, that I remember.
16   Q. Did you discuss this document with your daughter?
17   A. I don't know.  I don't remember doing it but I might
18   have.
19   Q. And I'm sorry, to confirm, were you in Mr. Dunn's
20   office when you signed this document or were you at home?
21   A. I'm assuming I was in his office.
22   Q. What is your understanding of this document?
23   A. I don't know.  It's a document.  It's a verified
24   complaint.
25   Q. Do you know if your daughter helped write this

Maxine Fortune 12/15/09

Page 78

1  document or if -- do you know if your daughter helped write
2  this document?
3      A. I don't know. I guess I would assume so. It would
4  make sense but I don't know.
5      Q. Exhibit 14 is the first amended complaint.
6      A. Okay.
7          MR. BHARTI: Let's put this away and focus on
8  this. Take a look at the whole document, please.
9      A. I remember reading this but I don't remember what I
10 read. But I do remember back here there, I remember some of
11 the pages. The Northwest Justice league and the initials,
12 and I remember the front page but I don't remember any more
13 about it.
14     Q. Did you see this document prior to it being filed
15 with the court?
16     A. I don't know.
17     Q. Were you asked for any input into this document?
18     A. I can't remember. I don't think so.
19     Q. Did you have meetings with Northwest Justice Project
20 to review this document?
21     A. I don't know. I don't remember.
22     Q. Did you provide a written recollection of the facts
23 to Northwest Justice Project?
24     A. No. I don't think so.
25     Q. Do you understand that this complaint was filed with

Page 79

1  you as a plaintiff?
2      A. Well, I didn't remember that but I guess I am. My
3  name is on there as a plaintiff, yeah. I mean it's not
4  something that they didn't do. I just don't remember.
5      Q. So going back to Exhibit 12 then.
6      A. Uh-huh.
7      Q. It's the second amended complaint.
8      A. Uh-huh.
9      Q. I'm sorry, take a moment to review. Had you seen
10 this document prior to it being filed with the court?
11     A. I don't know.
12     Q. Did you have any discussions with Northwest Justice
13 Project regarding this document prior to it being filed?
14     A. Not that I can remember.
15     Q. Were you asked to give input for this document?
16     A. I don't know.
17     Q. Did you help draft the document?
18     A. No, I don't think so. No, I know -- nobody asked me
19 to draft anything.
20     Q. Thank you. And one last exhibit.
21         (Exhibit No. 15 marked
22          for identification.)
23     A. I remember this.
24     Q. Do you know what this document is?
25     A. Yep.

Page 80

1      Q. Could you tell me what it is.
2      A. It's questions and answers in response to Murphy
3  Pierson's First Set of Interrogatories and Requests For
4  Production of Documents. That's what it says here. To
5  answer what Murphy Pierson said.
6      Q. Okay. Did you receive this document in the mail?
7      A. Yes, I did.
8      Q. And did you fill this out yourself?
9      A. Yes, I did. But I had a little help on it. My son.
10     Q. And how did your son help you?
11     A. Oh, there was some things I didn't really understand
12 and he would sort of explain it.
13     Q. Okay. Did you discuss your responses with your
14 daughter?
15     A. No, I didn't.
16     Q. Did you recollect all the facts in here on your own?
17     A. Um, I think that I got some help on some from Mike.
18     Q. Was your son Mike involved in any of the meetings --
19     A. No.
20     Q. -- of this transaction?
21     A. No. He was just helping me with the questions and
22 saying, you know, what do you remember. Well, write it
23 down. Are you sure that's what it was. Okay, if you're not
24 sure, don't put it in. Now, I don't know if that's good or
25 bad, but he was just trying to make it so that wherever this

Page 81

1  went, um, the people would understand it.
2      Q. Did you type up this document yourself?
3      A. No.
4      Q. Did your son Mike type up this document?
5      A. Yes. Or typed up a copy. I don't know if this
6  is -- yeah. I don't type.
7      Q. But your son does?
8      A. Yes.
9      Q. Did you provide these documents directly to Murphy
10 Pierson's attorney?
11     A. Directly to him?
12         MR. DUNN: Can we take a couple minute recess,
13 please?
14         MS. BROTHERTON: I'm in the middle of a question
15 and answer.
16         MR. DUNN: I think it's best if we take a couple
17 minutes.
18         MS. BROTHERTON: We're in the middle of a
19 question and answer. Can we please finish?
20     MR. DUNN: Yes.
21         MS. BROTHERTON: Thank you. You may answer.
22     A. What was the question?
23         MS. BROTHERTON: Could you read that back.
24
25

