UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

KAREN HANDLIN, BRIAN HANDLIN, and       )
MAXINE FORTUNE,                          )
                                         )
            Plaintiffs,                  )
                                         )
        vs.                              ) No. C-081-861-JCC
                                         )
MURPHY PIERSON, MICHELLE MERCERI,        )
KATHERINE MERCERI, ALTERNATIVE           )
INVESTORS, INC., FOCUS MORTGAGE, LLC,    )
AZ-WA INVESTORS, (a partnership),        )
RECONTRUST COMPANY, N.A., and GMAC       )
MORTGAGE CORPORATION,                    )
                                         )
            Defendants.                  )
                                         )
_____

DEPOSITION UPON ORAL EXAMINATION OF;

JOSEPH ROSS MURASHIE

_____

Tuesday, November 3, 2009
9:20 a.m.
401 Second Avenue South, Suite 407
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR

Lic. No. DE-JO-NM-J498K9

DEPOSITION OF JOSEPH MURASHIE, 11/3/09

2 (Pages 2 to 5)

### Page 2

APPEARANCES

For the Plaintiffs:    ERIC DUNN, Esq.
                and LETICIA CAMACHO, Esq.
                401 Second Avenue South,
                Suite 407
                Seattle, Washington 98104

For Defendants Jones,      KARI BROTHERTON, Esq.
Aylesworth:          1201 Third Avenue, Suite 3400
                Seattle, Washington 98101

For Defendant Michelle      RUSSELL M. AOKI, Esq.
Merceri, Focus Mortgage:   701 Pike Street, Suite 1525
                Seattle, Washington 98101

For Defendant Mark      DARRELL S. MITSUNAGA, Esq.
Merceri:          1601 114th Avenue SE, Suite 110
                Bellevue, Washington 981004

For Defendant GMAC:      DAVID A. WEIBEL, Esq.
                720 Olive Way, Suite 1301
                Seattle, Washington 98101

For Defendant AZ-WA:      JOHN A. HOLMES, Esq.
                600 University Street,
                Suite 2424
                Seattle, Washington 98101

For Defendant Murphy      DAVID DANIEL, Esq.
Pierson:          5224 Wilson Avenue North,
(via telephone)        Suite 200
                Seattle, Washington 98118

Court Reporter:        MARLIS J. DeJONGH, CCR, RPR
                1400 Hubbell, Suite 1510
                Seattle, Washington  98101

### Page 3

INDEX OF EXAMINATION

                              Page(s)

Examination of Joseph Murashie

By Ms. Camacho                    4
By Mr. Dunn                      19
By Ms. Brotherton                  21

Further Examination

By Ms. Camacho                    34

INDEX OF EXHIBITS

No.  Description            Marked  Identified

1.  Appraisal, 9/19/07        7      7

### Page 4

1    MS. CAMACHO:  Good morning.  My name is Leticia
2  Camacho with the Northwest Justice Project and my
3  colleague Eric Dunn, also with the Northwest Justice
4  Project.
5    This is a deposition in the matter of Karen
6  Handlin, Brian Handlin and Maxine Fortune, the
7  plaintiffs, and defendants Murphy Pierson, Michelle
8  Merceri, Katherine Merceri, Alternative Investors, Focus
9  Mortgage, AZ-WA Investors, Rainier Title, GMAC Mortgage
10  Corporation, Mark Merceri, James Aylesworth, Shawn Casey
11  Jones, and MortgageClose dot com.
12    This deposition is being held at the offices of the
13  Northwest Justice Project.  Today's date is November
14  3rd, 2009.
15    Notice of this deposition was given to all the
16  litigants either electronically or by first class mail,
17  and either through their attorneys or if they were
18  representing themselves individually.
19    In the room we have Ms. Kari Brotherton, Mr. John
20  Holmes, Mr. Darrell Mitsunaga, Mr. Russell Aoki, and
21  participating by telephone Mr. David Daniel.
22    MR. WEIBEL:  David Weibel is present as well.
23    MS. CAMACHO:  Yes, Mr. David Weibel is also present
24  with us.
25

### Page 5

1  JOSEPH ROSS MURASHIE,   deponent herein, being first duly
2              sworn on oath, was examined and
3              testified as follows:
4
5              EXAMINATION
6  BY MS. CAMACHO:
7    Q.  Mr. Murashie, have you had a deposition before?
8    A.  Yes.
9    Q.  I will ask you some questions to find out about the
10  facts in this case.  You understand that?
11    A.  Yes.
12    Q.  If you do not understand a question, you can ask me
13  to rephrase it.
14    A.  Okay.
15    Q.  Now if you answer a question I will assume that you
16  have heard it and understood it.  You understand that?
17    A.  Yes.
18    Q.  You have also taken an oath to tell the truth.  Do
19  you understand that?
20    A.  Yes.
21    Q.  Please state your full name for the record.
22    A.  Joseph Ross Murashie.
23    Q.  And what is your address?
24    A.  Post office or street, for the company or for
25  myself?

