UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

KAREN HANDLIN, BRIAN HANDLIN, and   )
MAXINE FORTUNE,                      )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             ) No. C-081-861-JCC
                                     )
MURPHY PIERSON, MICHELLE MERCERI,    )
KATHERINE MERCERI, ALTERNATIVE       )
INVESTORS, INC., FOCUS MORTGAGE, LLC, )
AZ-WA INVESTORS, (a partnership),    )
RECONTRUST COMPANY, N.A., and GMAC   )
MORTGAGE CORPORATION,                )
                                     )
          Defendants.                )
                                     )
_____

DEPOSITION UPON ORAL EXAMINATION OF

SHAWN CASEY JONES

_____

Thursday, December 17, 2009
1:00 p.m.
401 Second Avenue South, Suite 407
Seattle, Washington

Reported by Marlis J. DeJongh, CCR, RPR

Lic. No. DE-JO-NM-J498K9

MARLIS J. DeJONGH & ASSOCIATES
206-583-8711

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

---

**Page 2**

APPEARANCES

For the Plaintiffs:   LETICIA CAMACHO, Esq.
        and ERIC DUNN, Esq.
        401 Second Avenue South,
        Suite 407
        Seattle, Washington 98104

For Defendants Jones,   DAVID L. TIFT, Esq.
Aylesworth:   1201 Third Avenue, Suite 3400
        Seattle, Washington 98101

For Defendant Michelle   RUSSELL M. AOKI, Esq.
Merceri, Focus Mortgage:   701 Pike Street, Suite 1525
        Seattle, Washington 98101

For Defendant Mark   DARRELL S. MITSUNAGA, Esq.
Merceri:   1601 114th Avenue SE, Suite 110
        Bellevue, Washington 981004

Court Reporter:   MARLIS J. DeJONGH, CCR, RPR
        1400 Hubbell, Suite 1510
        Seattle, Washington  98101

---

**Page 3**

INDEX OF EXAMINATION

Page(s)

Examination of Shawn Casey Jones

    By Ms. Camacho        4

INDEX OF EXHIBITS

No. Description        Marked  Identified

    1. Document Jones-Ayles 0020-0485     4     14

---

**Page 4**

(Exhibit No. 1 marked for identification.)

SHAWN CASEY JONES,     deponent herein, being first duly
        sworn on oath, was examined and
        testified as follows:

EXAMINATION

BY MS. CAMACHO:

Q.  Good afternoon.  My name is Leticia Camacho.  This
is my colleague Eric Dunn.  We represent Karen and Brian
Handlin in this matter.

This deposition is held in the offices of the Northwest
Justice Project.  For the record, today's date is
December 17, 2009.

Notice of this deposition was given to all the named
parties in this litigation.

Have you ever had a deposition before?

A.  No.

Q.  Do you know what a deposition is?

A.  Not exactly.

Q.  All right.  I will ask you some questions to find
out what you know about the facts in this case.  Do you
understand that?

A.  Yes.

Q.  Please be sure to speak up.

---

**Page 5**

Now, if you do not understand a question, say that you
do not understand it and I will rephrase the question.

A.  Yes.

Q.  Do you understand that?

A.  Yes.

Q.  If you answer a question, I will assume that you
have heard and understood the question.  Do you understand
that?

A.  Yes.

Q.  Your attorney may make an objection over a
question.  The objection will be noted on the record by the
court reporter but you are still required to answer the
question.  Do you understand that?

A.  Yes.  I didn't believe I had to if it was objected
to and sustained.

Q.  You are required to answer the question.

THE WITNESS:  Is that true?

MR. TIFT:  Well, the exception would be the
attorney-client privilege, but as a general rule,
counsel's point is correct.

A.  Yes.

Q.  If you want to stop, take a short break, or if you
run out of water, let me know and we can stop the deposition
for a moment.  Do you understand?

A.  Yes.

---

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

3 (Pages 6 to 9)

Page 6

1   Q.  You have also taken an oath to tell the truth.  Do
2   you understand that?
3   A.  Yes.
4   Q.  Please state your full name for the record.
5   A.  Shawn Casey Jones.
6   Q.  And how do you spell your first name?
7   A.  S-h-a-w-n.
8   Q.  And Mr. Jones, what is your home address?
9   A.  341 Caspers Street, Edmonds, Washington, 98020.
10  Q.  And do you have another home address anywhere else?
11  A.  Yes.
12  Q.  Where is that?
13  A.  21531 North 72nd Place, Scottsdale, Arizona 85255.
14  Q.  85255?
15  A.  Uh-huh.
16  Q.  Do you have any other home addresses anywhere else?
17  A.  No.
18  Q.  Do you have an e-mail address?
19  A.  Yes.
20  Q.  What address is that?
21  A.  Scaseyjones at Yahoo dot com.
22  Q.  Do you have a business address?
23  A.  No.
24  Q.  I notice you have an address in Washington and an
25  address in Arizona.  How many months of the year do you live

Page 7

1   in Washington?
2   A.  It varies.
3   Q.  It varies.  By what?
4       MR. TIFT:  Form of the question objection.
5   Q.  You stated that the number of months you live in
6   the State of Washington varies.  What does it vary by?
7   A.  I just don't understand the question.  I really
8   don't.
9   Q.  Let me ask a different question.
10  A.  I mean, it varies.
11  Q.  Fine.  How long have you been dividing your time
12  between Washington and Arizona?
13  A.  Ten years.
14  Q.  This last year, for example, are you living in
15  Arizona right now or are you living in Washington?
16  A.  I'm in Washington.
17  Q.  You are in Washington right now.
18  How old are you?
19  A.  41.
20  Q.  And what's your date of birth?
21  A.  8/22/68.
22  Q.  What year did you finish high school?
23  A.  1986.
24  Q.  And where did you go to high school?
25  A.  Edmonds High School.

Page 8

1   Q.  Did you go to college?
2   A.  Yes.
3   Q.  Where did you go to college?
4   A.  Yakima Community College.
5   Q.  Did you graduate from Yakima Community College?
6   A.  No.
7   Q.  What years did you go to college?
8   A.  1986 to 1987.
9   Q.  And what was your degree in when you were in Yakima
10  Community College?  Did you have any particular focus?
11  A.  General courses.
12  Q.  Did you go to any other colleges besides Yakima?
13  A.  Yes.
14  Q.  Where?
15  A.  Where?  Concordia College.
16  Q.  Where is Concordia?
17  A.  Portland, Oregon.
18  Q.  And what years did you do Concordia College?
19  A.  1987 to 1991.
20  Q.  Did you graduate from Concordia College?
21  A.  Yes.
22  Q.  And what field?
23  A.  Business.
24  Q.  Can you tell me the year that you graduated from
25  Concordia College again?

Page 9

1   A.  1991.
2   Q.  Thank you.
3       Now after you went to Concordia College, did you go
4   graduate school?
5   A.  No.
6   Q.  And besides Concordia College and Yakima Community
7   College, have you gone to any other colleges?
8   A.  No.
9   Q.  In addition to your business degree, do you have
10  any types of licenses?
11  A.  No.
12  Q.  Are you currently employed?
13  A.  No.
14  Q.  When was the last time you worked?
15  A.  You're going to need to be more exact with that
16  question.  Worked for somebody, worked for myself?
17  Q.  You mentioned a moment ago that you are not working
18  at this time?
19  A.  Correct.
20  Q.  When was the last time you were working either for
21  yourself or for anybody else?
22  A.  It would have been July of '08.
23  Q.  I'm sorry?
24  A.  2008.
25  Q.  July 2008.  And where were you working at that

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

4 (Pages 10 to 13)

Page 10

1  time?
2      A.  I was in a limited liability partnership.
3      Q.  You were an employee of a limited liability
4  partnership?
5      A.  It was a partnership.  It wasn't a direct
6  employment.  I was an investor.
7      Q.  You were an investor?  I see.  And what have you
8  been doing from July 2008 to the present to gain income?
9      A.  I haven't.
10     Q.  You have not.
11     Now have you ever held any jobs outside of the
12  partnership that you mentioned a moment ago?
13     A.  Yes.
14     Q.  Where?
15     A.  Which one?
16     Q.  Well, tell me, you mentioned you graduated from
17  Concordia College in 1991.  Where was your next employment?
18     A.  Ferrellgas Propane.
19     Q.  What were you doing there?
20     A.  Driving a truck.
21     Q.  And what period of time did you work as a truck
22  driver for this company?
23     A.  Approximately 1992 to -- '93, '94.  Approximately
24  a year and a half.  I'm not sure when it fell.
25     Q.  From 1991 through '94?

Page 11

1      A.  Yeah.
2      Q.  Is that what you said?
3      A.  1992 to 1993, 1994.  I'm not sure what year was my
4  last day.
5      Q.  Can you clarify?  I understood a moment ago you
6  said approximately a year and a half?
7      A.  Yes.
8      Q.  So 1990 to 1992?
9      A.  1992 to 19 -- my last day was either in 1993 or
10  1994, to the best of my recollection.
11     Q.  I understand.
12     And from -- what was it, Ferrellgas?
13     A.  Ferrellgas Propane.
14     Q.  From Ferrellgas Propane, which you're saying you
15  worked until 1993, 1994, where did you go to work?
16     A.  Rued Nissan Volvo.
17     Q.  And what were you doing?
18     A.  Selling cars.
19     Q.  And how long did you work at this company?
20     A.  Six months.
21     Q.  And what year was that?
22     A.  1994, to the best of my recollection.
23     Q.  And from this sales job, where did you go to work
24  next?
25     A.  National Sanitary Supply Company.

Page 12

1      Q.  And what year was that, or what years?
2      A.  From the last date at Rued Nissan, a year and a
3  half.
4      Q.  And from this National Sanitary Supply Company,
5  where did you go to work?
6      A.  Gentner Communications.
7      Q.  What were you doing at Gentner Communications?
8      A.  Selling teleconferencing.
9      Q.  What period of time did you work at Gentner?
10     A.  From leaving National Sanitary Supply to -- it was
11  about a year.
12     Q.  1995 or 1996?
13     A.  '96.
14     Q.  And from Gentner Communications where did you go?
15     A.  XO Communications.
16     Q.  What were you doing at XO Communications?
17     A.  Selling communications.
18     Q.  And what period of time were you at XO
19  Communications?
20     A.  From Gentner -- I left one out.  I sold payroll in
21  between those two.  I do not remember the name of the
22  company.
23     Then XO Communications for approximately a year.
24     Q.  1997?
25     A.  Uh-huh.