Page 82

1           (Question on Page 81, Lines 9
2           through 10, read by the
3           reporter.)
4     A. No.
5     Q. Who did you provide them to?
6           MR. BHARTI: Hold on. That question is over.
7     He wants to break. I think he's entitled to it.
8           MR. DUNN: Let's just get up and take our
9     recess.
10          (Recess taken 4:00 p.m. to 4:03 p.m.)
11    BY MS. BROTHERTON:
12    Q. If I may ask why were you just pulled out of the
13    meeting by your daughter's attorney?
14    A. Because I was worried. My son helped me write up
15    the answers and then I sent them down to the Justice League
16    and they typed them up because I just wrote in, you know,
17    longhand. And I didn't know whether, I didn't know
18    whether -- my son helped me write it up. Nobody else, and
19    he really didn't do a lot. What he did was just kind of
20    help me make sense of it.
21    Q. Okay. So did your son type up the answers?
22    A. He wrote them up.
23    Q. In longhand using a pen?
24    A. Uh-huh.
25    Q. Who typed up the answers?

Page 83

1     A. One of the people down at the Justice League.
2     Q. Okay. Do you think -- did you think at that time
3     that Northwest Justice was representing you?
4     A. I didn't have any representation. They were just
5     helping out.
6     Q. Had you signed the document prior to sending it to
7     them to have it typed up?
8     A. No.
9     Q. Did you sign it after it was typed up?
10    A. Yes.
11    Q. Where did you sign it? I'm sorry, were you in their
12    offices?
13    A. Yeah, I think it was.
14    Q. Did you review the document prior to signing it?
15    A. Yes, I sat down and looked through it.
16    Q. And did it agree with your handwritten answers?
17    A. Yes.
18    Q. Did you retain a copy of your handwritten answers?
19    A. I think I have a copy at home.
20    Q. Okay. Thank you.
21    Q. Is that bad or good?
22          MR. BHARTI: This is not your concern. Your
23    concern is to validate what you know. You're not supposed
24    to validate that. And for the record, Mr. Dunn pulled out
25    and wanted to make sure the truthful testimony is coming

Page 84

1     out. That was his concern. And he made it clear that it
2     should be 100 percent truthful, and that was conveyed to the
3     witness and reinforced by me.
4           MS. BROTHERTON: Mr. Dunn, do you have anything
5     to add since he's speaking for you?
6           MR. DUNN: No, that's what happened.
7           MS. BROTHERTON: Thank you.
8     BY MS. BROTHERTON:
9     Q. Did you discuss your answers with Northwest Justice
10    Project?
11    A. A little bit because my writing and my son's -- you
12    know, you did a little bit but not -- I don't think anything
13    was much changed.
14    Q. Did you make any changes based on those discussions
15    with Northwest Justice Project?
16    A. A few.
17    Q. Okay. Do you recall what those changes were?
18    A. No, I don't now. It didn't change what I wanted to
19    say. It changed what I maybe didn't say right. Wasn't as
20    clear.
21    Q. Okay.
22    A. I don't know how to explain it. But, you know, the
23    way I said it it wasn't -- I don't know. What do I want to
24    say. It wasn't as clear.
25    Q. Okay. Did you discuss the answers that your

Page 85

1     daughter -- with your daughter, the answers that you were
2     providing on these interrogatories?
3     A. No.
4     Q. These are interrogatories and requests for
5     production. Did you provide any documents to produce in
6     response to the request for production?
7     A. No, I don't think so.
8     Q. So if we turn -- if you could turn to the
9     last -- well, I'm sorry, the last four pages, the first two
10    pages of the last four pages.
11    A. The stop payment confirmation?
12    Q. Did you provide that to Northwest Justice Project?
13    A. This is Brian J. Handlin.
14    Q. Did you provide this?
15    A. I don't remember.
16    Q. Do you recall you having a copy of this document, of
17    the stop payment confirmation?
18    A. I can't remember.
19    Q. The next page, MLS report flyer. Is this your
20    document?
21    A. I don't remember. This doesn't even look like our
22    house. Well, it does. It's too dark.
23    Q. If we go to the two pages prior to the stop payment
24    confirmation, it's page 7 of the interrogatories and
25    requests for production. You'll see that --

Maxine Fortune 12/15/09

Page 86

1    A. Okay.
2    Q. There's a title towards the bottom of the page
3  request for production of documents. And there's a request
4  for production No. 1 and then a response and it says, "See
5  attached." Did you provide any documents that were
6  attached?
7    A. I don't think I did. I don't know. I don't
8  remember.
9    Q. If you spent a few minutes reviewing this, would you
10  be able to tell us what changes did happen after your
11  discussions with Northwest Justice Project?
12    A. I don't know that I can. You know, some things
13  here -- I remember that -- I don't have a lot of documents I
14  don't think. You know, I don't have a lot of the documents.
15  If I do, I don't know where they are.
16    Q. On the earlier pages in the interrogatory answers
17  can you -- if you look through those, can you determine what
18  was changed after your discussion with Northwest Justice
19  Project?
20    A. Well, this answer I'm not -- I'm sorry, I did talk
21  to her but I didn't remember at the time.
22    Q. Which answer are we looking at?
23    A. This is answer to No. 4.
24    Q. Okay.
25    A. About Kathryn. I did talk to her but I didn't