DEPOSITION OF JOSEPH MURASHIE, 11/3/09

3 (Pages 6 to 9)

Page 6

1    Q.  Where do you receive mail?
2    A.  My mail comes to me via the post office, Post
3  Office Box 3744, Bellevue, Washington, 98009, dash, 3744.
4    Q.  And actually go ahead and give me the address of
5  your company.
6    A.  My company presently is located at 14400 Bel, dash,
7  Red Road, Bellevue, Washington, Suite 103, 98007.
8    Q.  And what is the name of your company?
9    A.  Northwest Group.
10   Q.  What is your occupation?
11   A.  I have two licenses, one as a certified real estate
12  appraiser and one as a real estate broker.
13   Q.  Now how long have you been a certified residential
14  real estate appraiser?
15   A.  1994 was my first issued license.
16   Q.  And how do you become a certified real estate
17  appraiser in Washington?
18   A.  You go through two years of training with another
19  licensed or certified appraiser and you take a multitude of
20  tests and X number of courses.  And today you have to have a
21  degree.  The laws have been changing as we've been
22  progressing, or they're getting stiffer and stiffer, which
23  is good.
24   Q.  Once you become a certified real estate appraiser,
25  is there anything that you have to do to maintain that

Page 7

1  certification?
2    A.  Correct.  Just as attorneys, we have continuing
3  education requirements.
4    Q.  And have you kept up with all the requirements of
5  that ongoing education for certification purposes?
6    A.  Correct.
7    Q.  You mentioned that you own Northwest Group.  How
8  long have you owned this company?
9    A.  Since 19 -- a good question -- 82, I believe.
10   Q.  So did you have Northwest Group in 2007?
11   A.  Yes.
12       (Exhibit No. 1 marked for identification.)
13   Q.  Mr. Murashie, I'm showing you what has been marked
14  as Exhibit 1.
15   A.  Okay.  Very thick.
16   Q.  Do you recognize that document?
17   A.  Ah, interesting.
18       (Witness reviewing document.)
19       There's some very interesting pages here that I'm
20  curious how they were gotten in that I did not release them.
21   Q.  That is the file that we received.
22   A.  It appears to be the same as the original file.
23       But I was curious how they were received in that I
24  didn't authorize the departure of most of this report, which
25  is private information.

Page 8

1    Q.  We received that document through discovery.
2       Do you recognize it?
3    A.  That's what I say, it appears to be a full copy of
4  my entire report file.
5    Q.  So did you do that appraisal?
6    A.  Oh, yes, I remember the house and the basic work,
7  some of my training notes, et cetera.  That's why I'm
8  curious how that was received.  But, yes, it appears to be a
9  copy of the file of my report.
10   Q.  Is that the complete file then?
11   A.  Yes.
12   Q.  When did you do that appraisal?
13   A.  The inspection took place on 9/19/2007.
14   Q.  And is that your signature on the page that is
15  marked NWG 0003?
16   A.  Correct.  That's a -- had we already gone to
17  electronic signatures or not?  That's a good question.
18  Yeah, I think that's my, looks more like it could be my
19  original signature, not my electronic signature.
20   Q.  Then do you believe that to be a correct copy of
21  the appraisal that you did on that property?
22   A.  It appears to be.
23   Q.  And the property that I'm referring to is
24  5639 129th Avenue Southeast, Bellevue, Washington, 98006?
25   A.  You said 5623 129th, right?

Page 9

1    Q.  No, 5639.
2    A.  5639?  That is not it.
3    Q.  I apologize.  Yes, 5623.  Is that correct?
4    A.  Correct.
5       MS. CAMACHO:  I ask that this exhibit be admitted
6  into evidence for purposes of this deposition.
7    Q.  Now who did you do this appraisal for?
8    A.  Focus Mortgage.
9    Q.  And did you reach a conclusion about the market
10  value of that property?
11   A.  Yes.
12   Q.  And what was the market value of the property?
13   A.  $505,000.
14   Q.  Can you repeat that again?
15   A.  $505,000.
16   Q.  What approach did you use in order to arrive at
17  that market value for that property?
18   A.  I used all three required reports:  The sales
19  comparison approach, the cost approach, and the income
20  approach, because it was a nonowner occupied at the time.
21   Q.  And the value, the $505,000 that you listed, is
22  that based on any particular approach of those that you have
23  mentioned?
24   A.  It is more heavily weighted towards the sales
25  comparison approach.