Page 13

1      Q.  Now how many more jobs did you have between, before
2  you became a partner --
3      A.  One.
4      Q.  And what job was that?
5      A.  It was self-employed.  I was a broker in the
6  telecommunications industry for, until 2002, 2003,
7  approximately.
8      Q.  And what was the name of the company?
9      A.  It was, it was a brokerage.  It was myself, Casey
10  Jones.
11     Q.  Casey Jones Brokerage?
12     A.  Yeah.
13     Q.  And you had that company from what year to --
14  you're saying 2003?
15     A.  From whatever year I left XO.
16     Q.  1998 --
17     A.  Yes.
18     Q.  To 2003?
19     A.  Yes.
20     Q.  And you mentioned that you have been unemployed
21  since July 2008.  Is that correct?
22     A.  Yes.
23     Q.  Now are you familiar with a company called AZ-WA
24  Investors?
25     A.  Yes.

MARLIS J. DeJONGH & ASSOCIATES
206-583-8711

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 14

1    Q.  And I'm showing you what has been marked as
2  Exhibit 1.  Now if you look at the, you have this exhibit,
3  and at the bottom it has a number in the, the marker.
4    A.  Yes.
5    Q.  So if you look at Page 15, I believe.  Are you
6  looking at Page 15?
7    A.  Yes.
8    Q.  Do you see where it says Signature Page to
9  Operating Agreement at the top?
10    A.  Yes.
11    Q.  And under Partner it says Shawn Casey Jones?
12    A.  Yes.
13    Q.  Is that your signature?
14    A.  Yes.
15    Q.  And is that your address, or was it your address at
16  that time?
17    A.  Yes.
18    Q.  Now please take a look at this agreement, Pages 1
19  through 15.  Take a moment to do that.
20    A.  (Witness reviewing document.)
21    Q.  Have you had a chance to look at it?
22    A.  Pages 1 through 15?
23    Q.  Yeah, I do not want you to read it word by word but
24  I want you to take a look at it to see, is this the
25  agreement that you signed?

Page 15

1    A.  I don't know.
2    Q.  Do you remember signing an agreement with AZ-WA
3  Investors?
4    A.  Yes.
5    Q.  And you stated a moment ago this was your
6  signature.  Is that correct?
7    A.  Yes.
8    Q.  How did you first become involved with AZ-WA
9  Investors?
10    A.  Please be a little more exact with that.
11    Q.  How did you become involved with AZ-WA Investors?
12  You have stated that you are familiar with AZ-WA Investors?
13    A.  Yes.
14    Q.  And you have stated that you recognize your
15  signature?
16    A.  Yes.
17    Q.  That you signed an agreement with AZ-WA Investors.
18  So my question is, how did you first become involved with
19  this company?
20    A.  I introduced Michelle Merceri to Dan Goldman.
21    Q.  And what year was that?
22    A.  I believe it was 2004.  I was looking for a date.
23  I'm not certain of the date.
24    Q.  And so you were saying that you introduced Michelle
25  Merceri to Dan Goldberg?

Page 16

1    A.  Goldman.  Yes.
2    Q.  And what happened?
3    A.  Dan Goldman had an idea and Michelle had what she
4  claimed to be expertise in the mortgage field, and she said
5  that Dan's idea was valid, and I was an investor in that.
6    Q.  So was it your understanding that this was then
7  Goldman's idea to start?
8    A.  Originally it was Dan Goldman's idea.
9    Q.  Originally?
10    A.  Uh-huh.
11    Q.  And after that whose idea was it?
12    A.  The idea doesn't change.
13    Q.  Then, after that, who agreed with that idea?
14    A.  Dan Goldman, Michelle Merceri, Murphy Pierson,
15  myself, Kathy Merceri.
16    Q.  Now how did you know Michelle Merceri at the time
17  that you had this initial discussion?
18    A.  Met through a friend.
19    Q.  And what's the name of your friend?
20    A.  She's no longer a friend and I don't remember her
21  name.
22    Q.  And how long had you known Michelle Merceri before
23  you introduced her to Dan Goldman?
24    A.  I can't give you an exact time frame on that.
25    Q.  Had it been months, days?

Page 17

1    A.  No.
2    Q.  Years?
3    A.  Yes.
4    Q.  You had known Michelle for several years?
5    A.  No.  I can't give an exact time frame of how long I
6  knew her before AZ-WA was formed.
7    Q.  Was it more than one year?
8      MR. TIFT:  Form of the question objection, lack of
9    foundation.
10    Q.  How many years had you known Michelle Merceri
11  before you discussed with her AZ-WA?
12      MR. TIFT:  Form of the question objection, asked
13    and answered.
14      MS. CAMACHO:  Please answer the question.
15    MR. TIFT:  He has.
16    Q.  Now how did you know Dan Goldman at the time that
17  you had this --
18    A.  I met Dan Goldman through Murphy Pierson.
19    Q.  And how did you know Murphy Pierson?
20    A.  From the gym.
21    Q.  From working out at the gym?
22    A.  Yes.
23    Q.  And at what gym?
24    A.  Harbor Square Athletic Club.
25    Q.  Where is that?

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 18

1    A. Edmonds, Washington.
2    Q. How long had you known Murphy Pierson?
3    A. I met Murphy Pierson in 1994.
4    Q. You mentioned that you met Dan Goldman through
5  Murphy Pierson. Is that correct?
6    A. Yes.
7    Q. And how long had you known Dan Goldman?
8    A. I can't give an exact date. I met him on a social
9  basis initially. I don't know what year.
10    Q. And how did you know Katherine Merceri at the time
11  that this partnership was signed?
12    A. Through Michelle Merceri.
13    Q. And how long had you known Katherine Merceri?
14    A. Approximately six months.
15    Q. Where were you living at the time that the
16  agreement was signed?
17    A. Edmonds, Washington.
18    Q. And what was your occupation at the time that the
19  agreement was signed?
20    A. I wasn't working.
21    Q. And a question about the name. What does AZ-WA
22  mean?
23    A. AZ-WA for Arizona-Washington.
24    Q. And was there any particular reason why the company
25  was named Arizona-Washington?

Page 19

1    A. We contemplated doing business in Arizona.
2    Q. Now was there a monetary contribution that was
3  required in order to become a partner in AZ-WA?
4    A. No.
5    Q. Did you contribute anything monetary at the time
6  that the agreement was signed?
7    A. No.
8    Q. Did Michelle Merceri? Did she contribute any --
9    A. Not to my knowledge.
10    Q. Did Katherine Merceri contribute anything --
11    A. Not to my knowledge.
12    Q. Did Murphy Pierson contribute anything?
13    A. No.
14    Q. What about Mr. Goldman?
15    A. No.
16    MR. TIFT: Be sure to let counsel finish the
17  question before you answer.
18    Q. Now was there any nonmonetary contribution that was
19  required in order to become a partner in AZ-WA?
20    MR. TIFT: Form of the question objection.
21    A. Please be more specific.
22    Q. You mentioned a moment ago that there was no
23  requirement that the partners contribute anything in terms
24  of money to become a partner?
25    A. Uh-huh.

Page 20

1    Q. Was there any requirement of anything that was
2  nonmonetary in order to become a partner?
3    MR. TIFT: Form of the question objection.
4    Q. Was there a requirement of property, that the
5  property be --
6    A. No.
7    Q. Was there a requirement of anything other than
8  money or property?
9    A. There was an agreement.
10    Q. What was the agreement?
11    A. That I was the investor.
12    Q. And what were you investing?
13    A. Credit.
14    Q. And what was the -- was there any agreement about
15  what each of the other partners were going to contribute?
16    A. Yes.
17    Q. What was Michelle Merceri going to contribute to
18  the partnership?
19    A. She was to handle all transactions, marketing,
20  taxes, anything associated with the running of the business,
21  paperwork, partnership agreements, titles.
22    Q. What about Murphy Pierson, was there a discussion
23  of what he was going to contribute to the partnership?
24    A. Yes.
25    Q. And what was he going to contribute to the

Page 21

1  partnership?
2    A. Credit.
3    Q. And what about Katherine Merceri, what was she
4  going to contribute to the partnership?
5    A. She worked for Michelle and was going to assist
6  with the paperwork under Michelle's direction.
7    Q. Now what was the purpose of AZ-WA Investors?
8    A. To help people retain their homes.
9    Q. And how was AZ-WA going to help people retain their
10  homes?
11    A. To keep them from being repossessed by the banks.
12    Q. And what was AZ-WA going to offer people to keep
13  them from being repossessed by the banks?
14    A. Repurchase their home.
15    Q. You would purchase their homes.
16    Now where were you living at the time that you entered
17  into the AZ-WA Investors agreement?
18    A. Edmonds. I was going back and forth between the
19  two states.
20    Q. Now since the AZ-WA Investors agreement went into
21  effect, which according to your agreement was
22  September 22nd, 2004, I'm reading, looking at Page 1 at the
23  top, since the agreement went into effect, have any of the
24  partners left AZ-WA Investors?
25    A. Yes.

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 22

1    Q.  Who has left AZ-WA?
2    A.  Dan Goldman and Murphy Pierson.
3    Q.  Now why did Dan Goldman leave AZ-WA?
4    A.  He didn't contribute anything.
5    Q.  Was he asked to leave?
6    A.  We dissolved AZ-WA.
7    Q.  When was it dissolved?
8    A.  I can't give you an exact date on that.  I don't
9 know the year.
10   Q.  You don't know the year?
11   A.  I don't know the year.
12   Q.  Was it this last year?
13   A.  No.  It was before Alternative Investors.
14   Q.  I see.  Just one clarification.  Did you state that
15 Mr. Goldman left the partnership?  Is that correct?  Did I
16 understand that correctly?
17   A.  Yes.
18   Q.  And was this before AZ-WA was dissolved?
19   A.  It was simultaneous.
20   Q.  Did all the partners -- how did all of you decide
21 to dissolve the agreement?
22   A.  Lack of working cohesion.
23   Q.  Was this the same year that you decided to
24 dissolve?
25   A.  Pardon me?