Page 87

1  remember it at the time. I never met her in person. I
2  don't know what she looks like.
3    Q. So is this an answer you changed after discussion
4  with your daughter or Northwest Justice Project?
5    A. No. You asked earlier and I remembered then, but I
6  didn't remember that other than leaving a message for
7  Michelle. But I did talk to her after that once and she
8  just said Michelle wasn't there. I asked for Michelle,
9  Michelle isn't here. Will she be back. No, not today. I
10  think for the most part -- a lot of this is just something
11  else. You know, to tell you the truth, as much as I can
12  remember, this is what it was.
13    Q. Okay.
14    A. When it went to Justice League.
15    Q. So, for example, looking at page 4, interrogatory
16  No. 12.
17    A. It says I showed the advertise --
18        MR. BHARTI: Hold on. There is no question. She
19  only asked you to look at it. Question is coming. Just
20  wait for it.
21    A. Okay.
22    Q. Do you recollect now that you were facing
23  foreclosure?
24    A. Yes.
25    Q. Do you recall how you learned that you were facing

Page 88

1  foreclosure?
2    A. I think -- I'm not sure. I either got -- we either
3  got something in the mail or someone told me, but I can't, I
4  can't remember who or when it was. I'm sorry. You know, it
5  may have been something as easy as my son saying.
6        MR. BHARTI: Just tell her what you know and you
7  don't need to --
8    Q. Did your son remind you that you were facing
9  foreclosure?
10    A. He told me that later. I don't know if he did at
11  this time, but later he did.
12    Q. But when you were answering this you recollected
13  that you were facing foreclosure?
14        MR. BHARTI: Asked and answered.
15    Q. When you answered this question you recollected that
16  you were facing foreclosure?
17    A. He did. I didn't.
18    Q. Okay. You did not.
19    A. Until he mentioned it.
20    Q. Did your son help you answer this question then?
21    A. Not that much. But he said yeah, yeah, you were
22  facing foreclosure. You know, it's so confusing to me
23  because even now I have gaps. He's the one that told me
24  about that and I think -- I'm just not entirely sure about
25  that. But I think he's the one that told me and he told me

Page 89

1  while we were working on this. And then it kind of slipped
2  out of the brain and then now it's coming back again.
3  That's what's happening to me. I know something, I know it
4  as well as anybody and then suddenly it's not there. But
5  Mike said we were looking at foreclosure and we needed to do
6  something.
7    Q. Did Mike tell you why you were facing foreclosure?
8    A. He said that it had been already -- we've been told
9  we were facing foreclosure and got papers on it previous,
10  way previous to this, and he said and that's why you went to
11  Alternative Investors. They were the only company that
12  seemed like they would be able to help you. And then he
13  said don't you remember that, and I really didn't, but then
14  as I thought about it it kind of came back.
15    Q. But when we were talking earlier you didn't recall?
16    A. No. I'm sorry. You're going to have -- you're
17  going to find that's going to happen sometimes. I'm going
18  to remember, sometimes I'm going to forget. And then
19  sometimes you'll be standing there and we'll be talking
20  about something and all of a sudden it will come back. Is
21  that bad?
22    Q. Did you have --
23        MR. BHARTI: Just testify to what you remember.
24        THE WITNESS: Okay.
25        MR. BHARTI: You don't need to explain or

Maxine Fortune 12/15/09

Page 90

1    justify.  Whatever comes to your mind tell truthfully.  That
2    is all.
3            THE WITNESS:  Okay.
4        Q.  Did you have additional meetings with Northwest
5    Justice Project after filing the response to this, these
6    interrogatories?
7        A.  I went there a couple of times after that, yes.
8        Q.  Okay.  And what things were you discussing with
9    them?  This is prior to you obtaining your own counsel.
10   What were you discussing with Northwest Justice Project?
11       A.  This is horrible, but let's see.  One time we talked
12   about, you know, what was happening and another time we
13   talked about -- I can't remember.  Oh, I went in with Karen
14   and sat in for a while to hear about these, this because I
15   didn't have a lawyer.  And Eric and his lawyer, another
16   lawyer were there just to give me a general idea what it was
17   going to be like.
18       Q.  And what do you mean what it's going to be like?
19       A.  Well, you know, what would happen.  Where we would
20   be, what would we be doing, who would we be talking.  I was
21   scared out of my mind.  I was going to go stand before a
22   judge and have to give testimony, I wouldn't know what to
23   say.  So it was just kind of a little pep talk for me.
24       Q.  Okay.
25       A.  I didn't have a lawyer at that time.  And since then