DEPOSITION OF JOSEPH MURASHIE, 11/3/09

4 (Pages 10 to 13)

Page 10

1    Q.  And what does it mean to do a sales comparison
2  approach?
3    A.  You use similar sales in the recent history within
4  the confined geographical area.
5    Q.  And in this case did you do an analysis of the
6  neighborhood then?
7    A.  Yes.
8    Q.  Did you find any factors about the neighborhood
9  that made the location of the property appealing?
10   A.  Did you say made it appealing?
11   Q.  Yes.
12   A.  It's in a neighborhood that I originally lived in
13  when I first moved to Bellevue in 1973 so I was very
14  familiar with the neighborhood.  It was an average house,
15  basic average condition in an average neighborhood.
16   Q.  Did you find any unfavorable factors based on the
17  neighborhood?
18   A.  Not particularly.
19  Let me double check but I don't believe so.
20  Right, as stated, there were no unfavorable factors
21  noted.
22   Q.  Now did you make an analysis of comparable
23  properties in the neighborhood?
24   A.  Yes.
25   Q.  How do you determine whether a property is

Page 11

1  comparable?
2    A.  By appearance.
3    Q.  What do you mean by that?
4    A.  And statistical facts.
5  We pull up from the county records the county data
6  sheets and from the MLS system their county data sheets, and
7  so we compare them so that the size is approximately the
8  same size, the same age, the same condition, were there any
9  improvements.  If they have had improvements, we want to
10  find comparables with similar improvements.  Similarity is
11  the name of the game within a confined area.
12   Q.  And how many comparable properties did you look at
13  for your report in this case?
14   A.  I examined 21 sales and listings, and then an
15  additional number of expired, pending, et cetera, listings.
16   Q.  Now --
17   A.  And sales.
18   Q.  If you look at the reports on the page that is
19  listed NWG 005 --
20   A.  Okay.
21   Q.  At the top of the page you list three comparable
22  sales?
23   A.  Yes.
24   Q.  Is that -- were these the primary houses that you
25  were looking at in comparison to this site?

Page 12

1    A.  Correct.  I came back with four that were quite
2  similar and so I used three of the four.
3    Q.  Now did you research the sale or the transfer
4  history of the property and the comparable houses?
5    A.  Yes.
6    Q.  Now is the data that you considered regarding those
7  properties, the comparable properties included in your
8  report?
9    A.  In this one that you have.  You have all my backup
10  data, which I'm surprised you have.
11   Q.  But is all that information --
12   A.  It appears to be correct.
13   Q.  Now as to the house itself, 5623 129th Avenue
14  Southeast in Bellevue, did you find out whether the property
15  was in zoning compliance?
16   A.  Yes.  As indicated in the site section --  okay,
17  yeah, it was grandfathered in, which means it was built
18  under one set of zoning conditions that have changed since
19  the original construction.
20   Q.  So the answer is yes, it was in zoning compliance?
21   A.  Yes.
22   Q.  Now did you determine in looking at the property
23  whether the use of the property was the highest and the best
24  use of the property at the time?
25   A.  Yes.

Page 13

1    Q.  Were the utilities and off-site improvements
2  typical for the market area?
3    A.  Yes.
4    Q.  Did you find any adverse site conditions or
5  external factors?
6    A.  No.
7    Q.  Did you go to the site of the property?
8    A.  Yes.
9    Q.  Is the description of the site which is listed in
10  your report under NWG 004 under section called Improvements,
11  is that an accurate description of your observations
12  regarding the property?
13   A.  Correct.
14   Q.  Now was the house maintained well and in good
15  condition?
16   A.  The house appeared to have been well lived in so
17  there's always some general cleanup areas.  But no
18  structural damage, no safety hazards were noted.
19   Q.  You mentioned the house appeared to be well lived
20  in, but was it in good condition?
21   A.  Average condition.
22   Q.  Did you find any functional problems with the
23  house?
24   A.  No.  As I had said, there were no structural or
25  safety hazards or deficiencies in the building.

DEPOSITION OF JOSEPH MURASHIE, 11/3/09

5 (Pages 14 to 17)

Page 14

1    Q.  And did the property generally conform to the
2  neighborhood?
3    A.  Yes.
4    Q.  Now is the market value that you listed, $505,000,
5  which is on page NWG 005 --
6    A.  Right, the 505 number?
7    Q.  Yes.  Was that an accurate figure based on your
8  analysis of the property?
9    A.  Correct.
10   Q.  Did you do a single-family comparable rent
11 schedule?
12   A.  Yes.  It is attached --  let's see --  you had it
13 as -- okay, it is your exhibit NW 0010.
14   Q.  Now, for this rental survey did you rely both on
15 the property and comparable properties as well?
16   A.  Yes.
17   Q.  What did you find rental market to be for this
18 property?
19   A.  As I indicated here, between 1745 and 2200 a month,
20 as the grid shows.
21   Q.  And do you always do a rental survey when you do an
22 appraisal of a property?
23   A.  No.
24   Q.  So why did you do one in this case?
25   A.  It was requested.