Page 23

1    Q.  Was this the same year that you decided to
2 dissolve?  Did all of you have a meeting?
3    A.  No meeting.
4    Q.  Did you have a conference call?
5    A.  No.
6    Q.  So who decided to dissolve the company?
7    A.  Michelle was having trouble working with Murphy and
8 Murphy was friends with Dan.  So that's why it was all
9 dissolved.
10   Q.  And the three of them decided to dissolve the
11 company?
12   A.  It was a mutual decision, not all done at one time,
13 to dissolve the company.
14   Q.  So who -- mutual -- I'm trying to understand what
15 you just said.  Mutual decision not done at the same time?
16   A.  But very close.
17   Q.  But very close.  I see.  So who did you speak with
18 about dissolving the company?
19   A.  Michelle Merceri and I believe Murphy Pierson.
20   Q.  Did you speak with Dan Goldman also?
21   A.  No.
22   Q.  And what about with Katherine Merceri, did you
23 speak with her about dissolving?
24   A.  No, no.
25   Q.  So did you speak with Michelle Merceri and Murphy

Page 24

1 Pierson at the same time?
2    A.  No.
3    Q.  Did you speak with them in person?
4    A.  I can't recall.
5    Q.  And what was your conversation?  What was it that
6 you discussed when you decided to dissolve the company?
7    A.  Lack of cohesion.  People weren't getting along.
8    Q.  And so based on that --
9    A.  Dissolved.
10   Q.  -- all you decided to dissolve?
11   A.  Yes.
12   Q.  And who was in charge then of dissolving the
13 company?
14   A.  Michelle Merceri.
15   Q.  And, but you do not recall the year, or do you
16 recall the year?
17   A.  I don't recall what year it was dissolved.
18   Q.  Now who drafted -- who drafted this agreement?
19   A.  Michelle Merceri.
20   Q.  She drafted it herself?
21   A.  She presented it to me so I'm assuming she drafted
22 it herself.
23   Q.  Now when AZ-WA was in business, how many employees
24 did it have?
25   A.  Five.

Page 25

1    Q.  And who are these employees?
2    A.  The five partners.
3    Q.  And how much were each of the partners paid by
4 AZ-WA as employees?
5    MR. TIFT:  I'm going to object to the form of that
6 question.  I think there's a lack of foundation there.
7    Q.  Now Mr. Jones, you had stated a moment ago that
8 AZ-WA had had five employees.  Is that correct?
9    A.  Five limited liability partners.
10   Q.  Were these limited liability partners also
11 employees?
12   MR. TIFT:  Form of the question objection, calls
13 for a legal conclusion.
14   Q.  I'm going to ask you again.  Did AZ-WA have any
15 employees while it was in business?
16   MR. TIFT:  Same objection.
17   A.  The five partners.
18   Q.  And did the partners do any work for AZ-WA?
19   A.  Yes.
20   Q.  Now what kind of work did you do for AZ-WA?
21   A.  Besides my credit on two occasions, I helped
22 refurbish homes.
23   Q.  How many homes?
24   A.  Two.
25   Q.  What about Katherine Merceri, did she contribute

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

8 (Pages 26 to 29)

Page 26

1  anything else?
2      A.  She assisted Michelle with paperwork in the office.
3      Q.  And Michelle Merceri, what did she do?
4      A.  She did everything.
5      Q.  And Murphy Pierson?
6      A.  His credit, and he helped refurbish, I believe, one
7  house, possibly two.
8      Q.  And Dan Goldman?
9      A.  He hired his cousins to do some painting for him on
10  one of the homes, so he worked on one of the homes.
11      Q.  In addition to your credit, did you contribute any
12  money at any point toward AZ-WA?
13      A.  No.
14      Q.  Now after the agreement was signed, the AZ-WA
15  agreement was signed, did you receive any money at any point
16  for the business that was being created by AZ-WA?
17      A.  Not for the creation of AZ-WA.
18      Q.  Did you receive any money at all?
19      A.  While with AZ-WA as partner?
20      Q.  Yes.
21      A.  Over the course of time?
22      Q.  Yes.
23      A.  Yes.
24      Q.  And how much did you receive?
25      A.  I cannot answer that question.

Page 27

1      Q.  Was this an annual amount that you received?
2      A.  No.
3      Q.  Was this a monthly amount that you were receiving?
4      A.  No.
5      Q.  Was this -- do you recall the amounts at all?
6      A.  They varied.
7      A.  They varied.
8  Did you receive money more than five times?
9      A.  I can't recall.
10      Q.  More than once?
11      A.  Yes.
12      Q.  Was it more than ten times?
13          MR. TIFT:  Object to the form of the question,
14      asked and answered.
15      Q.  What about -- one moment.  Let me think about
16  this.
17  How long was AZ-WA in business?
18      A.  I don't remember the date when we dissolved it.
19      Q.  During that time did Michelle Merceri receive any
20  money as part of AZ-WA, the work she was doing for AZ-WA?
21      A.  Yes.
22      Q.  And do you know how much that was?
23      A.  No.
24      Q.  Do you know how often that was?
25      A.  No.

Page 28

1      Q.  How do you know that she received any money?
2      A.  She was a partner, general partner, and then she
3  also, as we used -- we needed a mortgage company so we used
4  her mortgage company, Focus Mortgage.  So she handled all
5  the paperwork on that end as well, and she took a fee for
6  that as well.
7      Q.  And did you discuss what her fee was going to be
8  originally when you signed the agreement?
9      A.  The fee as a partner or the Focus Mortgage side?
10      Q.  Focus Mortgage.
11      A.  No.
12      Q.  Did you discuss what each of you were going to get,
13  if anything, when you signed this agreement?
14      A.  Yes.
15      Q.  And how much were you going to get, if anything?
16      A.  My part?
17      Q.  Yes.
18      A.  20 percent.
19      Q.  20 percent of what?
20      A.  Of the hundred.  Each partner, there was five
21  partners, so of the profit, not counting Focus Mortgage,
22  each person got 20 percent.
23      Q.  20 percent of the profit?
24      A.  Yeah.
25      Q.  Now who kept the accounting for AZ-WA Investors?

Page 29

1      A.  Michelle Merceri.
2      Q.  And how frequently did you communicate with
3  Michelle Merceri about the accounting for AZ-WA?
4      A.  Please explain to me the question as far as the
5  accounting part.
6      Q.  You mentioned that you agreed that the five
7  partners -- it is five partners, isn't it?
8      A.  Yes.
9      Q.  -- were each going to get 20 percent of the total
10  profits for AZ-WA Investors.  Is that correct?
11      A.  Yes.
12      Q.  So who kept track of the money for --
13      A.  Michelle Merceri.
14          MR. TIFT:  Remember to let counsel finish her
15      question, please.
16      Q.  And so how frequently did you speak or follow up
17  with Michelle Merceri about the profits for the company?
18      A.  I can't put a number on that.
19      Q.  Did you ever communicate with her about the profits
20  for the company?
21      A.  She would tell me what size a check was coming.
22      Q.  Would she call you in advance to let you know, I'm
23  sending you this check for X amount?
24      A.  She would do that or she would mix it in
25  conversation, because at the time we were friends.  So we

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 30

1  had^ we'd many conversations as friends, so she would
2  interject that.
3      COURT REPORTER:  Can we go off the record?
4      MS. CAMACHO:  Yes.
5      (Off the record.)
6      (Recess.)
7      Q.  Mr. Jones, looking at my notes I see earlier you
8  had testified that the idea or the business of AZ-WA was a
9  result of an idea by Dan Goldman.  Is that correct?
10     A.  That's correct.
11     Q.  And what exactly was his idea?  What was this idea
12 that he had about?
13     A.  To purchase the home from somebody who was going to
14 lose it, keep them in it, and then buy it back at a
15 predetermined price, whatever we bought it for, don't mark
16 it up, don't do anything like that, they can get their
17 financials in order, and then buy back the house back,
18 like I said, for exactly what we bought it for, and they
19 then get to retain their house rather being kicked out on
20 the street.
21     Q.  So it was going to be purchased back for exactly
22 what they sold it to you?
23     A.  Yes.
24     Q.  There would be no markups?
25     A.  Not to my knowledge.

Page 31

1      Q.  That was your understanding?
2      A.  Yes.
3      Q.  And that was the discussion that you had with Dan
4  Goldman.  Was that discussion about --
5      A.  Yes.
6      Q.  And was that also the discussion you had with
7  Michelle Merceri?
8      A.  Yes.
9      Q.  And with Katherine Merceri?
10     A.  No.
11     Q.  You didn't have that discussion?
12     A.  I didn't have that discussion.
13     Q.  What about Murphy Pierson?
14     A.  Yes.
15     Q.  Now before we took a short break you had also
16 testified that Michelle Merceri would call you or would let
17 you know somehow that she was about to send you a check.  Is
18 that correct?
19     A.  Yes.
20     Q.  And do you know how she determined the checks that
21 you were going to, the amount of checks you were going to
22 get?
23     A.  No.
24     Q.  Was it -- were you getting paid by transaction,
25 by --

Page 32

1      A.  Per transaction.
2      Q.  Per transaction.  And did you communicate with
3  anyone else about this real estate transaction when you were
4  getting those checks?
5      A.  Please explain the question.
6      Q.  Let me rephrase the question.
7      Was it your understanding that all of you as partners
8  were getting the exact amount --
9      A.  Yes.
10     Q.  -- per transaction?
11     A.  Yes.
12     Q.  Yes?
13     A.  Yes.
14     Q.  And if I understood you correctly, you mentioned
15 that your contribution was your credit.  Is that correct?
16     A.  That's correct.
17     Q.  And so tell me how this was going to work in your
18 understanding of how your credit was going to be used.
19     A.  The homes or home would go into my name.  They
20 would buy it back from us in a year and we put it back in
21 their name.
22     Q.  In a year?
23     A.  I believe it was a year.
24     Q.  So it was a set amount of time?
25     A.  I didn't negotiate that part.  I don't know.