Page 91

1    Mr. Bharti has been very good at giving me information,
2    helping me.  I'd never done anything like this before and
3    they were all such nice people, but I didn't know what I was
4    facing.
5        Q.  Prior to obtaining counsel were you asked if you
6    wanted to withdraw as a plaintiff?
7        A.  I don't, I don't think so.  I don't remember.
8        Q.  Did you want to be a part of this lawsuit?
9        A.  I thought I should be.  I thought I had to be.  I
10   mean my name was on a lot of the stuff.  It was Karen and I,
11   you know, mostly.  I don't think I would have asked to be,
12   not to be a plaintiff.  I mean I know it's scary to think
13   about.  But at the same time, you know, if I'm part of it, I
14   should be there to answer if I can.  Isn't that my duty to
15   do?
16       Q.  Were you given other alternatives besides being a
17   plaintiff in this lawsuit?
18       A.  No.
19       Q.  Have you discussed that in particular with Northwest
20   Justice Project?
21       A.  No.  I just assumed -- bad, I know.  But anyway, I
22   just assumed since my name was on the papers and I was part
23   of it, even though a lot of it I didn't remember, um, that I
24   needed to be on it.  I'm there because I was part of it.  It
25   would be wrong to take my name off, wouldn't it?

Page 92

1            MS. BROTHERTON:  I think I'm done but I'm going
2    to ask if others have questions.
3            MR. AOKI:  I have a few questions.
4
5
6                   EXAMINATION
7    BY MR. AOKI:
8        Q.  I just want to follow up a little bit on the line of
9    question about the Northwest Justice Project.  And I know
10   you've been here all day and I know you're getting probably
11   a little fatigued, so I'll just ask you a few questions
12   about that.
13           It sounds like you have the kind of relationship
14   with the Northwest Justice Project attorneys that you trust
15   them?
16       A.  Yes.
17       Q.  And when they were giving you advice you were
18   relying upon that advice?
19       A.  Yes.
20       Q.  And did you get the sense that they were looking out
21   for you?
22       A.  Yes.
23       Q.  And that you're a part of their client's team?
24       A.  You mean the clients Karen and Brian?  I was part of
25   that team.

Page 93

1        Q.  Yes.
2        A.  Yes, I guess I did.
3        Q.  You know, today we learned a lot about some pretty
4    significant incident in your life and that's your heart
5    attack.
6        A.  Yes.
7        Q.  And the impact it has on your ability to recollect.
8    Can you tell us a little bit more about your heart attack.
9    This is the one I'm referring to in June 2008.
10       A.  Yeah, yeah.  Well, I had gone to my chiropractor and
11   came home on the bus.  I was going to stop and then I didn't
12   because I just didn't really feel good but I didn't feel bad
13   and it's a fairly steep hill, up the hill.  And when I got
14   off at Newport Hills at the bottom where the bus stops and
15   then I walked up the hill.  And as I went up the hill I got,
16   you know, I went slower and slower and slower and slower and
17   I felt tireder.  I don't remember what happened but it was
18   right at the, at the end of the sidewalk before the
19   elementary school.  I just fell down flat, flat on my face
20   on the grass.
21           And now this is stuff that I've been told that I
22   don't know about.  There were people, parents that were in
23   cars and they were lined up to take the kids out on,
24   somewhere, I don't know, Remlinger Farm, somewhere like that
25   and they saw me laying there.  And my next door neighbor ran

Maxine Fortune 12/15/09

Page 94

1  down to see who it was and saw who it was.  So she ran and
2  told Karen and Brian who were home.  And the other guy that
3  she was with is a fireman or a policeman, I don't remember
4  which, and he came down and started CPR, you know, whatever.
5  And they called the fire department right away and they got
6  some equipment from the school and came.  And when the
7  fireman got there, the policeman got there, I wasn't
8  breathing.  I don't remember any of this, okay.  But they
9  got me in the ambulance and took me down to Overlake
10  Hospital.  And Karen and Brian came down and then they
11  called Mike at work, my son, and then he came.
12      When I was there apparently I wasn't breathing.  And
13  they at first said that, you know, I'm dead.  They're going
14  to pronounce me dead.  But then I guess that my heart
15  started again or my pulse or something started, and so they
16  decided to put me on a cold pad and take my temperature way
17  down.  Now, the only functioning organs were my heart and my
18  brain apparently, that's sort of the way they said it, and I
19  don't know how long I was there, how long I was under.  I do
20  know that I don't remember much of anything until I was all
21  through.  It was saucered and blown.  What I hadn't had was
22  the pacemaker and defibrillator which they put in, but they
23  had done open heart surgery and a three way bypass.  And
24  then two days later they did the pacemaker and defibrillator
25  which I was kind of woozy, in and out.