Page 15

1    Q.  And who requested it?
2    A.  I would suspect -- let me double check something
3  here, because the borrower was not living there at the time.
4  Nonowner occupied property is income property and the state
5  requires an income analysis.  At least -- not the state but
6  most mortgage companies.  I take that back.
7    Q.  Would that request then come in from Focus
8  Mortgage?
9    A.  Yes.
10   Q.  Now did you also do an operating income statement?
11   A.  Correct, and that is 0011 and 0012.
12   Q.  And what does an operating income statement tell
13 you?
14   A.  Basically how much money is going through the
15 operation and -- this is an interesting one because the net
16 cash flow, the last number is a minus $1120, which means
17 it's eating somebody's pocket.
18   Q.  And what figure are you looking at, Mr. Murashie?
19   A.  Down on page 0012, a third of the way down
20 underneath the double-lined operating income reconciliation
21 bar.  Then you see in here we have effective gross income,
22 and the total operating expenses, the operating income, the
23 monthly operating income.  Then on the next line, the
24 monthly operating income with the monthly housing expense,
25 which usually incurs the debt, and then what the net cash

Page 16

1  flow is.
2    Q.  And where did you get the figure for monthly
3  housing expenses?
4    A.  I got that out of the manuals of doing the analysis
5  of the income statement.  The backup for that is with
6  Marshall & Swift, which is updated quarterly.  Plus what the
7  MLS system shows is the operating income and what the rental
8  schedules show on the previous portion of what the common
9  rentals in that area are.
10      One of the key things that operates the expense is what
11 the outflow for the mortgage is and insurance.
12   Q.  Now do you always do an operating income statement
13 when you do an appraisal of a property?
14   A.  No, only when it's a nonowner occupied.  That's
15 what's required by most of the mortgage firms.
16   Q.  Now how did you determine that this was a nonowner
17 occupied house?
18   A.  On county records, which is your page 0027, the
19 owner's name is right there via con records of that time
20 frame, and then on page 0004 you have the borrower's name,
21 which was supplied by the mortgage, the Focus Mortgage.
22   Q.  I'm looking at 004.  Where are you looking at?
23   A.  At the very top, the second line down.
24   Q.  Murphy Pierson?
25   A.  Yeah.

Page 17

1    Q.  Now prior to this appraisal had you done any other
2  appraisals for Focus Mortgage?
3    A.  Yes.
4    Q.  And do you have any idea of how often you work with
5  Focus Mortgage?
6    A.  Yeah, if I had known that was going to be a
7  question, I could have looked that up, because I do keep a
8  tally of all the jobs I do.  I would guess maybe ten
9  percent, or something of that nature.
10   Q.  Ten percent of your work?
11   A.  Yeah.
12   Q.  Of your personal work or your company's work?
13   A.  My company at that time was just on the downsizing,
14 so I was down to five associates and about 45 customers.
15   Q.  And since you did this appraisal do you recall if
16 you did any other appraisals for Focus Mortgage?
17   A.  Some.  I was starting to slow down on accepting
18 their orders.
19   Q.  And why was that?
20   A.  Some mortgage companies require us to try to make
21 certain numbers, and being an honest appraiser, you make
22 what is real, not what is thought to be real.
23   Q.  And what had, what specifically had Focus Mortgage
24 asked you to do?
25   A.  Well, in some cases, and I would have to get each

Page 18

1 file out to see, but they asked me to meet a number and I
2 give them a theoretical, an electronic analysis, which is
3 against the law today but wasn't then, of what the spread
4 should be.
5    Q.  And had Focus Mortgage asked you for any specific
6 numbers in this case?
7    A.  Well, that's why I'm surprised that you've got this
8 file, the full file, because this file unfortunately is
9 missing in my files and I'm quite disturbed about that.
10    Hm, interesting.  On 0027, the purchase and sale price
11 theoretically was $465,000.  The purchase and sale agreement
12 as of 8/04/07 was $465,000.  There had been no MLS listing
13 within the past 12 months as of page -- your page 0004, and
14 I came up with a number of 505, which is above it.
15    And in the '03, '04, '05, '06, part of '07 before the
16 crash happened, the values were going up extremely high,
17 eight percent, 12 percent, 18 percent, in some cases above
18 25 percent, over what the assessed value was.  And so the
19 market was climbing extremely fast at that time, encouraged
20 by whatever.  I have my -- well, I'll be quiet.
21    Q.  Are you currently doing appraisals for Focus
22 Mortgage?
23    A.  No.  I don't know if they even exist anymore.
24    Q.  Have you done any appraisals for Michelle Merceri
25 outside of Focus Mortgage?