Page 33

1      Q.  Did you discuss that with Michelle Merceri?
2      A.  From what I recall, the general rule was it was
3  going to be a year.
4      Q.  And so when you say that the house was going to be
5  put in your name -- did you say that?  Did I understand that
6  correctly?
7      A.  Yes.
8      Q.  Did you mean that the loan was going to be used in
9  your name to transfer the property?
10     A.  Yes.
11     Q.  And did you have any discussion about what you were
12 going to tell the sellers of the --
13     A.  No.
14     Q.  -- home?
15     A.  No.
16     Q.  Remember to wait until I'm done.  Thank you.
17     Now did you play a role in identifying or procuring the
18 first property for AZ-WA?
19     A.  No.
20     Q.  Did Michelle Merceri?
21     A.  Did she play a role in identifying the first
22 property?  I believe so.
23     Q.  And what role did she play in identifying that
24 first property?  How did she identify that for AZ-WA?
25     A.  Please ask again.

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 34

1    Q.  Okay.  How was it that AZ-WA came to its first real
2  estate transaction?
3         MR. TIFT:  Form of the question objection.
4    A.  I don't know.
5    Q.  How were -- let me rephrase.
6    Did you and your partners discuss how you were going to
7  identify the potential houses that you could --
8    A.  Yes.
9    Q.  How was that?
10   A.  Michelle put together fliers, mailers.
11   Q.  For AZ-WA?
12   A.  Yes.
13   Q.  And do you have a copy of this mailer in your
14  possession?
15   A.  I do not.
16   Q.  Did you ever get to go to see the mailer?
17   A.  I don't believe so.
18        MR. TIFT:  Counsel, I believe we've shown you every
19  piece of paper we've got in this case.
20        MS. CAMACHO:  I understand.
21   Q.  But Mr. Jones, in your recollection, she did put
22  together some kind of pamphlet.  Is that correct?
23   A.  Yes.
24   Q.  And what was the purpose of this pamphlet?
25   A.  To put in the mail.

Page 35

1    Q.  And who was it going out to?
2    A.  People in a distressed situation that were about to
3  lose their homes.
4    Q.  And how did you identify people in distressed
5  situations that were about to lose their home?
6    A.  I didn't have any part of that.
7    Q.  Who made that decision?
8    A.  Michelle.
9    Q.  What about Kathy Merceri, did she do that as well?
10   A.  I don't know.
11   Q.  And Murphy Pierson?
12   A.  No.
13   Q.  And Dan Goldman?
14   A.  I don't know.
15   Q.  How many properties did AZ-WA Investors end up
16  investing in since --
17   A.  I don't know.
18   Q.  How many properties did AZ-WA Investors invest in
19  that you know of?
20   A.  I'm unable to give you an exact number on that.
21   Q.  Do you know of some of these properties?
22   A.  Yes.
23   Q.  Do you know what the addresses for these properties
24  are?
25   A.  No.

Page 36

1    Q.  Now if you look at the exhibit, Page 16, please,
2  now do you see this document at the top, it says AZ-WA list
3  of, and I think it's questions?
4    A.  Yes, I do.
5    Q.  Had you seen this document before?
6    A.  No.
7    Q.  This particular document says Owners Name, Robert
8  and June Gates, and it's filled out, but did you ever see a
9  blank form like this?
10   A.  No.
11   Q.  Did you know about this form?
12   A.  No.
13   Q.  Do you know who prepared it?
14   A.  For certain, no.
15   Q.  Do you have any idea who might have prepared it?
16   A.  Michelle.
17   Q.  Did you ever discuss her preparing this form --
18   A.  No.
19   Q.  -- with her?
20   At the bottom, kind of toward the bottom, still typed
21  in, it says, meth on property.  Do you see that?
22   A.  Meth on property?  Yes.
23   Q.  And then below that there is an example that says,
24  200,000 minus 300,000 equals 100,000 divided by two equals
25  50,000 buyback, 250,000.  Do you know what that means?

Page 37

1    A.  No.
2    Q.  And below that there's a line that says, you want
3  us to gain at least 35,000 in buyback once other items
4  reversed, we end up with four to five apiece.  Do you know
5  what that means?
6    A.  No.
7    Q.  Did you ever discuss this language or language to
8  this effect with Michelle Merceri or any of the other
9  partners in AZ-WA?
10   A.  Not with these numbers.
11   Q.  What about with any other numbers?
12   A.  I was given an example at the original meeting when
13  I brought Dan and Michelle together.
14   Q.  Tell me about that example.  What was the example
15  you were given, do you recall?
16   A.  If the house was worth $200,000, they owed 150, we
17  would buy it for 175, and then we would sell it back to them
18  for 175.
19   Q.  And was this example, was it discussed verbally or
20  was there some document that you reviewed with this example
21  or other information?
22   A.  Verbally.
23   Q.  Now tell me, in your discussions with Dan and
24  Michelle, how were the AZ-WA Investors transactions going to
25  be financed?  Did you discuss that?

Page 38

1    A.  Please explain.
2    Q.  When you spoke with Michelle Merceri and Dan
3  Goldman, who I understood you had stated earlier that the
4  idea came from your conversations, this idea of AZ-WA
5  Investors came from your conversations with them.  Is that
6  correct?
7    A.  Yes.
8    Q.  So when you were originally discussing creating
9  this company, the purpose of which is on Page 1 under
10  Recitals, states, for the purpose of real estate investment.
11    So when you had your conversations about AZ-WA getting
12  into real estate investments, did you discuss how these
13  investments were going to be financed?
14    A.  I was told the investor homes would go in my name.
15    Q.  And was that going to be based on your credit?
16    A.  Yes.
17    Q.  And were you the only investor in the company?
18    A.  No.
19    Q.  Who else was investing in the company?
20    A.  Murphy Pierson.
21    Q.  And was he investing anything other than credit in
22  your discussions?
23    A.  No.
24    Q.  Now you mentioned earlier that there was some
25  pamphlet that was sent out by Michelle Merceri by mail.  Is

Page 39

1  that correct?
2    A.  Yes.
3    Q.  In addition to that pamphlet, are you aware of any
4  other kind of marketing that was done for AZ-WA?
5    A.  No.
6    Q.  Now to your knowledge there was no TV marketing?
7    A.  Not to my knowledge.
8    Q.  What about radio marketing?
9    A.  Yes.
10    Q.  Yes?
11    A.  Yes.
12    Q.  What type of marketing was done by radio?
13    A.  Advertisements.
14    Q.  How often were these advertisements done?
15    A.  I don't know.
16    Q.  Who did these advertisements?
17    A.  Which stations?
18    Q.  Who prepared the advertisements to send them out to
19  the radio stations?
20    A.  Michelle.
21    Q.  And did you discuss what was going to be included
22  in the advertisements?
23    A.  No.
24    Q.  So what did you discuss about this marketing by
25  radio?

Page 40

1    A.  She stated it would be a good vehicle to get the
2  word out about the company.
3    Q.  And do you know how often this was done?
4    A.  No.
5    Q.  Do you know on what stations it was done?
6    A.  I believe I know of one station.
7    Q.  And which station is that?
8    A.  KMPS.
9    Q.  And is that -- do you know where that radio station
10  is?
11    A.  No.
12    Q.  Is it, to your knowledge, in the King County area?
13    A.  Yes.
14    Q.  What about marketing on the Internet, was that
15  discussed?
16    A.  Nothing to me.
17    Q.  And did you ever find out whether there was any
18  marketing done on the Internet?
19    A.  I have never heard of any.
20    Q.  Now please take a look at Page 21.  Are you
21  familiar with the property located at S10515 36th Street
22  East Edgewood, Washington 98372.
23    A.  Please explain to me in the question, the extent of
24  my knowledge of that property?  What are you asking for?
25    Q.  Do you know whether your name was used, for

Page 41

1  example, to purchase that property?
2    A.  I don't believe it was.
3    Q.  Are you familiar with that address?
4    A.  I have never been there.  I remember a home in
5  Edgewood being discussed.
6    Q.  And what were the discussions about?
7    A.  A person, if, if it's this property and I recollect
8  correctly, this person stopped paying their rent
9  disqualifying them from buying their house back.
10    Q.  So if it was discussed in this context, is it safe
11  then to assume it was purchased at some point for the
12  benefit of the company?
13    A.  And the benefit of the owner.
14    Q.  Do you know when the property was acquired?
15    A.  No.
16    Q.  Do you know how the loan was financed for that
17  property?
18    A.  Which finance company?
19    Q.  You stated that it wasn't bought in your name?
20    A.  I don't believe it was.
21    Q.  Do you know for sure?
22    A.  Not positive.
23    Q.  Now do you know about the monthly payments, the
24  mortgage payments?
25    A.  As far as?

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

12 (Pages 42 to 45)

Page 42

1  Q.  That was made by your company?
2  A.  I wasn't in charge of making any payments.
3  Q.  Did you know anything at all about the finances for
4  this address, for this house?
5  A.  As far as amounts, no.
6  Q.  Do you know what happened to that property?
7  A.  I believe he's still living there for free.
8  Q.  So do you know what AZ-WA Investors current
9  interest is in that property?
10  A.  No.
11  Q.  When you mentioned a moment ago that you believe
12  someone is still living there for free, what do you mean?
13  A.  If it's the property that I'm thinking of, that
14  property was owned by the person with the last name of
15  Beckman (phonetic), and he quit paying his rent, and it's my
16  knowledge that he is still residing in that house.
17  Q.  Did you ever receive any money from the, from this
18  real estate transaction dealing with this house?
19  MR. TIFT:  Form of the question, lack of
20  foundation.
21  Q.  Mr. Jones, if this is --
22  A.  I believe so.
23  Q.  Yes?
24  A.  I believe so.
25  Q.  Do you recall how much you received?

Page 43

1  A.  No.
2  Q.  Now what about the second address, 961 20th Avenue,
3  Seattle, Washington 98122, do you know if your credit was
4  used to purchase the house?
5  A.  I don't -- I was never told of that house.
6  Q.  Were you aware -- were you told anything at all
7  about that house?
8  A.  No.
9  Q.  And what about the next address, 22876 Camella Road
10  Northwest, Poulsbo, Washington 98370.
11  A.  I helped clean that house up.
12  Q.  Was your -- in addition to helping to clean up the
13  house, did you have any other role in acquiring that
14  property?
15  A.  I do not remember if my name was used for that
16  house or not.
17  Q.  And what about the fourth address, 908 Park Avenue,
18  Bremerton, 98337?
19  A.  I have no knowledge of that property.
20  Q.  None at all?
21  A.  None at all.
22  Q.  And the next address, 2405 Northeast Denny Way,
23  Bremerton, Washington 98310, do you have any knowledge --
24  A.  I don't have that one.
25  MR. TIFT:  Form of the question objection.