Page 95

1      Alert enough that I was a little bit hungry but I
2  was getting better.  But they said I was their miracle child
3  because they didn't think I would live after that.  And, you
4  know, I didn't remember any of it, not at all.  I had a hard
5  time remembering names.  I still have a hard time bringing
6  up things.  People's names basically.  I've known them all
7  for years and years and years and can't remember their
8  names.  If I think about it a little bit, usually they come
9  back.
10      A lot of these questions, give me an hour of two of
11  rest and maybe I can answer some of them.  I don't know.
12  All I know is I believe that I was due to die but that I
13  couldn't die because I had something to do on this earth
14  that I didn't get done.  And I was given that next chance.
15  Brought me back to life so I could do it.  And nothing
16  fancy, you know, nothing big, but just something that was
17  needed to be done and it was my task given to me to do while
18  I was on this earth.
19      Now, maybe that's silly and strange.  Some people
20  really believe it and some people just, you know, oh, yeah,
21  right.  But I have tried to live my life since then to the
22  best of my ability being the person I think I should be
23  rather than, you know -- I don't know if that's answering
24  your question or not.
25      Q.  I appreciate what you're saying.  Just for

Page 96

1  clarification, you were in critical care over at Overlake?
2      A.  Uh-huh.
3      Q.  How long were you in the critical care unit?
4      A.  Karen?
5      Q.  If you don't know, the answer is you don't know.
6  You don't need to look around the table.  I appreciate that.
7      A.  She knows and I don't.  I mean I don't know.  I
8  really don't.
9      Q.  And then you went to nursing care after that?
10      A.  I was in critical care and then I was on the medical
11  wing.  And then after I had my pacemaker and defibrillator,
12  then I went to a place in downtown Bellevue.  It's senior
13  living, penthouse living on the top four floors.  And then
14  it's three floors for people that are recovering from
15  surgery and people that need more care, Alzheimer patients
16  and stuff.  And that's where I was, and I don't even
17  remember how long I was there.  A week at least and maybe
18  two.  I don't know.  And then from there I came home.
19      Q.  Okay, okay.  And it's your understanding it's your
20  heart attack and the circumstances -- excuse me -- your
21  heart attack that caused your inability to recollect certain
22  events?
23      A.  That's what my doctors have told me, yes.
24      Q.  Okay.  And has your ability to recollect events
25  improved over the months since your heart attack?

Page 97

1      A.  Yes, it has.  If you talked to me in September, you
2  would have said oh, send her away.  She doesn't know what's
3  going on and in October was a little better.  I still have
4  problems remembering things of people.  But it's slowly but
5  surely getting better all the time.
6      Q.  So you see -- people have noted to you an
7  improvement from month to month in the last few months?
8      A.  Yeah.
9      Q.  Okay.
10      MR. AOKI:  You know, this is a deposition that
11  was noted by Ms. Brotherton and I'm here because I represent
12  a party to this case.  I want to reserve the rest of my
13  questions in light of the fact that she continues to improve
14  with her recollection and may be able to recollect events
15  prior to this in the next few weeks or so.
16      MR. BHARTI:  I'm going to object.  She's here
17  right now.
18      MR. AOKI:  I understand.
19      MR. BHARTI:  And I'm going to object strongly
20  and unless you make a motion and get a court order, she's
21  not coming here as long as I'm the counsel of record.  So
22  she's here, she is ready to answer questions and that is,
23  you know --
24      MR. WEIBEL:  Well, she changes her answers from
25  not recalling to recalling, we're going to be before a

Page 98

1  judge.
2       MS. BROTHERTON:  Absolutely.
3       MR. BHARTI:  That is what I'm saying.  You go
4  before a judge, get an order, of course, we will comply.
5  But without a court order, she's not coming here as long as
6  I'm the counsel.
7       MS. BROTHERTON:  For the record, I support
8  Mr. Aoki in that right.  And I would like to put on the
9  record that I'm reserving the right to continue this
10  deposition for the same purposes considering the
11  circumstances.
12       THE WITNESS:  Well, you know, I'm not loath to
13  coming back at a future date.  Give me a couple, three, four
14  months and, you know, if you feel that there are questions
15  that I need to answer, you know, we can try again.
16       MS. BROTHERTON:  Thank you.
17       THE WITNESS:  You've all been very, very nice.
18  You've all been very patient and I thank you for that.
19       MS. BROTHERTON:  We appreciate you taking the
20  time this afternoon.
21       MR. WEIBEL:  I don't have any questions today.
22  Not at this time.
23       MR. DUNN:  I did want to ask a couple questions
24  to clarify.
25