Page 19

1    A.  No, not to my knowledge.
2    Q.  Now in preparing this particular appraisal of the
3 site did you comply with the requirements of the Code of
4 Professional Ethics and the Standards of Professional
5 Appraisal Practices?
6    A.  Yes.
7    MS. CAMACHO:  Mr. Dunn?
8
9    EXAMINATION
10 BY MR. DUNN:
11    Q.  Mr. Murashie, I wanted to see if you could clarify.
12 You mentioned that it was a nonowner occupied property and
13 you pointed to the document showing the name of the owner,
14 Maxine Fortune, the name of the borrower as Murphy Pierson.
15    Now normally when someone takes on a mortgage loan,
16 aren't they actually going to become the owner once they get
17 the loan and they're going to buy the property?
18    A.  As a rule.
19    Q.  Was this a different situation than the normal one
20 than I just described?
21    To clarify the question, what I'm asking is, do you know
22 whether Murphy Pierson was intending to buy the house and
23 become the owner and then occupy the property or not?
24    A.  Well, what is interesting is, and that's why I was
25 going through this so quickly, I'll go through it one more

Page 20

1 time to see, that would verify what you just asked.  And it
2 is something that I require.  That's why I'm concerned that
3 the file is missing out of my files.  That upsets me very
4 much.
5    Okay, now here we have the buyer -- we have the document
6 that I was looking for.  We have a purchase and sale
7 agreement saying --
8    Q.  Which document are you looking?
9    A.  0067 that says that this is a purchase and sale
10 agreement dated August 4, and on page 004, when it says the
11 subject lender, and then it says under there, is this a
12 purchase and sale agreement, it's marked yes.  And then it
13 says the purchase and sale agreement, 8/4/07 for 465,000
14 with no past MLS listing.  So, yes, it was a sale.
15    Q.  So I guess I'm confused.  When you say you were
16 appraising this as a nonowner occupied property, did you
17 have reason to think that Murphy Pierson was not going to
18 occupy the property after he bought it?
19    A.  It must -- again, because the file is missing,
20 which I'm upset about, I must have been asked by the
21 mortgage company to do an income statement and a rental
22 analysis.
23    Q.  Is it common for someone who intends to actually
24 occupy a property that they're going to buy to ask for the
25 rental analysis and income statement?

Page 21

1    A.  No.
2    Q.  Then last, you mentioned that you discovered that
3 some of your documents are missing from your own file.
4    A.  Yes.
5    Q.  When did you learn that?
6    A.  When I got your notice.
7    Q.  Do you have any knowledge as to where they have
8 gone or how they turned up missing?
9    A.  No.  Now, I have changed my location but not since
10 this job.  So my storage location has been the same.  And
11 that's why I'm quite concerned.  There might have been
12 something happening in my office that I'm unaware of which
13 makes me very concerned.
14    MR. DUNN:  Thank you.
15
16    EXAMINATION
17 BY MS. BROTHERTON:
18    Q.  Mr. Murashie, I'm Kari Brotherton.  We met earlier.
19 I represent two of the defendants, Shawn Casey Jones and
20 James Aylesworth.  I would like to ask you a few questions
21 as well.
22    Have you met Shawn Casey Jones?
23    A.  I haven't the slightest idea.
24    Q.  Have you met James Aylesworth?
25    A.  Again, I don't have the slightest idea.

DEPOSITION OF JOSEPH MURASHIE, 11/3/09

7 (Pages 22 to 25)

Page 22

1    Q.  Do you know if you've done appraisal work for
2  either one of them?
3    A.  That's a hard question to answer.  One of my
4  previous associates had indicated that the same entity was
5  buying a number of homes through and with Focus Mortgage.
6    Q.  Who was that previous associate?
7    A.  Todd Fenell (phonetic) -- F-e-n -- e-mail me and
8  I've got all the records.
9    Q.  Is he with a specific company?
10    A.  He now, I think, has his own company, which happens
11  with most of my trainees.  As soon as they learn the
12  process, they leave the company, and hopefully they don't
13  take too many of my customers with them, but on occasion it
14  happens.  So I don't know what is going on in his world
15  right now.
16    Q.  So when you called him your previous associate, you
17  meant associate as an employee of Northwest Group?
18    A.  Yes.
19    Q.  And when you say that you have been hired or
20  engaged by Focus Mortgage, who specifically has that been
21  within Focus Mortgage?
22    A.  Michelle, and I would have to find her last name in
23  my records.  But her first name is Michelle, because it's
24  written on my notes.
25    Let's see, one other place.  It's not showing --  maybe

Page 23

1  I -- again, I don't know her last name.
2    Q.  Would it be Michelle Merceri?
3    A.  Yes.
4    Q.  You mentioned at the beginning that you had been
5  deposed before.  Have you been deposed for any other matter
6  involving Michelle Merceri or Focus Mortgage?
7    A.  No.
8    Q.  Have you been interviewed in relation to any
9  investigation into Michelle or Focus Mortgage?
10    A.  Not to my knowledge.
11    Q.  So could you tell me about your relationship with
12  Michelle Merceri?
13    A.  I believe I have only physically met her once or
14  twice.  Everything is through the fax machine, the telephone
15  and e-mail.
16    Q.  And about when did you first meet Ms. Merceri?
17    A.  If you e-mail me that question I could find that
18  out.
19    Q.  Was it as far back as 1982 when you first owned
20  Northwest Group or was it in the last ten years?
21    A.  I would think the last ten years.
22    Q.  And to your knowledge, during the entire time that
23  you have known Michelle Merceri, has she been associated
24  with Focus Mortgage?
25    A.  That's a good question.  A lot of the mortgage