Page 44

1  A.  I don't have that one.
2  Q.  I'm sorry.  Please turn to page 22.  I apologize.
3  A.  I don't have any knowledge of that property.
4  Q.  You never heard anybody, any of the partners
5  discuss that address at any time?
6  A.  No.
7  Q.  And the next house, still on page 22?
8  A.  In Marysville?
9  Q.  Yes, 2104 1405h Place Northeast, Marysville,
10  Washington?
11  A.  Absolutely no knowledge of that property.
12  Q.  And the next address, 7221 East Raintree Lane,
13  Port Orchard, Washington 98366.
14  A.  I cannot answer for certain on that property.  I
15  know nothing about it.
16  Q.  You don't know anything at all about it?
17  A.  The city sounds familiar but the address doesn't.
18  Q.  Does it mean that you know of a property that was
19  invested in by your company in Port Orchard?
20  A.  I believe I remember a property being discussed
21  that was in Port Orchard.
22  Q.  But you don't recall the address.  Is that correct?
23  A.  I don't recall the address.
24  Q.  So it may or may not be this house.  Is that
25  correct?

Page 45

1  A.  That's correct.
2  Q.  What about the next address, 519 Corrin Avenue
3  Northwest, Orting, Washington 98360?
4  A.  I remember an Orting house being discussed.
5  Q.  Was it this address?
6  A.  I believe so.
7  Q.  And did you play any role at all in acquiring the
8  property?
9  A.  I played no role in acquiring the property, no.
10  Q.  Was your name used on the loan?  Was your credit
11  used?
12  A.  I do not know.
13  Q.  What did you -- what do you know about that house?
14  A.  Nothing.
15  Q.  But had you discussed that address with Michelle
16  Merceri?
17  A.  I believe an address in Orting came up in
18  conversation.
19  Q.  And what was discussed about that particular
20  address?
21  A.  That we were looking at a house in Orting.  She was
22  looking at a house in Orting for the partnership.
23  Q.  I'm sorry, can you state that again?  She was
24  looking for what?
25  A.  She was contacted by somebody in Orting asking

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 46

1  about our services. I believe it was this Corrin Avenue,
2  and that's all I know.
3      Q.  And on Page 23 is another address, 850 South
4  326 Street, Federal Way, Washington 98003. Are you familiar
5  with that address?
6      A.  I remember a Federal Way house being discussed. I
7  do not know that address.
8      Q.  Are you aware of more than one house in Federal Way
9  that was discussed by any of the partners?
10     A.  No.
11     Q.  Do you know if your credit was used to purchase
12 this house?
13     A.  It was not.
14     Q.  Do you know whose credit was used to purchase this
15 house?
16     A.  I believe it was Murphy Pierson.
17     Q.  Do you know the current status of that property?
18     A.  No.
19     Q.  Do you know whether AZ-WA Investors currently has
20 an interest in that property?
21     A.  Please define interest for me.
22     Q.  Is there any financial -- let me rephrase it.
23 Is that house currently listed as one of the properties
24 owned by AZ-WA?
25     A.  It was -- I believe it was acquired by AZ-WA and I

Page 47

1  believe it's still in Murphy Pierson's name.
2      Q.  And when it was acquired by AZ-WA, was it acquired
3  under Murphy Pierson's name?
4      A.  Yes.
5      Q.  Now are you familiar with Alternative Investors?
6      A.  Yes.
7      Q.  Please turn to page 30. You will see pages 30 to
8  35 contain the Alternative Investors Limited Partnership
9  Agreement.
10     Take a look at page 45, please. You see page 45 at the
11 top says Signature Page of Operating Agreement. Do you see
12 that?
13     A.  Yes.
14     Q.  And it has under partner, one of the partner names,
15 Shawn C. Jones. Do you see that?
16     A.  Yes.
17     Q.  Is that your name?
18     A.  That is my name.
19     Q.  Is that your signature?
20     A.  I can't say for certain.
21     Q.  Did you ever sign an agreement with Alternative
22 Investors?
23     A.  I don't recall.
24     Q.  You do not recall ever signing an agreement?
25     A.  No.

Page 48

1      Q.  Never?
2      A.  Never.
3      Q.  Do you ever recall having a discussion about
4  becoming a partner in Alternative Investors?
5      A.  Yes.
6      Q.  Do you recall sitting down to sign the agreement to
7  become a partner?
8      A.  No.
9      Q.  Do you have a reason to believe that you will not
10 be a partner in Alternative Investors?
11     A.  I'm a partner in Alternative Investors. I am not
12 sure if that is my signature.
13     Q.  And why are you concerned that this will not be
14 your signature?
15     A.  There have been other occasions I have seen my
16 signature that I have not signed.
17     Q.  But was it your testimony a moment ago that you are
18 a partner in Alternative Investors?
19     A.  Yes, I am.
20     Q.  So how did you first become involved with
21 Alternative Investors then?
22     A.  After dissolving AZ-WA due to lack of cohesion, I
23 discussed with Michelle about starting a second company.
24     Q.  And do you recall when that was, what period of
25 time that was?

Page 49

1      A.  No.
2      Q.  I'm sorry, can you tell me again who it was you had
3  this discussion with?
4      A.  Michelle Merceri.
5      Q.  Anyone else?
6      A.  At that present time, no.
7      Q.  So was it your idea then to start Alternative
8  Investors?
9      A.  I don't recall who first said, let's start another
10 company. It was brought up in conversation. I don't
11 remember -- this was -- I don't remember the progression of
12 the conversation.
13     Q.  But you were in agreement that you should start
14 Alternative Investors?
15     A.  Yes.
16     Q.  And in addition to Michelle Merceri, did you
17 discuss this with Katherine Merceri?
18     A.  No.
19     Q.  What about Mark Merceri?
20     A.  No.
21     Q.  James Aylesworth?
22     A.  Yes.
23     Q.  Now how did you know Mark Merceri at the time that
24 the agreement was signed?
25     A.  I believe I had met him once while at Michelle's

Page 50

1  house on a social basis.
2      Q.  And how did you know James Aylesworth at the time
3  that you reached this agreement?
4      A.  I have known Jim since fifth grade.
5      Q.  Is that in Edmonds?
6      A.  Yes.
7          MR. TIFT:  I thought you said he was a lot older
8      than you.
9      Q.  Have you been friends since fifth grade?
10     A.  Yes.
11     Q.  Now where were you living at the time that this
12  Alternative Investors partnership was reached?
13     A.  I would have been up here, because I believe it was
14  done face to face, but I was -- I go back and forth between
15  the two states.
16     Q.  And?
17     A.  It rains here a lot.
18     Q.  Yes.  Now what was your occupation at the time that
19  the agreement was signed?
20     A.  Unemployed.
21     Q.  Was there a financial contribution that was
22  required to become a partner in Alternative Investors?
23     A.  No.
24     Q.  Was there a nonmonetary contribution that was
25  required in order to become a partner in Alternative

Page 51

1  Investors?
2      A.  It was the same role -- I had the same role in
3  Alternative Investors as I did in AZ-WA.
4      Q.  Which was what?
5      A.  Use my credit, and if a property needed some work,
6  I would go work on it.
7      Q.  What about the contributions of Michelle Merceri,
8  what was discussed in terms of what she was going to
9  contribute to the company?
10     A.  Similar to AZ-WA, she did the selling, buying,
11  marketing, bookkeeping, the dealing with customers, or
12  potential customers, chief cook and bottle washer.  She
13  handled all the business affairs of Alternative Investors,
14  also bringing in Focus Mortgage because we needed a mortgage
15  company to complete the transactions.
16     Q.  And what about Katherine Merceri, what was going to
17  be her contribution to Alternative Investors?
18     A.  She worked in Michelle's office, so helping with
19  the paperwork.
20     Q.  And Mark Merceri's contribution?
21     A.  He was supposedly working in Michelle's office and
22  he would help with some property cleanup.
23     Q.  Now James Aylesworth, what was his contribution to
24  this company?
25     A.  Investor and property maintenance, fix-up.

Page 52

1      Q.  And what was he going to invest in the company?
2      A.  His credit.
3      Q.  Now you mentioned a moment ago that you were
4  unemployed at the time the agreement was signed.  Is that
5  correct?
6      A.  That's correct.
7      Q.  So how did you support yourself?
8          MR. TIFT:  Form of the question objection.  Is that
9      relevant to anything in --
10         MS. CAMACHO:  I think it is.
11         Please answer the question.
12     A.  I'm good at saving.
13     Q.  Now what was going to be your percentage of the
14  interest in Alternative Investors?
15     A.  20 percent.
16     Q.  What about Michelle Merceri?
17     A.  20 percent.
18     Q.  Katherine Merceri?
19     A.  20 percent.
20     Q.  Mark Merceri?
21     A.  20 percent.
22     Q.  James Aylesworth?
23     A.  20 percent.
24     Q.  And what was going to be the purpose of Alternative
25  Investors?

Page 53

1      A.  The exact same thing as AZ-WA, purchase the homes,
2  keep the people from losing them, keep a roof over their
3  head, provide them the opportunity to restore their
4  financial wherewithal to buy the house back at the
5  predetermined price that we purchased it for.
6      Q.  At the exact same amount?
7      A.  Exact same amount.
8      Q.  Now where were you planning to make this real
9  estate investments?  Was it in the state of Washington?
10     A.  Yes.
11     Q.  What about in Arizona?
12     A.  No.
13     Q.  Now please look at Page 32.  Under Article 2,
14  Section 2.2, Principal Office, do you see that section?
15     A.  Uh-huh, yes.
16     Q.  Is says, The company shall maintain its principal
17  place of business at 8338 Northeast 28th Street, Redmond,
18  Washington 98052-5904 in Washington and 21535 North 72nd
19  Place, Scottsdale, Arizona 85255, or other location selected
20  by the partners.
21         Was that discussed with --
22     A.  I have never seen that nor discussed, nor did I put
23  that on the page.
24     Q.  And --
25     A.  That was a private residence.