Page 99

1              EXAMINATION
2  BY MR. DUNN:
3       Q.  Ms. Fortune, do you remember coming to my office in
4  the fall of 2008 during a time that you were facing eviction
5  proceedings?  It would have been a case filed by Murphy
6  Pierson.  If you don't remember, that's fine.
7       A.  I think I do but I don't know.  I don't know if that
8  was when --
9       Q.  That would have been around the time Karen and Brian
10  first became my clients.
11       A.  And Lizzy was there, and I went out with Lizzy
12  because she was fussing around.
13       Q.  Right.  And do you recall whether I had a
14  conversation with you about whether I could represent you?
15       A.  Yeah, you told me you couldn't.  Didn't you?
16       Q.  And do you recall whether in that conversation I
17  indicated that it would be important for you to be a
18  participant in a lawsuit because you were one of the people
19  who appeared on the title?
20       A.  No, I don't remember that but it makes sense.
21       Q.  Do you recall whether after that day I showed you a
22  copy of a document called Verified Complaint that's marked
23  as Exhibit 13?
24       A.  No, I don't remember that.
25       MR. BHARTI:  Let's show it to her before she

Page 100

1  states.  Take a look before you answer anything.
2       Q.  Could you take a look at Exhibit 13 and look at the
3  very last page, page 13.
4       A.  The very last page?
5       Q.  Yes.
6       MR. BHARTI:  Sometimes fancy words are
7  different.  What you see is different so take a look.
8       Q.  You're looking at page 23 of something called the
9  Verified Complaint?
10       A.  Yeah, here is Verified Complaint.
11       Q.  Does your signature appear on that document?
12       A.  Yes, it does.
13       Q.  Do you believe you read this document before you
14  signed it?
15       A.  I don't know if I did or not.  I can't remember,
16  sorry.  I either read it or someone explained it to me but I
17  don't know.
18       Q.  Above your signature it says that you're the above
19  named plaintiff and on November 7th, 2008 you read and
20  reviewed the foregoing Verified Complaint in that
21  verification and reviewed the contents thereof and believed
22  the same to be true?
23       MR. BHARTI:  Go ahead read it and then answer.
24       Q.  And that you declared under penalty of perjury in
25  the state of Washington that the foregoing was true and

Page 101

1  correct?
2       A.  Well, I signed it, so I must have believed it.  I'm
3  fuzzy about this.
4       Q.  What number did we mark as the interrogatories?
5       THE REPORTER:  15.
6       Q.  Ms. Fortune, could you take a look at document No.
7  15.  It's entitled Plaintiff Maxine Fortune Responses to
8  Defendant Pierson's First Interrogatories and Request For
9  Production of Documents?
10       A.  Uh-huh.
11       Q.  Do you recall having a conversation with me which I
12  indicated that you had been sent a copy of these and needed
13  to respond to them?
14       A.  Yes.
15       Q.  And did I indicate that my office thought it was
16  consistent with the interest of Karen and Brian that you
17  answer the interrogatories?
18       A.  Yes.
19       Q.  And did I say that my office was willing to help you
20  compile the answers and forward them to Murphy Pierson?
21       A.  I think, I think you did say that.
22       Q.  Did I say that our office would help you get the
23  interrogatories answered?
24       A.  Yes.
25       Q.  And did we, did we help you prepare the final

Page 102

1  responses before they were sent?
2      A. I think you did. I don't remember it but I think
3  you did.
4      Q. Did we have an appointment where you came in to
5  review the answers before you signed them?
6      A. You know, I think I did. I think I did remember
7  that.
8      Q. When you came in that day, did you have a couple of
9  documents with you at that appointment?
10     A. Documents with me?
11     Q. Well, do you remember whether you had documents or
12  not when you came in for that appointment?
13     A. I don't remember. I'm really sorry.
14     Q. Could you turn to page, the signature page, No. 8.
15  Page 8 of Exhibit 15.
16     A. Page 8. Okay, how do we find that?
17     Q. Exhibit 15, page 8. Keep going.
18     A. Is this page 8, okay.
19     Q. Yeah, where it's signed.
20     A. That's my signature.
21     Q. And above your signature it says that you certify
22  under penalty of perjury in the state of Washington that the
23  foregoing is true and correct?
24     A. Yes.
25     Q. Did you review these answers before you signed them?

Page 103

1      A. I read through them, yeah.
2      Q. Did you agree that they were true and accurate to
3  the best of your knowledge?
4      A. To the best of my knowledge.
5      Q. And that's why you signed the document?
6      A. Yes. You told me not to sign it if I didn't agree,
7  didn't you?
8      Q. I believe so.
9          MR. DUNN: Nothing further.
10
11
12          EXAMINATION
13  BY MS. BROTHERTON:
14     Q. I have another question. If we could go back to
15  Exhibit 6, please.
16     A. 6?
17     Q. Yes, please. If you could go to page 18.
18     A. Okay.
19     Q. Right above where the buyer's signature is, buyer
20  and seller signatures are, the last line there says, "I have
21  had adequate time and opportunity to read and understand
22  these instructions and all other existing documents referred
23  to in these instructions." Because you signed below that,
24  would you have read that?
25          MR. BHARTI: Okay. Hold on. I'm going to