Page 24

1  people jump companies like used car salespeople, so I don't
2  know.
3    Q.  Have you ever done any work with her outside of
4  appraisals?
5    A.  Not that I know of.
6    Q.  Have you done any work, you personally, or
7  Northwest Group, done any work with a company called Avere
8  Private Lending?
9    A.  Again that question has to be e-mailed me so I can
10  do proper research.  I don't believe so.
11    Q.  Have you as an individual or as Northwest Group
12  done any work with Alternative Investors?
13    A.  Again that would require more research, but I don't
14  believe so.
15    Q.  And the same question in relation to AZ-WA
16  Investors?
17    A.  Same answer.
18    Q.  Do you have any knowledge of a partnership named
19  Alternative Investors or AZ-WA Investors?
20    A.  Again, not to my knowledge, without more research.
21    Q.  Did you have any discussions with Ms. Merceri
22  regarding any of her activities with a partnership called
23  Alternative Investors or AZ-WA Investors?
24    A.  Not knowingly in conjunction with those entities,
25  just about her own procedures.

Page 25

1    Q.  Did you have any discussions with Ms. Merceri
2  regarding Mr. Jones or Mr. Aylesworth?
3    A.  Not to my knowledge.
4    Q.  When you were engaged by Ms. Merceri and Focus
5  Mortgage was she the only contact that you worked with
6  during the engagement?
7    A.  Basically.
8    Q.  You had mentioned earlier that most mortgage
9  companies require rental surveys when it's going to be an
10  income-producing property?
11    A.  Yes.
12    Q.  Did Focus Mortgage require rental surveys in those
13  situations?
14    A.  That's why it's here, but I don't see the request.
15    Q.  And so when you mentioned earlier that there was a
16  missing document, is that what more would normally be in the
17  file is a request?
18    A.  Yes.  The request form is not there.
19    Q.  What would the request form normally look like?
20    A.  It's a generic form by most mortgage companies
21  which tells the address and the borrower and any other
22  special requirements of the report.
23    Q.  And so in the event that it was going to be a
24  rental, which approach would be most demonstrative of the
25  value of the rental?  Would it be cost approach or the

DEPOSITION OF JOSEPH MURASHIE, 11/3/09

8 (Pages 26 to 29)

Page 26

1  income approach or the comparison?
2      A.  With residential property that is single family,
3  it's still leans more towards the sales comparison approach,
4  but it does engage the income approach a little more.  When
5  it's two units and above, the weight changes progressively.
6      Q.  So residential rental you would give more weight
7  still to a sales comparison approach than an income?
8      A.  With a single-family residence and standard home in
9  a standard lot, a standard place.
10     Q.  Were you ever asked in your engagements with
11 Ms. Merceri and Focus Mortgage to change the values after an
12 appraisal had already been completed?
13     A.  That's a hard question to answer.  Such requests
14 have happened in the past from numerous firms.
15     Q.  Have they happened from Focus Mortgage and
16 Ms. Merceri?
17     A.  I don't know if in this concern, but I would
18 suspect that it may have.  Again, I don't know for sure.
19     Q.  You had mentioned also earlier that electronic,
20 that you could give electronic opinions, I guess, or ranges
21 back then.  Would Ms. Merceri or Focus Mortgage request
22 those types of opinions or advice from you?
23     A.  Most of the companies did until it became maybe
24 misused and the restrictions were changed.
25     Q.  But specifically to Ms. Merceri and Focus Mortgage,

Page 27

1  did they request electronic advice?
2      A.  I would suspect so.
3      Q.  Would you keep a record of that advice that was
4  given?
5      A.  As a rule, yes, because it would be on item --
6  let's see if I can find it again.
7      0027, up in the upper right-hand corner you see that
8  arrow pointing in at the total assessed value.  If I had
9  given a range there would be a low number at the bottom of
10 that arrow and a high number at the top of that arrow.
11     In this particular case, the only thing that was noted
12 was what the theoretical sales price, which was, which was
13 backed by the purchase and sale agreement.
14     Q.  Whose handwriting is on this page?
15     A.  It appears to be mine, except for the bottom
16 80 times 105.  I think that probably was Kari's.
17     Q.  Who is Kari?
18     A.  She used to be one of my office managers and
19 typist.
20     Q.  Sticking with this report, I had a couple of
21 questions.  If you turn to NWG 0025.
22     A.  Okay.
23     Q.  If you could read this e-mail to me, please.
24     A.  Regarding Pierson, crud, they changed the purchase
25 price to 505,000 instead of 465,000 per CMG, the lender,