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

15 (Pages 54 to 57)

Page 54

1    Q.  And whose residence was that?
2    A.  Mine.
3    Q.  Please look at Page 3.  Under Section 2.2,
4  Principal Office:  The company shall maintain its principal
5  place of business at 18338 Northeast 28th Street, Redmond,
6  Washington 98052-5904 in Washington and 21535 North 72nd
7  Place, Scottsdale, Arizona 85255, or any other location
8  selected by the partners.  Is that also your residence?
9    A.  Yes.
10   Q.  Was it your testimony earlier that AZ-WA was to do
11 business both in Washington and Arizona?
12   A.  We contemplated doing business in Arizona depending
13 on how things went, which may have been why I'm assuming
14 Michelle Merceri, when she did this form, that's why she put
15 that address.  Like she used her home address, she used my
16 home address.
17   Q.  Now since the Alternative Investors agreement went
18 into effect, and according to this agreement on page 30, it
19 says that this, at the top, This agreement is made and
20 entered into as of May 9, 2005.  Was that correct?
21   A.  I do not remember the date.  It could be.
22   Q.  It could be.  Now who drafted this agreement for
23 Alternative Investors?
24   A.  Michelle Merceri.
25   Q.  And how was, in your mind, how was Alternative

Page 55

1  Investors going to be different from AZ-WA?
2    A.  I didn't believe there would be any difference.
3    Q.  Now was it your understanding that by the time this
4  agreement was signed, AZ-WA was no longer in business?
5    A.  It was not a functioning company any longer.  There
6  may have still been some properties to deal with, I don't
7  know, but there were no, AZ-WA was no longer acquiring
8  anything.
9    Q.  Did you discuss with your partners whether anyone
10 was taking steps to dissolve the company AZ-WA?
11   A.  No, because Michelle had organized everything.  I
12 entrusted her to, and her expertise that she claimed she had
13 in forming companies, that she would take the appropriate
14 steps to dissolve the company.
15   Q.  So was it your understanding then at the time that
16 you signed that agreement that only Alternative Investors
17 would be in business?
18   A.  Yes.
19   Q.  And to the extent that there were still houses that
20 were originally purchased by AZ-WA, did you discuss with
21 Michelle Merceri or any of the other partners in AZ-WA what
22 was going to happen to those houses?
23   A.  Yes.
24   Q.  And what was going to -- what was going to --  what
25 was decided with regard to those properties?

Page 56

1    A.  She said she was working on either of the people
2  buying them back or -- I don't remember the status of each
3  property, if the original owners were still in it or if we
4  even -- I don't know which properties we had at the time.
5    Q.  Now does Alternative Investors have any employees?
6    A.  It was constructed the same way as AZ-WA.
7    Q.  Meaning?
8    A.  Five partners.
9    Q.  Have you contributed anything in terms of money
10 toward Alternative Investors since that agreement went into
11 effect?
12      MR. TIFT:  I'm going to object to the form of the
13 question.  Are you asking if he put money into the
14 company?
15      MS. CAMACHO:  Yes.
16   A.  I did not put money into the company.
17   Q.  What about Michelle Merceri, did she put any money
18 into the company?
19   A.  Not to my knowledge.
20   Q.  Katherine Merceri?
21   A.  Not to my knowledge.
22   Q.  Mark Merceri?
23   A.  Not to my knowledge.
24   Q.  James Aylesworth?
25   A.  He didn't make a contribution to the company.

Page 57

1    Q.  I'm sorry, what did you say?
2    A.  He did not make a financial contribution to the
3  company.
4    Q.  To the company.  Did he make any other kind of
5  contribution?
6    A.  He worked on properties, cleanup.
7    Q.  Did he make any other kind of contributions other
8  than cleaning up?
9    A.  No.
10   Q.  What about you, Mr. Jones, did you make any other
11 contributions besides money, which you stated a moment ago
12 that you didn't contribute?
13   A.  One more time.
14   Q.  Was there anything other than money that you
15 contributed toward Alternative Investors?
16   A.  Money and working in the yards.  Other than that,
17 no.
18   Q.  Working in the yards?
19   A.  Well, working on the houses, property cleanup.
20   Q.  What about Michelle Merceri?
21   A.  Not that I know of.
22      MR. TIFT:  Counsel, can we go off the record for a
23 moment?
24      MS. CAMACHO:  Yes.
25      (Discussion off the record.)

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 58

1      (Recess.)
2      (Requested testimony read by the court reporter.)
3      Q.   Mr. Jones, let me ask you about your contributions
4    toward Alternative Investors.  Have you contributed anything
5    other than cleaning up or credit toward the properties
6    purchased by Alternative Investors?
7      A.   One more time?
8      Q.   Have you contributed anything other than credit,
9    your credit, or cleaning up toward the houses purchased by
10   Alternative Investors?
11     A.   Because the three other partners besides Jim and
12   myself ran for the hills leaving us with these homes, Jim
13   and I were forced to put in personal money to try to keep
14   these homes afloat.
15     Q.   And how much money did you contribute towards
16   saving these homes?
17     A.   I cannot give a certain amount.
18     Q.   Do you have an estimate?
19     A.   Somewhere between 15 and $20,000.
20     Q.   Is that the total?
21     A.   It's an estimate.
22     Q.   And for what properties were you contributing this
23   money?
24     A.   I don't know.
25     Q.   And when did you pay 15 to $20,000 toward payment

Page 59

1    of these properties, a period of time?  Was it this year,
2    last year, the year before?
3      A.   It would have been prior to and a little bit after
4    July of '08.
5      Q.   Around July 2008?
6      A.   Yes.
7      Q.   And now you mentioned a moment ago that this was
8    something that both you and Mr. Aylesworth had done.  Do you
9    know, have an estimate of how much he contributed?
10     A.   No, I don't.
11     Q.   Or for what properties?
12     A.   I couldn't give you a list of those.
13     Q.   What about time period when he may have
14   contributed?
15     A.   Same time period as mine.
16     Q.   Now before we move on I want to clarify some things
17   that you said earlier.
18         Now if I recall correctly, you stated that the idea of
19   Alternative Investors and AZ-WA, it sounded like it was the
20   same concept?
21     A.   Correct.
22     Q.   Was to purchase property from families that were in
23   financial trouble?
24     A.   Uh-huh, yes.
25     Q.   And give them time to recover?

Page 60

1      A.   Yes.
2      Q.   And if I understood correctly, that was about a
3    year?  That was your understanding?
4      A.   As a general rule.
5      Q.   And then at the end, give those families the
6    opportunity to purchase the home at the same amount that you
7    sold it?
8      A.   That is correct.
9      Q.   Excuse me, that they sold it to you?
10     A.   Yeah, that's correct.
11     Q.   So how were you going to make money?
12     A.   To go back with the original scenario that I gave
13   you, the $200,000 house, they owe 150, you buy it for 175,
14   you cash out the note at the 150, so you've made that
15   $25,000, and then they buy it back from you at 175, still
16   retaining some equity in their home and keeping their home.
17     Q.   And they would keep the equity?
18     A.   The 175 to the 200, absolutely.
19     Q.   So they would keep part of the equity?
20     A.   Absolutely.
21     Q.   So I just wanted to clarify on, when we discussed
22   the Alternative Investors agreement, which you recognize
23   that you are a partner, or were a partner of Alternative
24   Investors.  Is that correct?
25     A.   I'm a partner of Alternative Investors.

Page 61

1      Q.   But you mentioned that you are not sure if the
2    signature on page 45, which is above your name, is your
3    signature.  Is that correct?
4      A.   I am not positive that is my signature.
5      Q.   And has there been a problem with anybody forging
6    your name, your signature?
7      A.   Yes.
8      Q.   And when has that happened?  Do you have documents
9    that, where your signature has been forged?
10     A.   Yes.
11     Q.   And what documents are those?
12     A.   Mortgage documents.
13     Q.   On what properties?
14     A.   I would have to look at them, which I have, but I
15   don't remember which ones were forged.  We have records at
16   the office.
17     Q.   About how many times was your signature forged, to
18   your knowledge?
19     A.   That I know of, five, six, seven.  I believe
20   there's more than that.
21     Q.   And by five, six, seven times, do you mean the
22   number of times that your signature was forged on documents
23   or the number of properties on which your signature was
24   forged?
25     A.   I'm including refies that I had no knowledge of.

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

17 (Pages 62 to 65)

Page 62

1   So there was the original house, which was a forgery, and
2   then the refi was another forgery, so I would count that as
3   two.
4       Q.   So two refies plus some other potential properties
5   that you're aware of?
6       A.   No, no.
7           MR. TIFT:  Form of the question objection.  It
8   doesn't accurately characterize his testimony.
9       Q.   Let me rephrase the question.
10      You believe that your name has been, your signature has
11  been forged on some mortgage documents.  Is that correct?
12      A.   Absolutely certain of it.
13      Q.   And it is your belief that that forgery has
14  occurred both in refinancing loans as well as original
15  loans.  Is that correct?
16      A.   That is my belief.
17      Q.   Now when we were discussing the change between
18  AZ-WA to Alternative Investors, you testified, correct me if
19  I'm wrong, that the discussion, you left the discussion of
20  both the formation of the company as well as the dissolution
21  of AZ-WA to Michelle Merceri.  Is that correct?
22      A.   That's correct.
23      Q.   And it was your testimony that she had expertise in
24  forming companies.  At least that was what you were led to
25  believe.  Is that correct?

Page 63

1       A.   By her statements she said she had expertise in
2   starting companies as well as subprime mortgage, going so
3   far as to say she helped write the rules, guidelines,
4   boundaries of subprime mortgages for the state of
5   Washington.
6       Q.   She mentioned that to you?
7       A.   Yes.
8       Q.   Personally and directly --
9       A.   Yes.
10      Q.   -- when discussing AZ-WA Investors?
11      A.   Some of that may have come up before AZ-WA just in
12  knowing her, the friendship part.  I believe I heard her
13  state something about the subprime rules to a potential
14  client.
15      Q.   And do you recall who that client was?
16      A.   No, I do not.
17      Q.   Now since Alternative Investors, the agreement went
18  into effect, have you received any money from the company?
19      A.   Did I make any money with Alternative Investors?
20      Q.   Yes.
21      A.   Yes.
22      Q.   And do you have an estimate of how much you made?
23      A.   No, I don't.
24      Q.   And do you -- was it again by real estate
25  transaction when you would get a check?