Page 104

1  object because this is beyond the scope of redirect or
2  recross-examination. This question has been asked and
3  answered. So objection, asked and answered. Beyond the
4  scope. Go ahead.
5      Q. You can go ahead and answer the question.
6      A. What are you asking me?
7      Q. Above the signature lines, the last line there
8  says -- above the signature line it says, "I have had
9  adequate time and opportunity to read and understand these
10  instructions and all other existing documents referred to in
11  these instructions."
12     A. Well, I signed down here. That's my signature.
13     Q. And in your normal procedure would you have read --
14     A. I don't know that I read it all. You know, that's
15  my problem. In the first place most of this is so small,
16  it's hard to read. So generally speaking, I kind of skim
17  it. Not read it thoroughly.
18     Q. Okay. But you would have read this line and still
19  signed the document?
20          MR. BHARTI: Asked and answered. She already
21  answered it.
22          MS. BROTHERTON: It's a different question.
23  Please let her answer.
24          MR. BHARTI: Objection. Asked and answered. Go
25  ahead. Do you know what the question is?

Page 105

1      A. Yes. Yes, I would have signed it.
2      Q. If we can go to page 22. Above the signature lines
3  there it states, "I have had adequate time and opportunity
4  to read and understand these instructions and all other
5  existing documents referred to in these instructions."
6          MR. BHARTI: Hold on. Let me make the same
7  objection. Beyond the scope. Asked and answered. Go
8  ahead.
9      Q. Would you have read that statement?
10     A. What is he saying to you or what does he mean?
11     Q. Your attorney is stating objections for the record
12  but you still answer the question.
13          MR. BHARTI: My objection what I'm raising is
14  that this question has been previously asked and you have
15  already answered it. So repetition is not permitted. I'm
16  trying to protect that objection. So despite my making the
17  record, you again are requested to go ahead and answer.
18  Make sense?
19          THE WITNESS: Not really.
20          MR. BHARTI: Go ahead then.
21     A. Like I said, I scanned but I maybe didn't read the
22  whole thing real carefully.
23     Q. Would you have read this line prior to signing below
24  it?
25     A. Yeah. Yes.

## Page 106

1      MS. BROTHERTON:  Thank you.  I'm all done for
2  today.
3
4           EXAMINATION
5  BY MR. AOKI:
6      Q.  If I can ask just a quick question for followup.
7  When you were executing your signature on these documents,
8  did you understand that you were committing to follow the
9  terms and conditions of the document?
10     A.  I was told that when I signed.
11     Q.  But that's what you understood you were doing by
12  signing that you were going to follow those terms and
13  conditions?
14     A.  I questions so, yeah.  You know, I'm not
15  guaranteeing --
16     MR. BHARTI:  There is no question.  You answered
17  it.  Unless there's a question, you don't have to be taking
18  everybody's time.  Are we done?
19     MS. BROTHERTON:  We are.  Thank you again.
20     MR. BHARTI:  Let me make a quick record.  For
21  the record for each party I'm representing Maxine Fortune.
22  I filed my notice of appearance over the weekend and within
23  a couple of days we are here for the deposition of Maxine,
24  even though I had other conflicts to accommodate the parties
25  so that the noted deposition proceeds.

## Page 107

1      So since we have made the effort to cancel some -- I
2  had a board meeting, I'm on the board of lawyers helping
3  hungry children, I had to let go of that meeting.  We still
4  took care of the deposition and this was properly noted.  So
5  my objection is if anybody tries to rehash and try to do
6  their deposition again, it's highly improper and without a
7  court order we will be resisting to show up again.
8      If you have any further questions, it is only 4:37,
9  38.  And it has been three hours and about ten minutes of
10  deposition time utterly devoted by Maxine which is pretty
11  much close to the time deposition taken by the previous
12  witness.  So, if you have any further questions, this is
13  your opportunity.  You have all the time you want.  I'm
14  going to be here, but after we walk out, you're not going to
15  see her again unless there is a court order.  Thank you very
16  much.
17     MR. WEIBEL:  I would just add so long as
18  Ms. Fortune doesn't recall and change her answers from what
19  she's testified here today, we will not be seeking her
20  deposition.
21     THE WITNESS:  You know something, I don't
22  know --
23     MR. BHARTI:  No.  There is no question from you.
24  Just hold on.
25     THE WITNESS:  Thank you.