Page 28

1  from Michelle.
2      Q.  And was this an e-mail written to you?
3      A.  This page and Page 26 are completely, and page 24,
4  and Page 23 and -- so there are several pages here that I
5  have never seen before.
6      Q.  Would you receive e-mails at info at Northwest
7  Group dot com?
8      A.  Yes.  So that one came to the office, but
9  exhibit 0020 through 26, to my knowledge, I haven't seen
10 before.
11     Now Kari on 0026, was my office manager at the time, and
12 she has been quite respectful, I think, and honest, so she
13 would have brought that to my attention, I believe.
14     Q.  Would Kari have any control over the values in an
15 appraisal?
16     A.  She shouldn't.
17     Q.  Would she have relayed this information to you
18 then?
19     A.  I would have thought she might have.
20     Q.  And what would the e-mail mean to you then?
21     A.  Maybe the safety of raising the purchase and sale
22 agreement --  this is an assumption.  Is it safe to raise
23 the purchase and sale agreement from 465 to 505,000.
24     Q.  Do you know if there was a second appraisal that
25 you produced?

Page 29

1      A.  Again, I would have to be asked that question and
2  take it back to my files to see.  I don't believe I did.
3      Q.  If you turn to the next page, and if you could read
4  that out loud to me, please.
5      A.  Please send me a revised appraisal on the Pierson
6  file.  He is now going to live in it so that I need to take
7  the rental pages.
8      Q.  Do you recall this e-mail?
9      A.  Again, not offhand, but it came to my company.  So
10 again, Kari, I would have thought, would have talked to me.
11     Q.  So do you recall having to revise this appraisal?
12     A.  Again, I would have to look at my files to see if
13 there's another one, because, as a rule, I don't change
14 product that has been prepared and released.  And by the
15 rules you're supposed to do a new appraisal if requested.
16     Now there are some forms that have just come into being
17 allowing an update appraisal, but that wasn't completely in
18 effect at that time.
19     Q.  You had mentioned earlier that Ms. Merceri, you
20 suspect, has requested changes to appraisals or appraised
21 values at times.  Would this be typical of how the request
22 would come in?
23     A.  Well, it might be.  Again, I don't know.  The
24 report that went out that's in my office matches yours at
25 505 and it didn't change the purchase and sale price above

DEPOSITION OF JOSEPH MURASHIE, 11/3/09

Page 30

1    it.
2        Q.  Excuse me for not knowing this, backing up a little
3    bit.  Did you produce these documents to Northwest Justice
4    Project?
5        A.  The packet that you have in front of you?
6        Q.  Yes.
7        A.  Not to my knowledge.  That's why I'm concerned.
8        Q.  Have you responded to discovery requests from
9    Northwest Justice Project?
10       A.  I don't know.  Now this was on the bottom of
11   this -- see, I have no evidence as to when this whole
12   packet originated and went out.
13       Q.  Does Kari still work for you?
14       A.  On a very part-time basis as a bookkeeper.
15       Q.  So you still have communication with her?
16       A.  Yes.  And if I can have a copy of this, I would
17   like to take it back with me.
18       Q.  The last -- there is a PS on this e-mail saying, I
19   received your e-mail last night.  I will look at it
20   regarding your family member to see if we can help.
21       Are you aware of Kari and Ms. Merceri having a personal
22   relationship?
23       A.  I don't know.  Stranger things have happened.
24       Q.  The e-mail that we had looked at on the previous
25   page, it had said the purchase price was changing.  Would

Page 31

1    you have received an updated purchase and sale agreement?
2        A.  If it did happen, I should have it.
3        Q.  And who would that come from?
4        A.  Well, it could be -- let's double check something
5    here.
6        There are two places it could come from.  It could come
7    from the mortgage company and/or the listing or selling
8    office, and in this case I don't think there was either.
9        Q.  Would you typically have contact with the buyer or
10   seller of the property?
11       A.  No.
12       Q.  If you had produced an appraisal for a property and
13   within two years that property was going to be sold again,
14   would you typically update your appraisal or do a new
15   appraisal?
16       A.  It would be a new appraisal.
17       Q.  Would you use the original appraisal as a
18   benchmark?
19       A.  Not particularly.
20       Q.  Have you had any complaints or investigations I
21   guess with the Department of Licensing against you or
22   Northwest Group?
23       A.  Yes, I have.  I think it was back in '05 or '4, and
24   what was really interesting about that particular case, I
25   reviewed what the reviewer had reviewed, and it was so