Page 64

1       A.   Yes.
2       Q.   And do you have any recollection of about how many
3   times you received a check for Alternative Investors?
4       A.   No.
5       Q.   And was it similar to AZ-WA in that Michelle
6   Merceri will call you or speak with you and tell you, I'm
7   about to send you a check?
8       A.   There were many times she would direct deposit.
9       Q.   And do you recall what the largest amount of money
10  was deposited in your bank account?
11      A.   Approximately.
12      Q.   Approximately.  And do you recall approximately how
13  much that was?
14      A.   There was one transaction that was about $17,000.
15  But that was not the rule.  That was the exception.
16      Q.   And do you know what that transaction was for?
17      A.   Yes.
18      Q.   What was it for?
19      A.   House on Mercer Island, last name of Dodd.
20      Q.   Do you know whether Michelle Merceri received a
21  similar amount?
22      A.   At the time of the transaction I believed she
23  received a similar amount plus the Focus Mortgage part.
24      Q.   And since then have you changed your mind about how
25  much she received?

Page 65

1       A.   I have some suspicions.
2       Q.   And how much do you think she received?
3       A.   I can only give an estimate of some gray area.  I
4   don't know if she received it or not.
5       Q.   And what gray area is this, Mr. Jones?
6       A.   Probably about $200,000.
7       Q.   And what do you base this estimate on?
8       A.   Paperwork seen at a much later time.
9       Q.   And do you have some of that paperwork?
10      A.   I believe there's some in the office.
11      Q.   And is that based only on that transaction for the
12  Mercer Island house?  That 200 figure that you're
13  calculating, is that based only on that one transaction?
14      A.   Yes.
15      Q.   What about Katherine Merceri, do you know how much
16  she received from that transaction?
17      A.   She would have received the same amount, and I
18  think Michelle was also paying her on the Focus Mortgage
19  side.
20      Q.   And by the same amount, do you mean 200,000 though
21  or 17,000?
22      A.   17,000.
23      Q.   And Mark Merceri?
24      A.   17,000.
25      Q.   And James Aylesworth?

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 66

1    A.  17,000.
2    Q.  Now how frequently have you communicated or did you
3  communicate with Michelle Merceri about the Alternative
4  Investors finances?
5    A.  Since which date?
6    Q.  Since the agreement went into effect.
7    A.  I'm unable to say.
8    Q.  Was it every month, every -- once a year?
9    A.  We spoke daily, sometimes twice a day on a
10 friendship level, so it would be impossible to say when she
11 may or I asked interjection about financial wherewithal.
12   Q.  And was it customary for you to discuss business
13 when you were speaking daily on a friendship basis?
14   A.  No.
15   Q.  Did you communicate with anyone else other than
16 Ms. Merceri, including Katherine Merceri, or any of the
17 other partners about the finances for Alternative Investors?
18   A.  Interworkings of the company, no.  Maybe check size
19 with Jim Aylesworth.
20   Q.  And how often did the two of you discuss the check
21 size?
22   A.  Well, being friends, we spoke often, so I cannot
23 say how many conversations we had about check size.
24   Q.  Now you mentioned that you received a check in the
25 amount of $17,000 for the house on Mercer Island.  Do you

Page 67

1  have an estimate of how much money you received overall
2  since Alternative Investors went into business?
3    A.  No, I do not.  I want to stress, that was an
4  exception.
5    Q.  I understand.
6    Have you filed taxes the last three years?
7    A.  Yes.
8    Q.  Now I want to ask you about your role.  Do you
9  recall the first property that, the first real estate
10 transaction for Alternative Investors?
11   A.  I don't recall the first one.
12   Q.  Did you have a role in identifying any of the
13 properties that would become the real estate transactions?
14   A.  When you say identify, I need you to be more
15 specific on identify.
16   Q.  How did Alternative Investors find the houses that
17 became real estate investments for Alternative Investors?
18   A.  To my knowledge, it was through the mailers and
19 possibly radio.  I don't know if we were using it with the
20 second company for sure.
21   Q.  Radio.  What about TV?
22   A.  Not that I know of.
23   Q.  Internet?
24   A.  Not that I know of.
25   Q.  Take a look, please, at Page 46.  Do you know who

Page 68

1  prepared this pamphlet?
2    A.  I believe it was Michelle Merceri since she was in
3  charge of marketing.
4    Q.  Had you seen it before?
5    A.  This is the first time I have seen this.
6    Q.  The very first time?
7    A.  Very first time.
8    Q.  Do you know -- take a look at that third line that
9  says, To find out more about our system and what it can do
10 for you, give us a call.  In just a few minutes you will
11 understand how the program works.
12   Do you know what was meant by the program?
13   A.  I believe I know what is meant by the program.
14   Q.  And what do you think it means?
15   A.  It means we purchase the house and sell it back at
16 our purchase price.
17   Q.  And what about that paragraph in the corner that
18 says, We have helped over 100 families get out from under
19 the threat of foreclosure.  Our team of Alternative
20 Investors is motivated to come up with a solution that fits
21 your needs.
22   Do you know how many families were, agreed to sell their
23 houses to Alternative Investors?
24   A.  I have absolutely no idea how many people agreed to
25 it.

Page 69

1    Q.  And did you discuss this, the content of this
2  pamphlet with any of the Alternative Investors' partners at
3  any point before this went out?
4    A.  Like I said, I have never seen this before.
5    Q.  And that number says on the side, Give us a call
6  today, available seven days a week, 888-362-8755.  Do you
7  see that?
8    A.  Uh-huh.  Yes.
9    Q.  Do you know whose number that is?
10   A.  I believe it was an 800 number that terminated into
11 her cell phone, which is the number above.
12   Q.  And by her cell phone, who do you mean?
13   A.  Michelle.
14   Q.  Michelle Merceri.  And did you know that she had
15 this 800 number?
16   A.  I believe I knew of an 800 number.  I never knew
17 the number.
18   Q.  And had you discussed with her this 800 number,
19 whether she -- how did you find out there was an 800 number?
20 That's my question.
21   A.  I can't recall how I knew that she had an 800
22 number.
23   Q.  Now take a look at 47.  Who prepared this document,
24 do you know, this pamphlet?
25   A.  I would assume Michelle since she was doing the

Page 70

1   marketing.
2       Q.  Did you ever discuss this pamphlet, this marketing
3   pamphlet with her?
4       A.  She had mentioned what types of things were going
5   to go on the pamphlet or a pamphlet.  We never discussed the
6   pamphlet.
7       Q.  And what kinds of things were going to be on the
8   pamphlet based on your conversation with her?
9       A.  That I cannot recall with certainty.
10      Q.  Let's look at the first paragraph where it says,
11  The threat of losing your home.  The last sentence, Our
12  solution will allow you and your family to stay in your
13  home.
14      Did you discuss putting this in with Michelle Merceri,
15  this kind of language?
16      A.  The formation of the company states, that when we
17  talked, we buy the home, you stay in it, you buy it back.
18      Q.  The formation of the company says that?
19      A.  Well, the scenario I gave you on the 200,000 says
20  that.  We buy your home before you lose it, you stay in the
21  house, and in a year, or approximately that time frame, you
22  buy the house back.  So they're staying in their home.
23      Q.  And earlier you had mentioned that you had had a
24  verbal discussion about a similar example.  Did you have
25  anything in writing to that effect?

Page 71

1       A.  I don't have anything in writing regarding the
2   marketing of Alternative Investors or AZ-WA.
3       Q.  Looking back at page 47, on the second paragraph,
4   second line says, This will help your family keep you in
5   control of your property.  With this method you will be able
6   to save your home from foreclosure, rebuild your credit and
7   even recapture some of your equity you've worked so hard to
8   earn.
9       Was this what -- is this what you discussed with
10  Michelle Merceri about marketing?
11      A.  We didn't discuss marketing.  We discussed how the
12  company would function, and that covers my understanding of
13  how the company was supposed to function.
14      Q.  And likewise the third paragraph, Over the past
15  couple years we were able to help over 100 families get out
16  from under the threat of foreclosure.
17      Do you know where that comes from?
18      A.  That was never discussed.
19      Q.  The second paragraph -- before that, there's a
20  line, This will cost you absolutely nothing.  Was that
21  discussed?
22      A.  In the formation of the company but not in a
23  marketing sense, because it cost them absolutely nothing.
24      Q.  And that next paragraph, Our system is designed so
25  that you won't have to pay anything up front while our team

Page 72

1   at Alternative Investors designs a restructure program.
2       Was that also discussed in the formation of the company?
3       A.  Yes.
4       Q.  Now where it says, You need to give us a call.  In
5   just a few minutes you will understand how the program
6   works.  You will see it is a fair agreement that works for
7   both.
8       Was that also a part of your discussion in the formation
9   of the company?
10      A.  No.
11      Q.  And this 800 number, is that the same 800 number
12  that you think may be Michelle Merceri's?
13      A.  Again I can't -- I couldn't give you the
14  800 number.  I knew she had an 800 number.
15      Q.  Now Mr. Jones, was it your understanding then that
16  the real estate investments that Alternative Investors was
17  going to become involved in would be identical to the real
18  estate investments that AZ-WA was involved in?
19      MR. TIFT:  Form of the question objection.
20      A.  I'm going to ask that you restate the question,
21  because I'm not sure what you're getting at.
22      Q.  So what type of real estate investments was
23  Alternative Investors going to become involved in based on
24  your discussions about the formation of Alternative
25  Investors with the other partners?

Page 73

1       MR. TIFT:  Form of the question objection, asked
2   and answered.
3       MS. CAMACHO:  Please answer.
4       A.  It was formed exactly like AZ-WA where you purchase
5   the home before the people are going to lose it and be out
6   on the street.  They're able to stay in their house and buy
7   it back at the same price that we purchased it for.
8       Q.  Please take a look at Page 48.  Pages 48 through
9   51, beginning on Page 48, it says, Fixed assets in the -- at
10  the top it says Assets, then fixed assets.  Do you see that?
11      A.  Yes.
12      Q.  And then it says, 1320 Bothell/Geston 2nd,
13  1340 Tacoma/Briones, and so on.  Do you see that?
14      A.  Yes.
15      Q.  Now I'm assuming that 1320, 1340, 1350, 1360,
16  1370, 1380, 1390, 1400, and next page, 4010 and 1420, are
17  describing properties in which Alternative Investors was
18  involved.  Is that your understanding.
19      MR. TIFT:  Form of the question objection, lack of
20  foundation.
21      A.  They do not all look familiar to me.
22      Q.  Do some of them look familiar to you?
23      A.  Some of them do.
24      Q.  Which ones look familiar to you?
25      A.  Which ones do?