## Page 108

1      MR. BHARTI:  I know you guys love to talk.
2      THE WITNESS:  We're friends.
3      MR. BHARTI:  No, we're not.  So you are
4  instructed to --
5      THE WITNESS:  My son went back home and now he's
6  going to come back down to get us to take us home.
7      MS. BROTHERTON:  Okay.  Thank you.
8      MR. BHARTI:  Reserve signature.
9      (Signature reserved.)
10     (Deposition adjourned at 4:42 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 109

1  STATE OF WASHINGTON )   I, Mary W. Miller,
                        ) ss CCR 2653 a
2  County of KING      )   duly authorized Notary
3                          Public in and for the
                            State of Washington
4                          residing at Issaquah,
                            do hereby certify:
5
6
7      That the foregoing deposition of MAXINE FORTUNE
   was taken before me and completed on December 15, 2009, and
8  thereafter was transcribed under my direction; that the
   deposition is a full, true and complete transcript of the
9  testimony of said witness, including all questions, answers,
   objections, motions and exceptions;
10     That the witness, before examination, was by me
   duly sworn to testify the truth, the whole truth, and
11  nothing but the truth, and that the witness reserved the
   right of signature;
12
       That I am not a relative, employee, attorney or
13  counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
14  financially interested in the said action or the outcome
   thereof;
15
16     IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my official seal this 28th day of December,
17  2009.
18
19
20         Mary W. Miller
           Notary Public in and for the State
21         of Washington, residing at Issaquah.
22
23
24
25

Maxine Fortune 12/15/09

## Page 110

```
1                CORRECTION SHEET
2
     Deposition of:  MAXINE FORTUNE
3    Date:  December 15, 2009
     Case:  Handlin v Pierson, et al
4    Cause No.:  C08-1861-JCC
     Reporter:  Mary W. Miller
5
     Instructions:  Please carefully read your deposition and on
6    this correction sheet make any changes or corrections in form
     or substance that you feel should be made.  You may add
7    additional sheets, if necessary.  Please do not mark the
     transcript.  Thank you.
8
     PAGE #  LINE #  CORRECTION       REASON FOR CORRECTION
9
10   _____  _____  _____       _____
11   _____  _____  _____       _____
12   _____  _____  _____       _____
13   _____  _____  _____       _____
14   _____  _____  _____       _____
15   _____  _____  _____       _____
16   _____  _____  _____       _____
17   _____  _____  _____       _____
18   _____  _____  _____       _____
19   _____  _____  _____       _____
20   _____  _____  _____       _____
21   _____  _____  _____       _____
22   _____  _____  _____       _____
23   _____  _____  _____       _____
24   _____  _____  _____       _____
25   _____  _____  _____       _____
```

## Page 111

```
1         I, MAXINE FORTUNE, do hereby declare under penalty
2    of perjury that I have read the foregoing transcript of my
3    deposition; that I have made such corrections as noted
4    herein, in ink, initialed by me, or attached hereto; that my
5    testimony as contained herein, as corrected, is true and
6    correct.
7
8         EXECUTED this_____day of_____, 2010, at
9    _____(City),_____(State).
10
11
12                 _____
13                 MAXINE FORTUNE
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 112

```
1    Date: December 29, 2009
2
3    To:  ERIC DUNN
          Northwest Justice Project
          401 Second Avenue S.
4         Suite 407
          Seattle, Washington  98104
5
     Case: Handlin v Pierson, et al
6    Cause No.: C08-1861-JCC
     Deposition of: MAXINE FORTUNE
7    Date Taken: December 15, 2009
8    The above transcript must be read and the Correction Sheet
     signed within 30 days of this notice or before the trial
9    date.  If the Correction Sheet is not signed within that time
     period, signature will be deemed waived for all purposes.
10
     Please contact the witness and arrange a convenient time and
11   place for reading and signing.
12   After the Correction Sheet is signed, please mail the signed
     original Correction Sheet to:
13
               KARI BROTHERTON
14         Ryan Swanson & Cleveland
           1201 Third Avenue, Suite 3400
15         Seattle, Washington  98101
16   FAX ADDITIONAL COPIES TO:
     Esquire Deposition Services
17   Fax No.: 206.624.9995
     RUSSELL M. AOKI
18   Fax No.: 206-442-4396
     DAVID A. WEIBEL
19   Fax No.: 206-622-0354
     HARISH BHARTI
20   Fax No.: 866-664-0667
21
     Reporter: Mary W. Miller
22   License No.:  2653
23
     Cc: RUSSELL M. AOKI, DAVID A. WEIBEL, HARISH BHARTI
24
25
```

## Page 113

```
1    Date:  December 29, 2009
2
3
4
5    To:  KARI BROTHERTON
          Ryan Swanson & Cleveland
          1201 Third Avenue
6         Suite 3400
          Seattle Washington 98101
7
     Case:  Handlin v Pierson, et al
8    Cause No.:  C08-1861-JCC
9
10
11
     YOU ARE HEREBY NOTIFIED that the following original
12   transcript has been sealed and served upon you for filing:
13   Deposition of:  MAXINE FORTUNE
14   Taken:  December 15, 2009
15   Signature:    Waived  _____
16          Reserved _XX__
              Within 30 days or before the trial date,
17            the witness should forward to you the
              original signed correction sheet, which can
18            be filed separately at the time of trial.
19            Do not open the sealed transcript.
20
21
22
23
24   cc: ERIC DUNN, RUSSELL M. AOKI, DAVID A. WEIBEL, HARISH
     BHARTI
25
```