Page 32

1    flawed, turned it back into the Department of Licensing and
2    they didn't take corrective action.  They took no corrective
3    action, but they did not give me an ata boy for finding
4    another person who was inaccurate.
5        And then just by coincidence, that same investigator
6    taught one of my continuing education classes and I
7    approached him about that.  So it was quite interesting.  I
8    still have his card.
9        Q.  Was that investigation in any way related to
10   Ms. Merceri or Focus Mortgage?
11       A.  No.
12       Q.  What was the subject of that investigation or
13   complaint?
14       A.  The value.
15       Q.  Was it overappraising or underappraising?
16       A.  They were saying it was overvaluing.
17       Q.  And is that the only complaint or investigation
18   against you or Northwest Group?
19       A.  I think there was one other one, and unfortunately
20   it was when Todd had been one of my associates doing that
21   particular report.
22       Q.  And, again, what was the subject of that complaint
23   or investigation?
24       A.  That one was again overvaluing.
25       Q.  And what was the result of that complaint or

Page 33

1    investigation?
2        A.  Again, it was dismissed.  I have never had any
3    action taken against myself or my company with any
4    corrective or punishment issued.
5        Q.  And you mentioned that you no longer do work for
6    Focus Mortgage?
7        A.  Correct.
8        Q.  Have you done any work for Ms. Merceri in any other
9    capacity?
10       A.  Not to my knowledge.
11       Q.  Have you had any communications with
12   Ms. Merceri?
13       A.  No.
14       MS. BROTHERTON:  Thank you.  I appreciate you
15   answering questions.
16       MR. HOLMES:  No questions.
17       MR. MITSUNAGA:  Nothing.
18       MR. WEIBEL:  I have no questions.
19       MS. CAMACHO:  Mr. Daniel, do you have any
20   questions?
21       MR. DANIEL:  No questions.
22       MS. CAMACHO:  I just have one question for you.
23
24
25

## Page 34

```
1              FURTHER EXAMINATION
2  BY MS. CAMACHO:
3      Q.  You mentioned that there was an instance in 2005
4  when you had to take corrective action after reviewing
5  someone else's report?
6      A.  Uh-huh.
7      Q.  Who was that person that you were reviewing?
8      A.  It was a review appraiser, and hopefully it wasn't
9  past five years ago because those records have already been
10 destroyed.  I'm required to keep everything for five years
11 unless there's litigation, and then I keep it for seven.
12     Q.  Was that person working with you when you did this
13 appraisal for the site that we're discussing today?
14     A.  No, no.  That was a review appraiser chosen by the
15 state licensing department to review my work, and then I
16 reviewed his work and found it way out of line.  And I
17 expected corrective action to be taken against that reviewer
18 because I have taken action to have people's licenses
19 removed for shoddy work.
20     Q.  I understand.  Now your signature on this
21 appraisal, does it indicate that only you prepared this
22 report and worked on this appraisal?
23     A.  My procedure is that I do the inspection, I do all
24 the comparables, I choose what to use, and I do have an
25 associate typist.
```

## Page 35

```
1      Q.  The typist?
2      A.  Yes.
3      Q.  And is that all that associate does, type?
4      A.  Yes.  That's why I review everything before it gets
5  signed.  I have to.
6          MS. CAMACHO:  I have no further questions.  Thank
7  you for your time.
8          This deposition is ended.  Thank you.
9          (The deposition adjourned at 10:30 a.m.)
10         (Signature reserved.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 36

```
1              CORRECTIONS
2
3  PLEASE MAKE ALL CORRECTIONS, CHANGES OR CLARIFICATIONS TO
   YOUR TESTIMONY ON THIS SHEET, NOT IN THE TRANSCRIPT ITSELF,
4  SHOWING PAGE AND LINE NUMBER AND THE NATURE OF THE CHANGE.
   IF THERE ARE NO CHANGES, WRITE "NONE" ACROSS THE PAGE.
5  PLEASE SIGN THIS SHEET AND RETURN WITHIN 30 DAYS TO THE
   ATTENTION OF LETICIA CAMACHO, ESQ., 401 SECOND AVENUE SOUTH,
6  SUITE 407, SEATTLE, WA 98104 FOR FILING WITH THE ORIGINAL
   TRANSCRIPT.
7
   PAGE   LINE    CORRECTION AND REASON
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24        _____
25        JOSEPH ROSS MURASHIE
```

## Page 37

```
1          REPORTER'S CERTIFICATE
2
3  STATE OF WASHINGTON    )
                          )  ss.
4  COUNTY OF KING         )
5
6      I, MARLIS J. DeJONGH, CCR, RPR, a Notary Public in
7  and for the State of Washington, do hereby certify:
8  That prior to being examined, the witness named in the
9  foregoing deposition was duly sworn to testify the truth,
10 the whole truth and nothing but the truth;
11     That said deposition was taken down by me in
12 shorthand at the time and place therein named and thereafter
13 transcribed by means of computer-aided transcription, and
14 that the foregoing transcript contains a full, true and
15 verbatim record of the said deposition;
16     I further certify that I have no interest in the
17 event of the action.
18     WITNESS my hand and seal this 12th day of November,
19 2009.
20
21
           Notary Public in and for the State
22         of Washington, residing in Seattle.
           My commission expires 01/2012.
23         Lic. No. DE-JO-NM-J498K9
24
25
```