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

Page 74

1    Q.   Yes.
2    A.   1320, 1350, 1360, 1380, 1390, 1400, 1410, 1420.
3    Q.   Now 1410 lists Fortune/Bellevue.  Do you see that?
4    A.   Yes.
5    Q.   Are you familiar with the property located at
6  5623 129th Avenue Southeast in --
7    A.   I have never -- go ahead.  I thought you were done.
8    Q.   Are you familiar with the property that is the
9  subject of this litigation?
10    A.   I have never been to the property.  I don't know
11  anything about the transaction, but I'm aware of the
12  litigation.
13    Q.   And prior to the litigation, were you aware of the
14  property?
15    A.   I was aware of the property, that we acquired a
16  property in Bellevue.
17    Q.   And did you ever have a conversation about the, I'm
18  going to refer to this property as the Handlin property,
19  about the Handlin property with Michelle Merceri?
20    A.   Yes.
21    Q.   And what did you discuss with Michelle Merceri
22  about the Handlin property?
23    A.   That it would go into Murphy's name, Murphy
24  Pierson.
25    Q.   And do you recall when you had this discussion with

Page 75

1  Michelle Merceri about the Handlin house?
2    A.   I do not recall the date.
3    Q.   And do you recall discussing why the house would go
4  into Murphy Pierson's name?
5    A.   Because Jim did not want to do this property.  He
6  saw something in it he didn't like, and my, I believe my
7  credit was full with stuff I knew about, and some that I
8  didn't, and so she asked if Murphy would want to do this
9  again, and so I approached Murphy Pierson and he reluctantly --
10  he said yes.
11    Q.   So if I understand correctly, you, Mr. Aylesworth
12  and Mr. Pierson provided credit that could be used to
13  purchase these houses?
14    A.   That's correct.
15    Q.   And who decided, typically, which house was going
16  to be under whose name?
17    A.   It was rotated.
18    Q.   And how was it rotated?
19    A.   Murphy and Jim were never in the same partnership,
20  so it was either rotated between Murphy and I or Jim and I,
21  of the properties I know about.
22    Q.   And was it Michelle Merceri who approached you or,
23  once a property was identified?
24    A.   Yes.
25    Q.   What about Katherine Merceri, did she ever discuss

Page 76

1  this rotation with you or anybody else?
2    A.   No.
3    Q.   So did you have a role in acquiring the Handlin
4  property?
5    A.   No.
6    Q.   To your knowledge then, how was the loan financed
7  to purchase the property?
8    A.   In Murphy Pierson's name.
9    Q.   And then was it acquired for Alternative Investors
10  or AZ-WA?
11         MR. TIFT:  Form of the question objection, lack of
12  foundation.
13    A.   I believed it was under Alternative Investors.
14    Q.   Now --
15    A.   But Murphy was never part of Alternative Investors,
16  so...
17    Q.   I see.
18         MR. TIFT:  I don't.
19    Q.   But Murphy Pierson was in regular communication
20  with you.  There was this regular rotation between you and
21  Murphy Pierson or you and Mr. Aylesworth?
22    A.   Murphy and I rotated in AZ-WA.  Jim and I rotated
23  in Alternative Investors.  Jim was smarter than us and
24  started suspecting things quicker and didn't want any more
25  part of it.  He quit before this property.  He shouldn't be

Page 77

1  here.  He quit.  So Murphy stepped in and we put it in
2  Murphy's name.
3    Q.   And when you spoke with Michelle Merceri about
4  Murphy Pierson, using his credit to purchase the Handlin
5  property, was there a discussion about whether Murphy
6  Pierson was now part of one of the partners in Alternative
7  Investors?
8    A.   We never had that discussion, no.
9    Q.   What was your understanding then about who he was
10  purchasing the property for?
11    A.   For Alternative Investors.
12    Q.   Now do you know how much -- do you know what the
13  mortgage payment was for this property?
14    A.   I do not know an exact amount.
15    Q.   Do you know who paid the mortgage for this?
16    A.   Who paid the bank?
17    Q.   Yes.
18    A.   The checks were cut by either Kathy or Michelle.
19    Q.   And what funding was used to pay the loan?
20    A.   It was my understanding that the residence were
21  supposed to pay a certain amount and there was some money
22  set aside to help supplement that.  Then it was dumped in
23  Murphy's lap because they couldn't make their payments, any
24  of them, from what I understand.  And when I asked Michelle
25  where the supplemental money was, she said she used it for

MARLIS J. DeJONGH & ASSOCIATES
206-583-8711

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

21 (Pages 78 to 81)

---

Page 78

1 other properties.
2     Q. So let me ask you about the supplemental amount.
3 Where did that supplemental amount come from?
4     A. I wasn't involved in the paperwork so I don't know.
5     Q. When you discussed this supplemental amount with
6 Michelle Merceri, did you know how much that was?
7     A. I believe it was approximately $30,000.
8     Q. But you don't know where that money was coming
9 from?
10     A. I believe it came out of Michelle's mortgage
11 financing. I don't know. I don't understand the mortgage
12 industry.
13     Q. Did you or any of the other -- did you receive any
14 money from this transaction?
15     A. I believe I did.
16     Q. And how much did you receive?
17     A. I don't have a recollection of the amount.
18     Q. And do you know if you received a check more than
19 once regarding this property?
20     A. It was one check.
21     Q. And do you know, do you remember around the time
22 when you got this check?
23     A. It would be around the transaction time of that
24 property.
25     Q. And this one check that you received, what did you

---

Page 79

1 think that was for?
2     A. That property.
3     Q. Was it a profit based on -- what did you think the
4 money was for?
5     A. It was similar to that $200,000 scenario I gave
6 you, part of that $25,000 between 150 and 175.
7     Q. Do you know if James Aylesworth received any money
8 from this transaction?
9     A. He did not.
10     Q. And how do you know that?
11     A. Because he was not part of that transaction.
12     Q. Were you part of that transaction?
13     A. I was not part of the transaction. I didn't do any
14 of the paperwork. I didn't ever meet the people nor see the
15 house, but I received a check.
16     Q. So what is it that James Aylesworth -- let me
17 rephrase the question.
18     What is it you did different from James Aylesworth that
19 allowed you to get the check from this transaction?
20     A. James Aylesworth quit the company.
21     Q. He left the partnership?
22     A. He left the partnership.
23     Q. Was that -- how was that done by Mr. Aylesworth?
24 Was he --
25     A. He said, I'm not putting this house in my name, and

---

Page 80

1 it was his, technically it was his turn, so when he didn't
2 do it, that's when Murphy came in.
3     Q. So was Murphy Pierson then taking Mr. Aylesworth's
4 place? Is that how you saw it?
5     A. In what manner do you mean that?
6     Q. A moment ago you stated that Mr. Aylesworth left
7 the company because he was not part of this transaction
8 or --
9     A. Right.
10     Q. -- or that he refused to be part of this
11 transaction. Did I understand that correctly?
12     A. Yes, you did.
13     Q. And because Mr. Aylesworth refused to be part of
14 this transaction, I understood your testimony to be that
15 Murphy Pierson then came in?
16     A. Correct.
17     Q. Yes?
18     A. Correct.
19     Q. So then my question is, was it your understanding
20 that when Murphy Pierson was coming in he was replacing
21 Mr. Aylesworth as a partner?
22     A. That was --
23     MR. TIFT: Form of the question objection. Go
24 ahead.
25     A. It was never discussed. It was, Murphy, do you

---

Page 81

1 want to put this house in your name. That was it.
2     MR. TIFT: You're turning pages. Can we talk about
3 the time for a minute?
4     MS. CAMACHO: Yes.
5     (Discussion off the record.)
6     (The deposition recessed at 4:00 p.m.)
7     (Signature reserved.)

---

DEPOSITION OF SHAWN CASEY JONES, 12/17/09

22 (Pages 82 to 83)

Page 82

1        CORRECTIONS
2
3    PLEASE MAKE ALL CORRECTIONS, CHANGES OR CLARIFICATIONS TO
     YOUR TESTIMONY ON THIS SHEET, NOT IN THE TRANSCRIPT ITSELF,
4    SHOWING PAGE AND LINE NUMBER AND THE NATURE OF THE CHANGE.
     IF THERE ARE NO CHANGES, WRITE "NONE" ACROSS THE PAGE.
5    PLEASE SIGN THIS SHEET AND RETURN WITHIN 30 DAYS TO THE
     ATTENTION OF LETICIA CAMACHO, ESQ., 401 SECOND AVENUE SOUTH,
6    SUITE 407, SEATTLE, WA 98104 FOR FILING WITH THE ORIGINAL
     TRANSCRIPT.
7
     PAGE   LINE    CORRECTION AND REASON
8
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24
25        _____
          SHAWN CASEY JONES

Page 83

1        REPORTER'S CERTIFICATE
2
3    STATE OF WASHINGTON   )
                           )  ss.
4    COUNTY OF KING        )
5
6         I, MARLIS J. DeJONGH, CCR, RPR, a Notary Public in
7    and for the State of Washington, do hereby certify:
8    That prior to being examined, the witness named in the
9    foregoing deposition was duly sworn to testify the truth,
10   the whole truth and nothing but the truth;
11        That said deposition was taken down by me in
12   shorthand at the time and place therein named and thereafter
13   transcribed by means of computer-aided transcription, and
14   that the foregoing transcript contains a full, true and
15   verbatim record of the said deposition;
16        I further certify that I have no interest in the
17   event of the action.
18        WITNESS my hand and seal this 26th day of December,
19   2009.
20
21
          Notary Public in and for the State
22        of Washington, residing in Seattle.
          My commission expires 01/2012.
23        Lic. No. DE-JO-NM-J498K9
24
25

MARLIS J. DeJONGH & ASSOCIATES
206-583-8711